**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Case Number 1:21-cr-00053-CJN |
| EDWARD JACOB LANG, | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES' RESPONSE IN OPPOSITION TO**
**DEFENDANT LANG'S MOTION TO DISMISS COUNT**
**NINE: OBSTRUCTION OF AN OFFICIAL PROCEEDING**

The United States of America respectfully submits that this Court should deny defendant Edward Jacob Lang's motion, ECF 54, seeking dismissal of Count Nine of his superseding indictment, which charges his violation of 18 U.S.C. § 1512(c)(2).  The motion effectively seeks a pretrial determination of the sufficiency of the evidence for Count Nine, which is not the proper function of a motion to dismiss.  Moreover, while pursuing relief under this Court's decision in *United States v. Miller*, 1:21-cr-119-CJN, 2022 WL 823070, (D.D.C. Mar. 7, 2022), the motion disregards one of its rulings and demands, without analysis or discussion, dismissal under a theory rejected in *Miller* and every other decision where the same theory has been raised.  Although the defendant also pursues dismissal for additional reasons consistent with *Miller*, his motion still fails, if only because, even under the portion of *Miller* consistent with the defendant's interpretation of Section 1512(c)(2), the wording of Count Nine does not indisputably show that the prosecution is unable to meet *Miller*'s requirements.  Accordingly, and for the reasons stated below, this Court should decline to dismiss Count Nine.

**BACKGROUND**

The charges in this case followed from events described in *Trump v. Thompson*, 20 F.4th

1

10, 17-18 (D.C. Cir. 2021):

> On November 3, 2020, Americans elected Joseph Biden as President, giving **him** 306 electoral college votes. Then-President Trump, though, refused to concede, claiming that the election was "rigged" and characterized by "tremendous voter fraud and irregularities[.]" President Donald J. Trump, *Statement on 2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Dec. 7, 2021). …

> As required by the Twelfth Amendment to the Constitution and the Electoral Count Act, 3 U.S.C. § 15, a Joint Session of Congress convened on January 6, 2021 to certify the results of the election. 167 CONG. REC. H75–H85 (daily ed. Jan. 6, 2021). In anticipation of that event, President Trump had sent out a Tweet encouraging his followers to gather for a "[b]ig protest in D.C. on January 6th" and to "[b]e there, will be wild!" Donald Trump (@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM) ("Statistically impossible to have lost the 2020 Election.").

> Shortly before noon on January 6th, President Trump took the stage at a rally of his supporters on the Ellipse, just south of the White House. … During his more than hour-long speech, President Trump reiterated his claims that the election was "rigged" and "stolen," and urged then-Vice President Pence, who would preside over the certification, to "do the right thing" by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden. *See* Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32–3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification (last accessed Dec. 7, 2021) ("January 6th Rally Speech"). Toward the end of the speech, President Trump announced to his supporters that "we're going to walk down Pennsylvania Avenue * * * to the Capitol and * * * we're going to try and give our Republicans * * * the kind of pride and boldness that they need to take back our country." *Id.* at 4:42:00–4:42:32. Urging the crowd to "demand that Congress do the right thing and only count the electors who have been lawfully slated[,]" he warned that "you'll never take back our country with weakness" and declared "[w]e fight like hell and if you don't fight like hell, you're not going to have a country anymore." *Id.* at 3:47:20–3:47:42, 4:41:17–4:41:33.

> Shortly after the speech, a large crowd of President Trump's supporters—including some armed with weapons and wearing full tactical gear—marched to the Capitol and violently broke into the building to try and prevent Congress's certification of the election results. *See Capitol Attack* Senate Report at 23, 27–29. The mob quickly overwhelmed law enforcement and scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol. *Id.* at 24–25. Police officers were attacked with chemical agents, beaten with flag poles and frozen water bottles, and crushed between doors and throngs of rioters. *Id.* at

28–29; *Hearing on the Law Enforcement Experience on January 6th Before the H. Select Comm. to Investigate the January 6th Attack on the U.S. Capitol*, 117th Cong., at 2 (July 27, 2021) (statement of Sgt. Aquilino A. Gonell, U.S. Capitol Police).

As rioters poured into the building, members of the House and Senate, as well as Vice President Pence, were hurriedly evacuated from the House and Senate chambers. *Capitol Attack* Senate Report at 25–26. Soon after, rioters breached the Senate chamber. *Id.* In the House chamber, Capitol Police officers "barricaded the door with furniture and drew their weapons to hold off rioters." *Id.* at 26. Some members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence.

Even with reinforcements from the D.C. National Guard, the D.C. Metropolitan Police Department, Virginia State Troopers, the Department of Homeland Security, and the FBI, Capitol Police were not able to regain control of the building and establish a security perimeter for hours. *Capitol Attack* Senate Report at 26. The Joint Session reconvened late that night. It was not until 3:42 a.m. on January 7th that Congress officially certified Joseph Biden as the winner of the 2020 presidential election. *Id.*

20 F.4th at 17-18 (footnotes omitted); *see also Miller*, 2022 WL 823070 at *1 (summarizing events of January 6). The defendant was part of a mob that, among other actions, breached barriers and attacked officers present to prevent the mob from entering the Capitol.

As a result, the defendant is now charged in a superseding indictment. ECF 36. Count Nine of that indictment charges the defendant with violating 18 U.S.C. §§ 1512(c)(2) and 2. ECF 36:5. Congress enacted Section 1512 as a prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" in Section 1102 of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, 807, and codified it in Chapter 73 of Title 18 of the United States Code, placing it within the pre-existing Section 1512 as subsection (c). That prohibition applies to

(c) [w]hoever corruptly--

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.

18 U.S.C. § 1512(c).

Count Nine of the superseding indictment charges:

On or about January 6, 2021, within the District of Columbia and elsewhere, **EDWARD JACOB LANG** attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

(**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

ECF 36:5.

The defendant seeks dismissal of Count Nine for two reasons. He contends that Congress' certification of the Electoral College vote is not an "official proceeding" within the meaning of Section 1512(c)(2). ECF 54:1, 6. Next, he cites language from the Memorandum Opinion in *Miller*, 2022 WL 823070 ("Mem. Op.") stating that Section 1512(c)(2) addresses conduct undermining "the official proceeding's truth-finding function through actions impairing the integrity and availability of evidence." ECF 54:9. Neither contention supports dismissal of the indictment. As explained below, the defendant's view of an official proceeding lacks legal support and is refuted by *Miller*, the same decision from this Court that he wishes to invoke. And although this Court concluded otherwise in *Miller*, the defendant's narrow reading of Section 1512(c)(2) is inconsistent with that provision's text, structure, and history—as well as with decisions from every other judge on this Court to have interpreted it. Nevertheless, even if this Court adopts the same view as in *Miller*, the defendant has failed to provide sufficient reasons for dismissal, because *Miller* narrows but does not eliminate the prosecution's ability to prove Count Nine, and because what amounts to a pretrial determination of the sufficiency of the government's evidence is

unwarranted.

## LEGAL ANALYSIS

I.      Dismissal Of Count Nine Is Premature

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). And an indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a full proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005)—neither of which has occurred here.[1]  Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion,

---

[1] "It is usually improper to force the Government to proffer its evidence pretrial so that the defense might test its sufficiency. That could, for instance, curtail the Government's ability to obtain additional evidence or locate new witnesses." *United States v. Hitelsberger*, 991 F.Supp.2d 108, 125 (D.D.C. 2014) (cleaned up).

Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.).

Put differently, criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) (motions for summary judgment are creatures of civil, not criminal trials); *Yakou*, 428 F.2d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-cr-40-BAH at \*5, 2020 WL 6342940 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *United States v Knowles*, 197 F.Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

Here, to obtain dismissal, the defendant invokes *Miller* to object that Count Nine is deficient because it does not allege that the defendant "destroyed documents used in any January 6 proceeding." ECF 54:6. This argument can be summarily rejected. First, nothing in Section 1512(c) limits its application only to destruction of documents; both Section 1512(c)(1) and 1512(c)(2) list alternative offenses. Second, the defendant undermines his position by arguing that "obstruction laws prohibit *a range* of bad acts … all of which are inherently wrongful because by their very nature, they are directed at depriving the proceeding of honest decision makers or access to full and accurate evidence." ECF 54:7 (emphasis added) (citation omitted). Third, and most significantly, *Miller* does not require that a violation of Section 1512(c)(2) involve the destruction

of documents. Instead, *Miller* interpreted the meaning of the word "otherwise" in Section 1512(c)(2) to involve "some action with respect to a document, record or other object" taken "in order to corruptly obstruct, impede or influence an official proceeding." Mem. Op. at 15. Although the defendant in *Miller*, like the defendant here, styled his challenge to Section 1512(c)(2)'s scope as an attack on the indictment's validity, the scope of the conduct covered under Section 1512(c)(2) is distinct from whether Count Three in *Miller* or Count Nine here adequately states a violation of Section 1512(c)(2).[2] In *Miller*, Count Three of the indictment put that defendant on notice as to the charges against which he must defend himself, while also encompassing both the broader theory that a defendant violates Section 1512(c)(2) through any corrupt conduct that "obstructs, impedes, or influences" an official proceeding *and* the narrower theory that a defendant must "have taken some action with respect to a document," Mem. Op. at *15, in order to violate Section 1512(c)(2). This Court's conclusion that only the narrower theory is a viable basis for conviction should not result in dismissal of the count charging a violation of Section 1512(c)(2); instead, the Court would properly enforce that limitation by permitting conviction on that basis alone. *See United States v. Ali*, 885 F.Supp.2d 17, 33 (D.D.C. 2012) (limiting the government's aiding and abetting theory under 18 U.S.C. § 1651 to acts of piracy committed while the defendant was on the high seas but not dismissing the count), *reversed in part by* 718 F.3d 929, 941 (D.C. Cir. 2013) (disagreeing with the district court's limitation on aiding and abetting liability under Section 1651). Critically, cases involving successful challenges by defendants concerning whether their

---

[2] Although Miller argued that the indictment must contain "some allegation" that his conduct "undermined an official proceeding's 'truth-finding function through actions impairing the integrity and availability of evidence," *United States v. Miller*, No. 21-cr-119, ECF 59, at 7, this Court's ruling does not appear to announce a new rule that the narrowed interpretation of Section 1512(c)(2)'s scope creates a new offense *element* that must be alleged in an indictment.

*conduct*—and not merely the allegations against them—falls within the scope of the charged statute arise not under Rule 12 but following trials that establish the evidentiary record necessary to determine precisely what the defendant's conduct entailed. *See, e.g.*, *Marinello v. United States*, 138 S. Ct. 1101, 1105 (2018) (considering scope of 26 U.S.C. § 7212(a) following defendant's conviction at trial); *Yates v. United States*, 574 U.S. 528, 534-35 (2015) (plurality opinion) (considering scope of the phrase "tangible object" in 18 U.S.C. § 1519 following defendant's conviction at trial); *United States v. Aguilar*, 515 U.S. 593, 597 (1995) (considering scope of omnibus clause in 18 U.S.C. § 1503 following the defendant's conviction at trial).

It is clear why that is so. Assuming this Court's interpretation of Section 1512(c)(2) were correct, and that the government therefore must prove the defendant "took some action with respect to a document, record, or other object in order to corruptly obstruct, impede[,] or influence Congress's certification of the electoral vote," Mem. Op. at 29, no court could ascertain whether a defendant's conduct meets that test until after a trial, at which the government is not limited to the specific allegations in the indictment. And at trial, the government could prove that the Certification proceeding operates through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections.[3] For example, evidence would show

---

[3] Under the Twelfth Amendment, the state Electors must "vote by ballot," marking one set of ballots for the individual voted for as President and "distinct ballots" for the vice-presidential selection. U.S. Const. amend. XII. The Electors must then create "lists" of the presidential and vice-presidential candidates who received votes, "which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States." *Id.* These certified lists, or "certificates," are then opened by the President of the Senate "in the presence of the Senate and House of Representatives." *Id.* After opening them, the President of the Senate hands the certificates to two appointed "tellers," who in turn create a new "list" that comprises "the votes as they shall appear from the said certificates." 3 U.S.C. § 15. During the reading of the certificates, the President of the Senate must open the floor to objections; any objection "shall be made in writing . . . and shall be signed by at least one Senator and one Member of the House of Representatives." *Id.* Congress's certification of the Electoral College vote, therefore, operates

Congress had before it boxes carried into the House chamber at the beginning of the Joint Session that contained "certificates of votes from the electors of all 50 states plus the District of Columbia." *United States v. Reffitt*, Case No. 21-cr-32 (D.D.C.), Trial Tr. at 1064 (Mar. 4, 2022) (testimony of the general counsel to the Secretary of the United States Senate) (attached as Exhibit 1). Evidence would further show that, as rioters began to breach the restricted area around the Capitol building and grounds on January 6, 2021, legislators were evacuated from the House and Senate chambers, and the staff for the Secretary of the United States Senate "took the ballot boxes and other paraphernalia of the proceeding" out of the chamber "to maintain custody of the ballots and make sure nothing happen[ed] to them." *Id.* at 1072.

Additional evidence could establish that a defendant's conduct had the "natural and probable effect," *Aguilar*, 515 U.S. 593, 599 (1995) (internal quotation marks omitted), of destroying or imperiling the ballots and "other paraphernalia" from the Certification proceeding. Although the government does not anticipate presenting evidence that the defendant envisioned placing or in fact placed hands on a document or record connected to the Certification proceeding, his prolonged efforts to forcibly enter the Capitol building and assaults on law enforcement officers contributed to the chaos that led to the evacuation of lawmakers, the entrance of a Capitol police officer with a "very long, very large long gun" onto the Senate floor, and the scramble to remove the sealed electoral ballots to safety. *Reffitt*, *supra*, Trial Tr. at 1071-72. In that respect, the defendant here "took" many "action[s]" with respect to Congress's consideration of documents and records central to the Certification proceeding and thereby corruptly obstructed and impeded that Certification proceeding, including blocking lawmakers from considering such documents and

---

through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections.

records.  In acting to thwart the commencement and operation of an official proceeding that involved such documents, the evidence will establish that the defendant in this case violated Section 1512(c)(2) even under an interpretation of Section 1512(c)(2) that requires proof of "some action taken with respect to a document, record or other object," to obstruct an official proceeding. Mem. Op. at *15.

Whether or not trial evidence in fact does establish that action taken with respect to a document, record or object is not a question properly resolved by a motion to dismiss.  The question that is properly addressed is whether Count Nine alleges the elements contained in the offense it charges.  Because Count Nine echoes the language of the Section 1512(c)(2), the answer to that question is that it does.  This Court's definition for a particular phrase already in the statute and already in Count Nine does not change that count's facial sufficiency.  Accordingly, the defendant's demand for dismissal must fail.

II.  The Certification Of The Electoral College Vote Is An Official Proceeding

In 18 U.S.C. § 1515(a), Congress defined the term "official proceeding" as used in Section 1512 to include "a proceeding before the Congress[.]"  18 U.S.C. § 1515(a)(1)(B).  The defendant makes a perfunctory claim that Congress' Certification of the Electoral College vote is not a proceeding before Congress.  Every decision considering any version of this claim has rejected it. *Miller*, 2022 WL 823070 at *5-6; *United States v. Puma*, No. 21-cr-454-PLF, 2022 WL 823079 at *4-9 (D.D.C. Mar. 19, 2022); *United States v. Andries*, No. 21-cr-93-RC, 2022 WL 768684 at *3 (D.D.C. Mar. 14, 2022); *United States v. Bozell*, No. 21-cr-216-JDB, 2022 WL 474144 at *3-5 (D.D.C. Feb. 16, 2022); *United States v. Grider*, No. 21-cr-22-CKK, 2022 WL 392307 at *3-5 (D.D.C. Feb. 9, 2022); *United States v. McHugh*, 21-cr-453-JDB, ---F.Supp. 3d---, 2022 WL 296304 at *3-9 (D.D.C. Feb. 1, 2022); *United States v. Reffitt*, No. 21-cr-32-DLF (D.D.C. Dec.

29, 2021) (ECF 81:2-3); *United States v. Nordean*, No. 21-cr-175-TJK, ---F.Supp. 3d---, 2021 WL 6134595 at *4-6 (D.D.C. Dec. 28, 2021); *United States v. Montgomery*, No. 21-cr-46-RDM, 2021 WL 6134591 at *5-10 (D.D.C. Dec. 28, 2021); *United States v. Mostofsky*, 21-cr-138-JEB, ---F.Supp. 3d ---, 2021 WL 6049891 at *9-10 (D.D.C. Dec. 21, 2021); *United States v. Caldwell*, No. 21-cr-28-APM, ---F.Supp. 3d ---, 2021 WL 6062718 at *4-8 (D.D.C. Dec. 20, 2021); *United States v. Sandlin*, 21-cr-88-DLF, ---F.Supp. 3d---, 2021 WL 5865006 at *3-5 (D.D.C. Dec. 10, 2021).

The defendant ignores all of these rulings, including the ruling in *Miller*, notwithstanding his citation of that case for other reasons. Instead, he asks the Court to rely on the non-binding, out-of-Circuit opinion in *United States v. Ermoian*, 752 F.3d 1165, 1171 (9th Cir. 2013) for the proposition that Section 1512 does not prohibit obstruction of every governmental function. No one disputes this, including the district court judges who decided the cases cited above and rejected the argument the defendant makes now. To say that not every proceeding supports an obstruction charge falls short of establishing that a particular proceeding, such as Certification, is not covered. This aspect of the defendant's reliance on *Ermoian* fails to address or demonstrate whether Certification qualifies as an official proceeding.

The defendant also references *Ermoian* to suggest that only hearings before a tribunal should qualify as proceedings for purposes of the obstruction statute. The defendant in *Miller* raised the same argument in a more developed fashion, *see id.*, 20-cr-119-CJN (ECF 34:9-10), and it failed to persuade this Court or any other judge with a case where that argument arose. The defendant offers no reason for the Court to be persuaded now. Since *Ermoian* concerned whether or not the statute applied to an FBI criminal investigation, neither its facts nor the sub-section of 1515(a) relevant to its reasoning have any application here. After considering defendant Miller's analysis of *Ermoian*, this Court concluded that "context matters, and it makes little if any sense, in

the context here, to read 'a proceeding before Congress' as invoking only the judicial sense of the word 'proceeding.' After all, the only proceedings of even a quasi-judicial nature before Congress are impeachment proceedings, and Miller has offered no reason to think Congress intended such a narrow definition here."  Mem. Op. at *5.  Like Miller, the defendant here fails to offer any valid reason to treat the Congress' Certification as anything other than an official proceeding within the scope of Sections 1512 and 1515(a)(1)(B).[4]

III.   This Court Should Not Follow Its Prior Conclusion in *Miller*

The defendant's other argument for dismissal is that Count Nine contains "allegations that do not fit within the scope of the meaning of 18 U.S.C. § 1512(c)(2)."  ECF 54:1.  The defendant relies on *Miller*'s definition of Section 1512(c)(2) limiting the phrase "otherwise obstructs" to "some action with respect to a document, record or other object."  ECF 54:7.

Miller moved to dismiss the Section 1512(c)(2) count in his indictment on three grounds. He argued that (1) the Certification of the Electoral College vote was not an "official proceeding"; (2) Section 1512(c)(2) did not apply to his alleged conduct because it is limited to conduct impairing the availability and integrity of evidence; and (3) Section 1512(c)(2) is unconstitutionally vague as applied to him.  *Id.*  As noted above, the Court rejected the first argument, *see* Mem. Op. at *5-6, but agreed that Miller's alleged conduct did not fall within Section 1512(c)(2)'s scope, *id.* at *6-15.  The Court did not address Miller's third argument.

Focusing on the word "otherwise" in Section 1512(c)(2), the Court identified "three

---

[4] Similarly, the defendant's reliance on a 2018 memorandum from a former attorney general written when the author was a private citizen should have no bearing on this Court's determination of the defendant's motion.  The memorandum carries no authoritative or precedential weight; moreover, it was prepared more than two years before January 6, 2021 and did not address Certification of the Electoral College vote.  *Montgomery*, 2021 WL 6134591 at *10 n.3.

possible readings" of Section 1512(c)(2)'s scope. Mem. Op. at *6-11. First, Section 1512(c)(2)

could serve as a "clean break" from Section 1512(c)(1), *id.* at *6-8, a reading that "certain courts

of appeals have adopted," *id.* at 14. The Court, however, identified multiple "problems" with that

interpretation, all focused on the interpretation of the term "otherwise." The Court reasoned that

reading "otherwise" in Section 1512(c)(2) to mean "in a different way or manner" is "inconsistent"

with the Supreme Court's decision in *Begay v. United States*, 553 U.S. 137 (2008), which

considered whether driving under the influence qualified as a "violent felony" under the now-

defunct residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). Mem.

Op. at *7. The Court accordingly rejected the first interpretation. *Id.* at 19-20. Second, in the

Court's view, Section 1512(c)(1) could "provide[] examples of conduct that violates" Section

1512(c)(2). *Id.* at *8-9. Third, Section 1512(c)(2) could be interpreted as a "residual clause" for

Section 1512(c)(1), such that both provisions are linked by the document-destruction and

evidence-tampering "conduct pr[o]scribed by" Section 1512(c)(1). *Id.* at *9-11. After considering

Section 1512(c)'s structure, "historical development," and legislative history, the Court found

"serious ambiguity" as to which of the two "plausible" readings—the second and third readings

identified above—Congress intended. Applying what the Court described as principles of

"restraint," the Court then interpreted Section 1512(c)(2) to mean that a defendant violates the

statute only when he or she "take[s] some action with respect to a document, record, or other object

in order to corruptly obstruct, impede, or influence an official proceeding" (the third reading). *Id.*

at *15. Because, in the Court's view, the indictment did not encompass an allegation that Miller

took any such action, the Court dismissed the count charging Section 1512(c)(2). *Id.*

Both before and after the ruling in *Miller*, judges on this Court have rejected a document-

focused interpretation of Section 1512(c)(2). In *United States v. Sandlin*, No. 21-cr-88, 2021 WL

5865006 (D.D.C. Dec. 10, 2021), the Honorable Dabney L. Friedrich found that Section 1512(c)(2)'s terms are "expansive and seemingly encompass all sorts of actions that affect or interfere with official proceedings" and determined that the use of the word "otherwise" in Section 1512(c)(2) "clarifies" that it "prohibits obstruction by means *other than* document destruction*."* *Id*. at \*5-\*6. She did not view the Supreme Court's decision in *Begay* as altering that conclusion, because *Begay* rested on the ACCA's different statutory language and history. *Id.* at \*6. Judge Friedrich also rejected the defendant's reliance on *Yates v. United States*, 574 U.S. 528 (2015) (plurality opinion). *Sandlin*, 2021 WL 5865006, at \*6-\*8. Finally, Judge Friedrich concluded that, although a plain-text construction of Section 1512(c)(2) creates "substantial overlap" with other provisions in Section 1512 and Chapter 73, it does not create "intolerable overlap." *Id.* at \*7-\*8 (citing *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring in part and dissenting in part)) (emphasis omitted).

Decisions from other judges on this Court before *Miller* followed suit. For example, in *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718 (D.D.C. Dec. 20, 2021), the Honorable Amit P. Mehta concluded that Section 1512(c)(2) is not "limited" to conduct "affecting the integrity or availability of evidence in a proceeding." *Id.* at \*11 (brackets and internal quotation marks omitted); *see id.* at \*11-\*19 (addressing Section 1512(c)(2)'s text and structure, *Begay*, and *Yates*). In *United States v. Mostofsky*, No. 21-cr-138, 2021 WL 6049891 (Dec. 21, 2021), the Honorable James E. Boasberg found persuasive the analysis in *Sandlin* and *Caldwell*. *See id.* at \*11. In *United States v. Nordean*, 21-cr-175, 2021 WL 6134595 (D.D.C. Dec. 28, 2021), the Honorable Timothy J. Kelly reasoned that an interpretation of Section 1512(c)(2) limiting it to "impairment of evidence" could not "be squared with" Section 1512(c)(2)'s "statutory text or structure." *Id.* at \*6; *see id.* at \*6-\*9 (addressing *Yates* and superfluity concerns). And in *United*

14

*States v. Montgomery*, 21-cr-46, 2021 WL 6134591 (D.D.C. Dec. 28, 2021), the Honorable Randolph D. Moss reached the same conclusion following an extended discussion of Section 1512(c)'s text, structure, and legislative history, as well as the *Begay* and *Yates* decisions. *Id.* at *10-*18; *see also United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.) (reaching the same conclusion on the scope of Section 1512(c)(2)); *United States v. Grider*, 21-cr-22, 2022 WL 392307, at *5-*6 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.) (same). Following this Court's decision in *Miller*, two judges on this Court have disagreed with the *Miller* analysis. In denying a defendant's post-trial motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure, Judge Friedrich indicated that she was "not inclined to reconsider" her ruling in *Sandlin* and described her points of disagreement with *Miller*. *United States v. Reffitt*, 21-cr-32, Trial Tr. 1502-05 (Mar. 8, 2022) (attached as Exhibit 2). And in *United States v. Puma*, 21-cr-454, 2022 WL 823079 (D.D.C. Mar 19, 2022), the Honorable Paul J. Friedman concluded that the word "otherwise" in Section 1512(c)(2) "clarifies" that a defendant violates that section "through 'obstruction by means *other than* document destruction.'" *Id.* at *12 (quoting *Mostofsky*, 2022 WL 6049891, at *11). In reaching that conclusion, Judge Friedman rejected *Miller*'s "premise that any 'genuine ambiguity persist[s],'" *id.* at *12 n.4 (quoting Mem. Op. at 7), and therefore found the rule of lenity "inapplicable," *id.*

Revisiting and reconsidering *Miller*'s construction of Rule 1512(c)(2) is appropriate given that decision's reliance on the rule of lenity. As many other judges have concluded after examining the statute's text, structure, and history, there is no genuine—let alone "grievous" or "serious"— ambiguity.

"When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83

(1955).  That principle underlies the "venerable" rule of lenity, Mem. Op. at 8 (quoting *United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021) (en banc) (Bibas, J., concurring)), which ensures that "legislatures and not courts" define criminal activity given the "seriousness of criminal penalties" and the fact that "criminal punishment usually represents the moral condemnation of the community."  *United States v. Bass*, 404 U.S. 336, 348 (1971); *see Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

The rule of lenity, however, does not come into play when a law merely contains some degree of ambiguity or is difficult to decipher.  The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended."  *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019). In short, some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork.  *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted).  "Properly applied, the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'"  *Wooden*, 142 S. Ct. at 1074 (Kavanaugh, J., concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

The Court erroneously applied the rule of lenity in *Miller*.  There, the Court referred to the "'grievous' ambiguity" standard when initially discussing the rule, *see* Mem. Op. at 9, and found "a serious ambiguity" regarding the conduct that Section 1512(c)(2) reaches, *id.* at 28; *see also id.*

at 22 ("[T]he Court does not believe that there is a single obvious interpretation of the statute."). But the Court's interpretation of Section 1512(c)(2)'s scope places undue emphasis on a single word ("otherwise") and a single Supreme Court decision (*Begay*) that interpreted that word as used in an entirely different statute and statutory context. A proper reading of Section 1512(c)(2)'s text, structure, and history demonstrates that Section 1512(c)(2) prohibits any corrupt conduct that intentionally obstructs or impedes an official proceeding, not merely where a "defendant ha[s] taken some action with respect to a document, record, or other object," *id.* at 28, to corruptly obstruct an official proceeding.

Simply put, the rule of lenity is "inapplicable" here. *Puma*, WL 823079, at *12 n.4. Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings—regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction between these forms of obstruction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens to use force against the officers conducting that proceeding escapes criminal liability under the statute. Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."). It would strain credulity for any defendant who was focused on stopping an official proceeding from taking place to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] [any] official proceeding or attempt[] to do so." 18 U.S.C. § 1512(c)(2).

Confirming the absence of ambiguity—serious, grievous, or otherwise—is that despite Section 1512(c)(2)'s nearly 20-year existence, no other judge has found ambiguity in Section 1512(c)(2), including eight judges on this Court considering the same law and materially identical facts.

> **1. Section 1512(c)(2)'s text and structure make clear that it covers obstructive conduct "other" than the document destruction covered in Section 1512(c)(1).**

While Section 1512(c)(1) prohibits the corrupt destruction or alteration of documents, records, and other objects in connection with an official proceeding, Section 1512(c)(2) prohibits corrupt conduct that "otherwise" obstructs, influences, or impedes an official proceeding.    Before this Court's decision to the contrary, every reported case to have considered the scope of Section 1512(c)(2),[5] and every judge on this Court to have considered the issue in cases arising out of the events at the Capitol on January 6, 2021, concluded that Section 1512(c)(2) "prohibits obstruction by means *other than* document destruction." *Sandlin*, 2021 WL 5865006, at \*5.  That conclusion follows inescapably from the text of Section 1512(c)'s two subsections read together: Section 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing],

---

[5] *See, e.g.*, *United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects about issuance of arrest warrants before "outstanding warrants could be executed, thereby potentially interfering with an ongoing grand jury proceeding"), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Petruk*, 781 F.3d 438, 446-47 (8th Cir. 2015) (defendant attempted to secure a false alibi witness while in jail for having stolen a vehicle); *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (defendant solicited information about a grand jury investigation from corrupt "local police officers'); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target); *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (defendant disclosed identity of an undercover officer, thus preventing him from making controlled purchases from methamphetamine dealers); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (false testimony before a grand jury); *United States v. Reich*, 479 F.3d 179, 185-87 (2d Cir. 2007) (Sotomayor, J.) (defendant an opposing part a forged court order that purported to recall and vacate a legitimate order, causing the opposing party to withdraw an application for a writ of mandamus).

mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 2022 WL 823079, at *12, while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself," *Montgomery*, 2021 WL 6134591, at *12 (internal quotation marks omitted).

This Court was thus mistaken in concluding that this interpretation either "ignores" that "otherwise" is defined with reference to "something else," namely Section 1512(c)(1), or fails to "give meaning" to the term "otherwise."  Mem. Op. at *6-7.  Far from suggesting that Section 1512(c)(2) is "wholly untethered to" Section 1512(c)(1), *id.* at *7, "otherwise" as used in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1). That understanding of "otherwise" is both fully consistent with each definition the Court surveys, *see* Mem. Op. at 11 (noting that "otherwise" in Section 1512(c)(2) may plausibly be read as "in a different way or manner; differently"; "in different circumstances: under other conditions"; or "in other respects") (internal quotation marks omitted), and ensures that the term is not rendered "pure surplusage," *id.* at 12.  In sum, "otherwise" makes clear that Section 1512(c)(1)'s scope encompasses document destruction or evidence tampering that corruptly obstructs an official proceeding, while Section 1512(c)(2)'s ambit includes "other" conduct that corruptly obstructs an official proceeding.

The fact that some cases "could be brought under either or both prongs of Section 1512(c)," *Montgomery*, 2021 WL 6134591, at *12, does not imply that Section 1512(c)(2) "would have the same scope and effect . . . if Congress had instead omitted the word 'otherwise,'" Mem. Op. at 12. For one thing overlap is "not uncommon in criminal statutes," *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014), and Section 1512(c)(2)'s broader language effectuates its design as a backstop

in the same way that a "generally phrased residual clause . . . serves as a catchall for matters not specifically contemplated." *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009).  Moreover, interpreting the interplay of Sections 1512(c)(1) and 1512(c)(2) in this way does not foreclose a defendant from arguing that his conduct falls outside Section 1512(c)(2)'s scope because his document destruction or evidence concealment is prohibited and punishable only under Section 1512(c)(1).  To be sure, practical considerations may militate against seeking such a potentially Pyrrhic victory—where success leads to reindictment under Section 1512(c)(1)—but those practical considerations provide no reason to reject the straightforward interpretation of Section 1512(c) as divided between a provision that targets evidence destruction (Section 1512(c)(1)) and a provision that applies to "otherwise" obstructive conduct (Section 1512(c)(2)).  And, in any event, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005).

The Court further concluded that interpreting "otherwise" in the manner described above is "inconsistent" with *Begay*, where, in the Court's view, analysis of what "'otherwise' meant" was "[c]rucial" to the Supreme Court's analysis. Mem. Op. at *7.  That conclusion is flawed in several respects.  First, in considering whether driving under the influence was a "violent felony" for purposes of the ACCA's residual clause, which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury," 18 U.S.C. § 924(e)(2)(B)(ii), the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure than Section 1512(c)(2).  *See Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"); *United States v. Ring*, 628 F.Supp.2d 195, 224 n.17 (D.D.C. 2009).  Unlike in

the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples."[6] *Ring*, 628 F.Supp.2d at 224 n.17.  In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay*, "namely, the four example crimes," 553 U.S. at 147, is "absent" in Section 1512(c)(2).  *Caldwell*, 2021 WL 6062718, at *14.  Although this Court recognized the structural difference between the ACCA residual clause and Section 1512(c)(2), *see* Mem. Op. at 18-19, it offered no reason to import *Begay*'s interpretation of "otherwise" to Section 1512(c)(2)'s differently structured provision.

Second, describing the Supreme Court's interpretation of "what 'otherwise' meant" as "[c]rucial" to that Court's decision in *Begay* is an inaccurate description of *Begay*'s analysis.  The majority in *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual clause covered only similar crimes.  *Begay*, 553 U.S. at 142.  Those examples, the majority reasoned, demonstrated that Section 924(e)(2)(B)(ii) was not designed "to be all encompassing," but instead to cover only "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves."  *Id.* at 142-43.  The majority next drew support for its conclusion from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" that would have covered offenses involving the substantial use of physical force and described Section 924(e)(2)(B)(ii) as intending to encompass crimes

---

[6] The Court suggested (Mem. Op. at *8) that "[t]he government also presents an alternative reading" that Section 1512(c)(1) "provides examples of conduct that violates" Section 1512(c)(2). *Id.* at 15.  That is incorrect.  Neither the government nor Miller nor (to the government's knowledge) any court has proposed or adopted that construction of Section 1512(c)(2). Considering an interpretation that no party advocates and no court has adopted injects the kind of "front-end ambiguity" that "lead[s] to significant inconsistency, unpredictability, and unfairness in application."  *Wooden*, 142 S. Ct. at 1076 (Kavanaugh, J., concurring).

"similar" to the examples. *Id.* at 143-44. In the final paragraph of that section of the opinion, the majority addressed "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "*sufficient* to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' *can* (we do not say *must*, cf. *post* at [150-52] (Scalia, J. concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144.

A tertiary rationale responding to a party's argument where the majority refrains from adopting a definitive view of "otherwise" cannot be described as "crucial." The majority's "remarkably agnostic" discussion of "otherwise" in *Begay* explicitly noted that the word may carry a different meaning where (as here) the statutory text and context suggests otherwise. *Montgomery*, 2021 WL 6134591, at *11; *see Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" as "'in a different way or manner'" based on the discussion in *Begay*). In short, the majority in *Begay* "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 2021 WL 6134591, at *11.

Third, whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s ultimate holding demonstrates why this Court should not embark on imposing an extra-textual requirement within Section 1512(c)(2). The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompasses only crimes that, similar to the listed examples, involve "purposeful, violent, and aggressive conduct." 553 U.S. at 144-45. But "*Begay* did not succeed in bringing clarity to the meaning of the residual clause." *Johnson v. United States*, 576 U.S. 591, 600 (2015). Just as the *Begay* majority "engraft[ed]" the "purposeful, violent, and aggressive conduct" requirement onto the ACCA's residual clause, 553 U.S. at 150 (Scalia, J., concurring in judgment) (internal quotation marks omitted), so too this Court engrafts onto Section 1512(c)(2) the

requirement that a defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding, Mem. Op. at 28. In the nearly 20 years since Congress enacted Section 1512(c)(2), no reported cases have adopted the Court's interpretation, and for good reason. That interpretation would give rise to unnecessarily complex questions about what sort of conduct qualifies as "taking some action with respect to a document" in order to obstruct an official proceeding. *Cf. United States v. Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [*sic*] through his conduct in relation to a tangible object").[7] In brief, the Court's interpretation is likely to give rise to the very ambiguity it purports to avoid.

The Court's observation that only "certain courts of appeals," Mem. Op. at 14, have interpreted Section 1512(c)(2) to reach conduct that obstructs an official proceeding other than document destruction significantly understates the case law. Every reported case—both in the courts of appeals and in district courts—has interpreted Section 1512(c)(2) in that manner. *See*

---

[7] The Court's interpretation of Section 1512(c)(2) resembles the reading given in *Singleton* and *Hutcherson*, both of which are unpublished and neither of which the Court cites. As noted in the main text, no other court, at least in a reported opinion, appears to have adopted the nexus-to-tangible-evidence-or-a-tangible-object standard articulated in *Singleton* and *Hutcherson*. *See United States v. De Bruhl-Daniels*, 491 F.Supp.3d 237, 250-51 (S.D. Tex. 2020) (identifying *Singleton* and *Hutcherson* as outliers from the "most popular—and increasingly prevalent—interpretation of § 1512(c)(2) [as] an unlimited prohibition on obstructive behavior that extends beyond merely tampering with tangible items"); *Ring*, 628 F.Supp.2d at 225 n.18 (disagreeing with *Singleton* and *Hutcherson* but finding that the alleged conduct at issue in that case involved "some nexus to documents"). No court of appeals has cited either case.

ECF 74, at 7-9 (discussing cases). Moreover, the Court's effort to distinguish one of those cases, *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015), misses the mark. That *Petruk* did not cite or discuss *Begay*, Mem. Op. at *8, says nothing about the logic of its analysis, particularly given how "remarkably agnostic" *Begay*'s discussion of "otherwise" is. *See Montgomery*, 2021 WL 6134591, at *11. The Court likewise faulted *Petruk* for misreading the Supreme Court's decision in *United States v. Aguilar*, 515 U.S. 593 (1995), where the Supreme Court interpreted the omnibus clause in 18 U.S.C. § 1503 to require a "relationship in time, causation, or logic," *id.* at 599, between the obstructive conduct and the proceeding—a grand jury investigation—at issue in the defendant's case. But the restraint the Supreme Court exercised by interpreting Section 1503 to require that "nexus" is paralleled by interpreting the same nexus requirement to apply to Section 1512(c)(2)—as other judges on this Court have done, *see Miller*, 21-cr-119 at ECF 74:20-22 (explaining that the nexus requirement applies to Section 1512(c)(2)); *Montgomery*, 2021 WL 6134591, at *20-*21—and not by imposing an additional, atextual requirement that a defendant must "have taken some action with respect to a document" for his conduct to fall within the scope of Section 1512(c)(2).[8]

### 2. Other tools of statutory interpretation do not undermine that straightforward reading.

Because Section 1512(c)(2)'s text and context make clear that it reaches conduct that

---

[8] The Court's similar criticism of *United States v. Burge*, 711 F.3d 803 (7th Cir. 2013), Mem. Op. at *8 n.7, fails for the same reason. And the Court's related criticism that *United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014), which relied in part on *Burge*, "did not even involve a prosecution under § 1503, let alone § 1512(c)(2)," Mem. Op. at *8 n.7, falls short. The defendants in *Volpendesto* were prosecuted for, among other things, conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k), and the jury was instructed on the elements of 18 U.S.C. § 1512(c)(2). *See United States v. Volpendesto*, 08-cr-115, Dkt. No. 518, at 88-95 (N.D. Ill. Dec. 22, 2010).

obstructs, influences, or impedes an official proceeding in a manner other than document destruction or evidence tampering, resorting to other tools of statutory interpretation is not necessary. In any event, those tools reinforce that straightforward interpretation of Section 1512(c)(2)'s scope. *See Miller* ECF 74: 9-17. In reaching a contrary conclusion, the Court erred in several respects.

First, the Court suggested that reading Section 1512(c)(2) consistently with its plain language and structure as described above would "introduce something of an internal inconsistency" because Section 1512(c)(2) would have greater breadth than neighboring provisions in Section 1512. Mem. Op. at *12; *see id.* (describing Section 1512(c)(2) as an "elephant[] in [a] mousehole[]"). That reasoning is inconsistent with *Yates*, where a plurality of the Supreme Court recognized that Section 1512 consisted of "broad proscriptions," not "specialized provisions expressly aimed at corporate fraud and financial audits." 574 U.S. at 541 (plurality opinion). Moreover, the narrowing construction the Court imposes on Section 1512(c)(2) fails to consider that Section 1512(c)(2) reaches more broadly precisely because other provisions within Section 1512 leave gaps that Section 1512(c)(2) fills. *Cf. Catrino v. United States*, 176 F.2d 884, 887 (9th Cir. 1949) ("The obstruction of justice statute is an outgrowth of Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined.").

Second, the Court worried that a reading of Section 1512(c)(2) that encompasses obstructive conduct unrelated to documents or records would give rise to "substantial superfluity problems." Mem. Op. at *8. But even a "broad interpretation of § 1512(c)(2) does not entirely subsume numerous provisions within the chapter," and any overlap with other provisions in

Section 1512 is "hardly remarkable." *Sandlin*, 2021 WL 5865006, at \*8; *accord Nordean*, 2021 WL 6134595, at \*8.  More troubling, by interpreting Section 1512(c)(2) to require "some action with respect to a document," Mem. Op. at \*15, the Court risks rendering Section 1512(c)(2) itself superfluous in light of the "broad ban on evidence-spoliation" in Section 1512(c)(1), *Yates*, 574 U.S. at 541 n.4 (plurality opinion) (internal quotation marks omitted).  Moreover, because Section 1512(c)(1) includes both completed and *attempted* evidence tampering, *see* 18 U.S.C. § 1512(c)(1) (reaching "[w]hoever corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object, *or attempts to do so*) (emphasis added), it is unlikely that a defendant who "take[s] some action with respect to a document, record, or other object," Mem. Op. at \*15, has not also taken a "substantial step" toward altering, destroying, mutilating, or concealing that document sufficient to fall within the scope of Section 1512(c)(1).  *See United States v. Hite*, 769 F.3d 1154, 1162 (D.C. Cir. 2014) (explaining that the "general meaning of 'attempt' in federal criminal law" is "an action constituting a 'substantial step' towards commission of a crime and performed with the requisite criminal intent").

The canon against superfluity, which is "strongest when an interpretation would render superfluous another part of the same statutory scheme," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013), is even stronger when it renders superfluous "other provisions in the *same enactment*." *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (emphasis added; internal quotation marks omitted); *cf. Yates*, 574 U.S. at 543 (plurality opinion) ("We resist a reading of § 1519 that would render superfluous an entire provision passed . . . as part of the same Act.").  That principle comes into play here because Sections 1512(c)(1) and 1512(c)(2) were enacted together as part of the Sarbanes-Oxley Act.  *See* ECF 74, at 15-16.

Third, the Court's discussion of statutory and legislative history, Mem. Op. at \*12-14,

provides no sound reason to deviate from the straightforward interpretation of Section 1512(c)(2) described above.  For example, the Court suggested that Congress would have had no reason to add Section 1512(a)(2)(B) three months after enacting Section 1512(c)(2) if the latter provision were construed broadly.  Mem. Op. at *13.  Section 1512(a)(2)(B) prohibits the use or threatened use of physical force against "any person" with the intent to "cause or induce any person" to take one of four actions, including "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] an object with intent to impair the integrity or availability of the object for use in an official proceeding."  18 U.S.C. § 1512(a)(2)(B)(ii).  But as the Court noted, Mem. Op. at *11, unlike Section 1512(a)(2)(B), Section 1512(c) aimed generally to impose "direct" liability for obstructive conduct that was not directed at intimidating or influencing another person, *see* ECF 74, at 16.[9]  Understood in that light, Section 1512(a)(2)(B) operates harmoniously with both subsections in Section 1512(c): Section 1512(a)(2)(B)(ii) reaches a defendant's use of force or threatened use of force at *another person* in order to cause that person to destroy documents in connection with an official proceeding; Section 1512(c)(1) reaches a defendant's direct destruction of documents in connection with an official proceeding; and Section 1512(c)(2) reaches a defendant's non-document-related conduct that obstructs or impedes an official proceeding.  And while the legislators who enacted Section 1512(c) in the Sarbanes-Oxley Act undoubtedly had document shredding foremost in mind, *see* Mem. Op. at *13-14; *accord* ECF 74, at 15 (noting floor

---

[9] The Court suggested (Mem. Op. at 12 n.10) that Section 1512(c)(2) could be read as "creating 'direct' liability for the other types of conduct covered by § 1512—that is, that it makes criminal an individual doing directly those things for which the rest of § 1512 requires action directed at another person."  Although the government's supplemental brief described Section 1512(c)(2) in those terms, *see* ECF 74, at 16 ("Section 1512(c) aimed at closing a 'loophole' in Section 1512: the existing prohibitions did not adequately criminalize a defendant's *personal* obstructive conduct *not* aimed at another person."), the Court decided (Mem. Op. at 22 n.10) "not [to] address" the interpretation "further" because "[n]either party presses this argument (or anything like it)."

statements addressing concern about document shredding in the *Arthur Andersen* prosecution), "it is unlikely that Congress was concerned with only the type of document destruction at issue in the *Arthur Andersen* case." *Montgomery*, 2021 WL 6134591, at *16. In other words, "there is no reason to believe that Congress intended to fix that problem only with respect to 'the availability or integrity of evidence.'" *Id.*

Finally, an interpretation of Section 1512(c)(2) that imposes criminal liability only when an individual takes direct action "with respect to a document, record, or other object" to obstruct a qualifying proceeding leads to absurd results. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (rejecting interpretation of a criminal statute that would "produce results that were not merely odd, but positively absurd"). That interpretation would appear, for example, not to encompass an individual who seeks to "obstruct[], influence[], or impede[]" a congressional proceeding by explicitly stating that he intends to stop the legislators from performing their constitutional and statutory duties to certify Electoral College vote results by "drag[ging] lawmakers out of the Capitol by their heels with their heads hitting every step," *United States v. Reffitt*, 21-cr-32 (DLF), Trial Tr. 1502, carrying a gun onto Capitol grounds, *id.* at 1499, and then leading a "mob and encourag[ing] it to charge toward federal officers, pushing them aside to break into the Capitol," *id.* at 1501-02, unless he also picked up a "document or record" related to the proceeding during that violent assault. The statutory text does not require such a counterintuitive result.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion to dismiss.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

28

D.C. Bar Number 481052


By:    *s/Karen Rochlin*
Karen Rochlin
Assistant United States Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov


*/s/ James I. Pearce*
James I. Pearce
Appellate Counsel to the Capitol Siege Section
United States Attorney's Office
NC Bar No. 44691
555 Fourth Street, N.W.
Washington, DC 20530
James.Pearce@usdoj.gov
(202) 532-4991