```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
 2

 3      UNITED STATES OF AMERICA,         .
                                          .   Case Number 21-cr-32
 4                Plaintiff,              .
                                          .
 5           vs.                          .
                                          .
 6      GUY WESLEY REFFITT,               .   March 4, 2022
                                          .   9:02 a.m.
 7                Defendant.              .
        - - - - - - - - - - - - - - - - -

 8

 9                         TRANSCRIPT OF JURY TRIAL
                               (MORNING SESSION)
10             BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                        UNITED STATES DISTRICT JUDGE
11

12      APPEARANCES:

13      For the United States:     JEFFREY NESTLER, AUSA
                                   RISA BERKOWER, AUSA
14                                 United States Attorney's Office
                                   555 Fourth Street Northwest
15                                 Washington, D.C. 20530

16      For the Defendant:         WILLIAM WELCH, III, ESQ.
                                   5305 Village Center Drive
17                                 Suite 142
                                   Columbia, Maryland 21044
18

19

20

21      Official Court Reporter:   SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
22                                 U.S. Courthouse, Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24

25      Proceedings recorded by stenotype shorthand.
        Transcript produced by computer-aided transcription.
```

C O N T E N T S

TESTIMONY

DANIEL SCHWAGER        Direct Examination.............. 1053
                       Cross-Examination............... 1073
                       Redirect Examination........... 1075

PAUL WADE              Direct Examination.............. 1077
                       Cross-Examination............... 1092
                       Redirect Examination........... 1093

ROCKY HARDIE           Direct Examination.............. 1095
                       Cross-Examination............... 1159
                       Redirect Examination........... 1165

EXHIBITS RECEIVED

Government 411, 415, 500, 501.15 through 501.18,
504 through 507, 702, and 703......................... 1048

Government 410 and 221................................ 1077

Government 405, 111, and 163.......................... 1094

1    P R O C E E D I N G S

2        THE COURT:  Good morning, everyone.  So there is just one

3    brief matter that I wanted to talk to you all about under seal.

4    I know there's a logistical issue.  We could go in the jury

5    room.  That would take her longer.  I think we could also do

6    it -- it shouldn't take that long -- by the phone.

7        (Sealed bench conference.)















9    (End sealed bench conference.)

10             MR. NESTLER:  I just have some logistical matters.

11             THE COURT:  And I have a couple of things, too.

12             COURTROOM DEPUTY:  Your Honor, I don't think I

13    actually called the case for the record.

14        For the record, Your Honor, we're in United States of

15    America versus Guy Reffitt, Docket Number -- Criminal Action

16    21-32.

17        Representing Mr. Reffitt, we have Mr. William Welch, and

18    representing the United States, we have Mr. Jeffrey Nestler and

19    Ms. Risa Berkower.

20        Thank you, Your Honor.

21             THE COURT:  Go ahead, Mr. Nestler.

22             MR. NESTLER:  Thank you, Your Honor.

23        There are several exhibits that we believe are admissible

24    pursuant to a certification from a business record and/or from

25    they're self-authenticating.  We thought, in the interest of

1    efficiency, we would just ask the Court and counsel now to have

2    them pre-admitted so that when we show them to the juror we're

3    not --

4            THE COURT:  Yes.  And I want to address that issue

5    generally.

6        I take it you have no objection, Mr. Welch, to introducing

7    these just outside the presence of the jury, or alternatively,

8    as soon as the jury comes in, you can say that?

9        What's your pleasure, Mr. Welch?  But I want to start

10   moving things in in bulk.

11           MR. WELCH:  That would be fine, but I need to know

12   what specific ones they are talking --

13           THE COURT:  It's probably the Constitution --

14           MR. NESTLER:  I can read it right now.

15           COURTROOM DEPUTY:  Forgive me, Mr. Welch.  If you can

16   move the microphone closer.

17           MR. NESTLER:  So these exhibits would be 411, the

18   folio from the Melrose Hotel.  We have a business record

19   certification.  415, Mayor Bowser's curfew order, which is a

20   public document.  We have Exhibit 500, which is the Twelfth

21   Amendment; Exhibits 501.15 through 501.18, which are 3 U.S.C.

22   15 through 3 U.S.C. 18, which are public documents.  We have

23   Exhibit 504, which is Senate Concurrent Resolution 1, also a

24   public document.  Exhibits 505 and 506 are screen shots from the

25   video inside of the House and Senate chambers which we have

1    business record certifications for.  Exhibit 507 is a video

2    montage that contains some of those same video clips with the

3    same certifications, as well as Congressional Record snippets,

4    which are public documents.

5        Those are the materials we're going to be referring to,

6    Your Honor, and then there's also two additional stipulations we

7    intend to also read in while the witnesses are on the stand.

8    Those are Exhibits 702, about the Electoral College, and 703,

9    about Safeway and commerce.

10            THE COURT:  Any objections, Mr. Welch?

11            MR. WELCH:  No, now that I know what they are.

12            THE COURT:  Okay.  Any objection to him just moving

13    those now --

14            MR. WELCH:  No.

15            THE COURT:  -- or do you want him to do it in front of

16    the jury?

17            MR. WELCH:  No, it's just a matter of knowing what

18    they're going to do.  As long as I know.  They don't tell me

19    what they're doing.  They just do stuff.

20            THE COURT:  So you move to admit all that?

21            MR. NESTLER:  Yes.

22            THE COURT:  No objection?

23            MR. WELCH:  No objection.

24            THE COURT:  So all of those exhibits are admitted.

25        (Government Exhibits 411, 415, 500, 501.15 through 501.18,

1    504 through 507, 702, and 703 received into evidence.)

2          THE COURT:  Now, Mr. Nestler and Ms. Berkower, today

3    we have the agents, I think, Wade and Kennedy.  Tomorrow, we

4    have Hightower and Lane.  I think that's right.  Regardless --

5          COURTROOM DEPUTY:  Monday.

6          THE COURT:  Thank goodness it's Friday.

7     All right.  I know a number of those witnesses will move in

8    physical items, and those will have to be done one by one.  But

9    there's no need to -- correct me if I'm wrong, Mr. Welch, but I

10   see no need for things like photographs and videos, when they

11   have the right witness on the stand, to not say, "You have

12   reviewed Exhibits 1 through 20, and do they fairly and

13   accurately represent?"

14    Do we need to do these, you know, authenticate and publish

15   individually, Mr. Welch?

16          MR. WELCH:  We wouldn't if they would just tell me

17   ahead of time.

18          THE COURT:  Okay.

19          MR. WELCH:  They don't tell me.  They just do this

20   stuff, Your Honor.

21          THE COURT:  All right.  I know that they did try to

22   tell you which witness would be introducing the exhibits, and

23   you wanted them to be individually authenticated.

24    But I think given how this has gone, we're really slowing

25   things down, and it's putting the jurors to sleep.  So I would

1    like you all to talk before each witness and make sure Mr. Welch

2    has no issue.  And if not, then at the outset, move them all in.

3            MR. NESTLER:  We can do that right now, Your Honor.

4    The witness who has the bulk of the remaining exhibits is

5    Ms. Kennedy, who took the photographs during the search warrant

6    of the defendant's house.

7        We would move to batch admit all of those photographs.

8    They are in the 100 series in our exhibit list.  They've been

9    provided to defense counsel many weeks ago.

10           THE COURT:  Any objection, Mr. Welch?

11           MR. WELCH:  No.  And that would be fine, too.  And

12   just for the sake of clarity, the reason this became a problem

13   is when they changed up the other day who they were going to --

14           THE COURT:  Mr. Welch --

15           MR. WELCH:  They didn't tell me --

16           THE COURT:  -- I saw in the witness list -- so the

17   exhibit list just said "certification."  But the witness list

18   mentioned three witnesses would be looking at that document or

19   that exhibit, I think it was 200, and it was identified that

20   that witness -- I don't remember the name of that witness, but

21   that that witness would be referring to that exhibit.

22       So you should have been on notice.  I understand why you

23   thought it was coming in with a different witness, given its

24   location on the exhibit list.  But they did give you notice of

25   that.

1          MR. WELCH:  It's not that these things aren't out

2    there.  We can look at this.  This is a --

3          THE COURT:  I know, it's long; it's long.  All right.

4          MR. WELCH:  And we can't anticipate what they're going

5    to do.  They don't tell me what they're going to do, Your Honor.

6    They just do stuff.

7          THE COURT:  But we're all on the same page for the

8    remainder of the trial; right?  We can move these things today

9    at least?  We've covered this one witness for the morning, and

10   then at lunch, you all talk, and let's cover the other ones for

11   the afternoon.

12     Let's just -- the jurors are -- it's mind-numbing to do

13   these one by one.

14         MR. NESTLER:  We concur, Your Honor.  And just so Your

15   Honor is aware, we've introduced the bulk of our exhibits

16   already through our first three witnesses.

17         THE COURT:  Yes, I realize that.  I was asleep at the

18   switch for a while.

19         MR. NESTLER:  And now we plan to have these witnesses

20   testify about some of these remaining exhibits but do not have

21   to introduce much more.

22         THE COURT:  All right.  And when we get to, for

23   example, the Capitol Police, I get that you want to play certain

24   aspects so that the jury can hear the audio that wasn't clear

25   the first day, but to rewatch all that, I really think that

1    you're losing your jurors.

2              MR. NESTLER:  We understand, Your Honor.

3              THE COURT:  Okay.  Schwager is the Senate counsel?

4              MR. NESTLER:  Yes, your Honor.

5              THE COURT:  So he is going to testify to some of what

6    he saw that day in the chamber, right, in the gallery?

7              MR. NESTLER:  Yes, Your Honor.

8              THE COURT:  I take it none of this relates to the

9    Ashli Babbitt shooting?

10             MR. NESTLER:  Correct, Your Honor.

11             THE COURT:  All right.  And how much -- at some point

12   I think the potential prejudicial effect of what actually

13   happened in and around that room exceeds the probative value as

14   to Mr. Reffitt.  I get that you are entitled to present some

15   evidence of how close they got, but he never got in the

16   building.

17       So I just want to make sure you're not spending a lot of

18   time on that part of the case, because it's really minimal

19   probative value for him.  All right?

20             MR. NESTLER:  We do need to prove that --

21             THE COURT:  The obstruction.  But I just -- the

22   shooting and all of that seems too far.

23             MR. NESTLER:  We're not mentioning the shooting at

24   all.  It's not a part of the case.

25             THE COURT:  Okay.  I just wanted to make sure.

1          MR. NESTLER:  This is Mr. Schwager talking about the

2    official proceeding, why it was happening, what he saw, where he

3    went, and then his experiences in the Senate chamber and being

4    evacuated.

5          THE COURT:  Okay.  Great.  Anything else for you,

6    Mr. Welch?

7          MR. WELCH:  No, Your Honor.

8          THE COURT:  All right.

9          MR. NESTLER:  No, Your Honor.  Thank you.

10          THE COURT:  So we've got a few minutes.  Maybe the

11    jurors are here early.  Do you want to go check?

12          COURTROOM DEPUTY:  I can check, but don't hold your

13    breath.

14      (Pause.)

15          THE COURT:  Just one issue.  The law clerk noticed, in

16    reviewing the rough transcript last night, there were five

17    exhibits where they were offered by the government, there was no

18    objection, and then the government immediately said publish it

19    to the jury, and I didn't say they're admitted.

20      We'll need to look and see what the exhibits are.  But I

21    just want to make sure for the record that I've admitted them.

22    I intended to admit all of them, and I want to make the record

23    clear as to that.  So we will get those exhibit numbers and just

24    do that outside the presence of the jury at some point.

25          MR. WELCH:  I don't think that's going to be a

1     problem.  There is nothing that has been admitted that I made an

2     objection to and you hadn't ruled on or anything.

3               MR. NESTLER:  All right.  My recollection is, I

4     thought Your Honor had said "admitted."  So it may have been

5     just --

6               THE COURT:  I probably thought I said admitted when

7     you said what you said.

8               MR. NESTLER:  I apologize if I published something and

9     Your Honor hadn't actually said admitted.

10              THE COURT:  No worries.

11              MR. NESTLER:  May I step out for one minute?

12              THE COURT:  Sure.

13         (Pause.)

14         (Jury entered courtroom.)

15              THE COURT:  Good morning, ladies and gentlemen.

16    Welcome back.  I know you're happy it's Friday.  I think we all

17    are.  I want to remind you that we will be stopping at 4:00

18    today.  And the government is prepared to call its next witness.

19              MR. NESTLER:  Thank you, Your Honor.  The government

20    calls Daniel Schwager.

21         DANIEL SCHWAGER, WITNESS FOR THE GOVERNMENT, SWORN

22                       DIRECT EXAMINATION

23              BY MR. NESTLER:

24    Q.   Good morning, sir.

25    A.   Good morning.

1   Q.   If you are comfortable, you are permitted to remove your

2   mask.

3        Could you please tell us what your name is.

4   A.   Dan Schwager.

5   Q.   And how do you spell your name?

6   A.   Schwager is S-c-h-w-a-g-e-r.  Dan is common spelling.

7   Q.   Mr. Schwager, what was your title on January 6, 2021?

8   A.   I was the general counsel to the Secretary of the U.S.

9   Senate.

10  Q.   What does the general counsel to the Secretary of the U.S.

11  Senate do?

12  A.   I have multiple responsibilities.  Chiefly, I advise the

13  Secretary of the Senate on a host of issues, on legal issues

14  related to her work, on policy issues, on operational issues,

15  and then a lot of general counsel duties, contracts, continuity

16  of government, things like that.

17  Q.   What does the Secretary to the U.S. Senate do?

18  A.   The Secretary can be thought of as the chief administrative

19  officer of the Senate.  She is an officer to the Senate.  She

20  has some constitutional functions, many statutory functions.

21  She is responsible for the financial administration of the

22  Senate.  She is responsible for many administrative offices, the

23  curator of the Senate, the historian, the public records, office

24  of public records, and she's also responsible for the staffing

25  of the floor of the Senate chamber.

1      The -- all of the different types of legislative clerks are

2   under the Secretary's supervision.  The parliamentarian is under

3   the Secretary's supervision.

4   Q.   How many people approximately work for the Secretary of the

5   Senate?

6   A.   Around 225 or so.

7   Q.   How long did you serve as general counsel to the Secretary

8   of the Senate?

9   A.   Almost six years.

10  Q.   And how long did you work in Congress total?

11  A.   Almost ten years.

12  Q.   How long have you been a lawyer?

13  A.   Over 20.

14  Q.   Do you still work for the Secretary of the Senate?

15  A.   I do not.

16  Q.   How long ago did you leave?

17  A.   At the end of January, this year.

18  Q.   So just about a month ago?

19  A.   Correct.

20  Q.   Why did you leave?

21  A.   I was called by a recruiter and offered an opportunity for

22  a job that was a great opportunity in a lot of ways for me.

23  Q.   Do you now work at a non-profit organization?

24  A.   I do.

25  Q.   Mr. Schwager, how many houses of Congress are there?

1    A.    Two houses of Congress.

2    Q.    Can you please name them?

3    A.    The Senate and the House of Representatives.

4    Q.    Let's start with the House of Representatives.  What is the

5    title of the person who is in charge of the House of

6    Representatives?

7    A.    Well, the member who is -- the person who is chosen by all

8    of the members to perform leadership roles is the Speaker of the

9    House of Representatives.

10   Q.    And who held the role of Speaker of the House of

11   Representatives as of January 6, 2021?

12   A.    Nancy Pelosi.

13   Q.    And moving to the Senate side now, who is the person who is

14   in charge of the agenda and the day-to-day sort of functioning

15   of the Senate?

16   A.    Right.  The person, the party who holds the majority of

17   seats in the Senate chooses from amongst themselves a person to

18   manage the agenda and the day-to-day operations.  That person is

19   known as the majority leader.

20   Q.    And who was the majority leader of the U.S. Senate on

21   January 6 of 2021?

22   A.    Senator Mitch McConnell.

23   Q.    And under the Constitution, is there a different person who

24   formally presides over the United States Senate?

25   A.    Yes, the President of the Senate is different from the

1    majority leader.

2    Q.    And who is the President of the Senate?

3    A.    The President of the Senate is the Vice President of the

4    United States.

5    Q.    And as of January 6 of 2021, who was the Vice President of

6    the United States?

7    A.    Mike Pence.

8         MR. NESTLER:  At this time we're going to put on the

9    screen, Ms. Rohde, if you could, a stipulation between the

10   parties.  It's stipulation -- it's Exhibit 702.  If you could

11   just highlight the text for me, Ms. Rohde.

12        Mr. Hopkins, if you could please publish that to the jury.

13        And I will now read to the jury stipulation -- Government

14   Exhibit 702.

15        "The United States and defendant Guy Reffitt agree and

16   stipulate to the following:

17        "On January 6, 2021, a joint session of the United States

18   Congress convened at the U.S. Capitol.  During the joint

19   session, elected members of the United States House of

20   Representatives and the United States Senate were meeting in

21   both the House and Senate chambers of the Capitol to certify the

22   vote count of the Electoral College of the 2020 presidential

23   election, which had taken place on Tuesday, November 3, 2020.

24        "On January 6, 2021, the House of Representatives began its

25   session at approximately 12:00 p.m., the Senate began its

1    session at approximately 12:30 p.m., and the two Houses met

2    together at approximately 1:00 p.m. in the House of

3    Representatives chamber to begin the joint session.

4        "Vice President Mike Pence was in the Capitol building and

5    presiding over the joint session.  At approximately 1:15 p.m.,

6    the House and Senate adjourned to their separate chambers for up

7    to two hours to resolve a particular objection.

8        "At approximately 2:12 p.m., Vice President Pence evacuated

9    the Senate chamber, and approximately one minute later, the

10   senator who had become the presiding offer in Vice President

11   Pence's absence declared the Senate would stand in recess.

12   Senators evacuated the Senate chamber."

13           THE COURT:  Ladies and gentlemen, let me remind you

14   that a stipulation of fact is something you should consider as

15   undisputed evidence.

16           MR. NESTLER:  Thank you, Your Honor.

17       And just continuing on to page 2, two additional

18   paragraphs.

19       "At approximately 2:15 p.m., Speaker Nancy Pelosi, who was

20   presiding over the House of Representatives, evacuated the House

21   chamber, and approximately 15 minutes later, the representative

22   who had become the presiding officer in her absence declared

23   that the House would stand in recess.  Representatives evacuated

24   the House chamber.

25       "The Senate and House resumed meeting at approximately

1    8:06 p.m. and 9:02 p.m. respectively.  Congress's joint session

2    continued until approximately 3:44 a.m. on January 7, 2021, when

3    it completed the certification of the Electoral College vote."

4            BY MR. NESTLER:

5    Q.   At this time I would like to display to the jury Government

6    Exhibit 500, already in evidence.

7            Are you familiar with the Constitution of the United

8    States, Mr. Schwager?

9    A.   Generally, yes.

10   Q.   Go to page 2, please, Ms. Rohde.

11           And this is Amendment Twelve.  Do you know what the Twelfth

12   Amendment is, Mr. Schwager?

13   A.   I do.

14   Q.   I'm going to ask you to read the highlighted portion here

15   of the Twelfth Amendment to the U.S. Constitution, please.

16   A.   The first portion says, "The electors shall meet in their

17   respective states and vote by ballot for President and Vice

18   President."

19           The second highlighted section says, "Which lists they

20   shall sign and certify and transmit sealed to the seat of the

21   government of the United States, directed to the President of

22   the Senate, the President of the Senate shall, in the presence

23   of the Senate and House of Representatives, open all the

24   certificates and the votes shall then be counted.  The person

25   having the greatest number of votes for president shall be

1    president."

2    Q.    Just remind us, who is the President of the Senate?

3    A.    The Vice President of the United States.

4    Q.    At this time we will go to Government Exhibit 501.15,

5    already admitted into evidence, and this is a portion of the

6    United States Code.

7          Are you familiar with the United States Code, Mr. Schwager?

8    A.    Generally, yes.

9    Q.    What is it?

10   A.    It is the compilation of the federal laws of the United

11   States of America.

12   Q.    And if you could, please, read the title of 3 United States

13   Code 15.

14   A.    "Congress shall be in session on the Sixth day of January

15   succeeding every meeting of the electors.  The Senate and House

16   of Representatives shall meet in the hall of the House of

17   Representatives at the hour of 1 o'clock in the afternoon on

18   that day, and the President of the Senate shall be their

19   presiding officer."

20   Q.    Thank you.  Do you know what the hall of the House of

21   Representatives is?

22   A.    Yes.  We refer to it as the House chamber.

23   Q.    Is that in the U.S. Capitol building?

24   A.    It is.

25   Q.    If we could now go, Ms. Rohde, please, to Exhibit 501.16,

1   already admitted into evidence.  It's 3 United States Code.

2        Mr. Schwager, if you could read the highlighted portion for

3   us.

4   A.   "Such joint meeting shall not be dissolved until the count

5   of electoral votes shall be completed and the result declared."

6   Q.   In this section, when you see the word "dissolved," what

7   does that mean as a part of your job?

8   A.   The adjournment of that session, that day's session, or it

9   could be multiple sessions.

10  Q.   Dissolve, does that mean end?

11  A.   Yes.

12  Q.   Let's go to Exhibit 501.17, which is Title 3 of the United

13  States Code, Chapter 17.  Can you please read the highlighted

14  portion.

15  A.   "When the two Houses separate to decide upon an objection

16  that may have been made to the counting of any electoral vote."

17  Q.   Mr. Schwager, what does it mean when the Houses separate?

18  A.   Since the joint session is in the House chamber, the Senate

19  walks back to the Senate chamber, and they each deliberate on

20  their own in their own chambers.  The House stays in the House

21  chambers.

22  Q.   Thank you.  Ms. Rohde, if you could pull up Exhibit 501.18,

23  already admitted into evidence.

24       And if you could, please, just read the highlighted portion

25  for us, Mr. Schwager.

1    A.   "While the two Houses shall be in meeting as provided in

2    this Chapter, the President of the Senate shall have power to

3    preserve order."

4    Q.   Thank you.  Now let's move, please, to Exhibit 504,

5    Ms. Rohde, already admitted into evidence.

6         And this is Senate Concurrent Resolution 1.  What is a

7    Senate Concurrent Resolution, Mr. Schwager?

8    A.   A Concurrent Resolution is something short of a law, but

9    it's a legislative act that both chambers agree to.  And if it's

10   called a Senate Concurrent Resolution, then it originates in the

11   Senate.

12   Q.   And if you could, please, read the highlighted portion

13   here.

14   A.   "Resolved by the Senate, the House of Representatives

15   concurring, that the two Houses of Congress shall meet in the

16   hall of the House of Representatives on Wednesday, the 6th day

17   of January, 2021, at 1:00 post meridian, pursuant to the

18   requirements of the Constitution and laws relating to the

19   election of President and Vice President of the United States,

20   and the President of the Senate shall be their presiding

21   officer."

22   Q.   Thank you.  Ms. Rohde, if you could go down to the bottom

23   to the signature section.

24        And do you see at the bottom where it says "attest" and

25   there is somebody's name above Secretary of the Senate?

1    A.    I do.

2    Q.    Who is that?

3    A.    Julie E. Adams was the Secretary of the Senate at that

4    time.

5    Q.    Was she your boss?

6    A.    She was.

7    Q.    Okay.  Let's move on.  If you could take that down, please,

8    Ms. Rohde.

9         Do you know what the Congressional Record is, Mr. Schwager?

10   A.    I do.

11   Q.    What is it?

12   A.    It is the compilation of the proceedings of each chamber of

13   Congress for every -- every day.

14   Q.    Thank you.  At this time I would like to display for the

15   jury Government Exhibit 507, already admitted into evidence.

16        Mr. Hopkins, if you could take it down from the jury screen

17   just for a quick second.  Thank you.  And if you could put it

18   back up, please.  Thank you.

19        At this time -- it does have audio.  Agent Ryan, if you

20   wouldn't mind manning our speaker contraption.  Thank you.

21        (Video played.)

22   Q.    If you could pause for a minute, Ms. Rohde.

23        Mr. Schwager, do you see those young people walking into

24   the House chamber?

25   A.    I do.

1   Q.   Do you see what they're carrying?

2   A.   I do.

3   Q.   What are they carrying?

4   A.   They are carrying what we refer to as the Electoral College

5   ballots.  They're certificates of votes from the electors of all

6   50 states plus the District of Columbia.

7   Q.   And how do you know what's inside of those boxes?

8   A.   I was involved in ensuring that the ballots were placed

9   inside those boxes.

10  Q.   Thank you.  If we could, please, continue, Ms. Rohde.

11       (Video played.)

12  Q.   Can you, please, pause right there, Ms. Rohde.

13       Mr. Schwager, do you see yourself in this video?

14  A.   I do.

15  Q.   Could you, please, tell us which side you're on and what

16  you're doing?

17  A.   From our perspective, I'm to the left of the Vice President

18  and standing up in front of the -- in between the bottom desk

19  and the middle desk.

20  Q.   Is there anything in front of you?

21  A.   Yes.  There is an Electoral College ballot box, as we refer

22  to it.

23  Q.   Thank you.  If we can continue, Ms. Rohde.

24       (Video played.)

25  Q.   Do you see what chamber we're looking at here,

1    Mr. Schwager?

2    A.    That's the Senate chamber.

3    Q.    Who is the person sitting in the presiding officer's chair

4    in the Senate chamber?

5    A.    The President of the Senate, Vice President Pence.

6    Q.    This is at 1:39 p.m., according to the time stamp at the

7    bottom; is that correct?

8    A.    That's what it says.

9    Q.    If we could go forward to the next slide, please.

10         And at 1:48 p.m., who was sitting in the presiding

11   officer's chair?

12   A.    Still the President of the Senate.

13   Q.    And if we can go forward, at 1:54 p.m.?

14   A.    President of the Senate.

15   Q.    And if we can go forward, at 2:00 p.m.?

16   A.    President of the Senate.

17   Q.    If we can go forward, at 2:05 p.m.?

18   A.    President of the Senate.

19   Q.    And if we can go forward, at 2:10 p.m.?

20   A.    President of the Senate.

21   Q.    Thank you.  If we could then move to Government

22   Exhibit 506, Ms. Rohde, already admitted into evidence.

23         Do you recognize what chamber this is, Mr. Schwager?

24   A.    That is the House chamber.

25   Q.    Who is standing at the presiding officer's chair in the

 1    House chamber?

 2    A.    It looks like Nancy Pelosi.  It's a little blurry.

 3    Q.    This is at 1:43 p.m.

 4          If we can move to the next slide, at 1:48 p.m.?

 5    A.    Speaker Pelosi.

 6    Q.    If we could move forward, at 1:54 p.m.?

 7    A.    The Speaker.

 8    Q.    1:49?

 9    A.    The Speaker.

10    Q.    If we could move forward, at 2:04 p.m.?

11    A.    The Speaker.

12    Q.    If we could move forward, at 2:10 p.m.?

13    A.    The Speaker.

14    Q.    If we could move forward, at 2:14 p.m.?

15    A.    The speaker.

16    Q.    If we could move forward.  And that is the final slide.

17    Thank you.

18          Okay.  Mr. Schwager, let's talk about your role on

19    January 6 of 2021 and what you observed.

20          If we could, please, start, Mr. Rohde, by pulling up

21    Exhibit 507 and going to 540 on the counter at approximately

22    2:13 p.m.   If we could just stop it at 540.

23          So up on the screen in front of you, Mr. Schwager, this is

24    approximately 2:13 p.m.  Can you identify what chamber we're

25    looking at here?

1    A.   Senate chamber.

2    Q.   Are you visible in this view?

3    A.   I am.

4    Q.   Can you please tell us where you're positioned?

5    A.   As you're facing this exhibit, the door on the right, I'm

6    just inside to the left of the door on the right facing forward,

7    the bald guy.

8    Q.   Are you standing or sitting?

9    A.   I am standing up.

10   Q.   Sorry.  You mentioned that you're the bald guy?

11   A.   I am usually the bald guy, yes.

12   Q.   Got it.  Okay.  Were you in this position the entire time

13   the Senate was having its proceeding?

14   A.   I was not.

15   Q.   Why did you take yourself to this position at this time

16   around 2:13 p.m.?

17   A.   Prior to this, maybe a few minutes, judging by Officer

18   Billings (phonetic), prior to this I had been told that --  I

19   was standing at the back of the chamber.

20          MR. WELCH:  Objection.

21     (Bench conference.)

22          THE COURT:  I take it you're not offering this for the

23   truth?

24          MR. NESTLER:  That's correct, to explain why he ended

25   up where he ended up.

1        THE COURT: All right. So Mr. Welch, if you want an

2  instruction, I can give that.

3        MR. WELCH: Please.

4      (End of bench conference.)

5        THE COURT: Ladies and gentlemen, the testimony you're

6  about to hear this witness say is not being offered for the

7  truth of the matter, but to explain why he took the actions he

8  took.

9        BY MR. NESTLER:

10  Q.   Please continue, Mr. Schwager.

11  A.   Thank you. Just prior to this, I had been informed by a

12  Senate staffer that protestors had come into the Capitol

13  building, had breached the Capitol building, and I immediately

14  went down to that position to be near the Secretary of the

15  Senate, my boss, so I could -- and the legislative clerks on the

16  dais, so I could assist them and advise the Secretary and help

17  with whatever came next.

18  Q.   Just prior to you moving down to this position, who had

19  been presiding over the Senate chamber?

20  A.   The last senator presiding who recessed the Senate would

21  have been the President Pro Tempore, which is Senator Chuck

22  Grassley -- was Senator Chuck Grassley at that time.

23  Q.   And prior to Senator Chuck Grassley being there at the

24  presiding officer's chair, did you see who was there just before

25  him?

1    A.    Yeah, the President of the Senate, Vice President Pence.

2    Q.    Did you see Vice President Pence leave the Senate chamber?

3    A.    I did.

4    Q.    How would you characterize his departure from the Senate

5    chamber?

6    A.    He was accompanied by several people that I believed to

7    be -- that were not senators.  I don't know.  They appeared to

8    be officers or Secret Service or something like that.

9    Q.    Had you seen them before?

10    A.    I don't recall if I had seen any of them before.  I don't

11    recall if any of them were people I was familiar with or not.

12    Q.    And when you saw Vice President Pence leave the Senate

13    chamber with these people who you assumed to be his security

14    people, what did you believe was happening?

15    A.    Well, I knew we were in a dangerous situation and that we

16    were about to go into some protocols we had drilled on for

17    locking down, for when the chamber was under threat.

18    Q.    Did you see Senator Grassley leave the chamber?

19    A.    I don't recall exactly when Senator Grassley left the

20    chamber.  I saw him coming down from the presiding officer's

21    chair on the dais.

22    Q.    And the person standing in the presiding officer's chair at

23    2:13 p.m., is that a Capitol police officer?

24    A.    It is.

25    Q.    What did that make you think about what was happening at

1    this time?

2    A.    Well, I had already recognized what was happening as a part

3    of our procedures that we had drilled on when there is a -- for

4    when there is a threat to the chamber.  And so I believed that

5    those were the procedures and those were the posture that we

6    were under.

7    Q.    Around this time, what, if anything, did you observe about

8    the doors to the Senate chamber?

9    A.    At that time, as we had practiced, the Capitol police

10   officers or door keepers were locking all of the doors to the

11   galleries and some of the external doors on the chamber floor.

12   Q.    Are these small doors or large doors?

13   A.    They're very tall doors.  They're large, ornate, wooden

14   doors, and I saw one small police officer had to jump up to lock

15   one.

16   Q.    Do they make noises when they open and close?

17   A.    Typically, we try to avoid them making noises to disturb,

18   but they are heavy doors.

19   Q.    How did you feel when you saw the doors started being

20   locked?

21   A.    Again, I already -- from the moment -- from the moment I

22   was told that protestors had breached the Capitol, I was in a

23   state of alarm, and we were in a grave situation at that point,

24   to my understanding.  And closing the doors was just -- locking

25   the doors was just a part of what we had trained for, and I,

1    frankly, was happy that they were being locked.

2    Q.    Were the people inside of the Senate chamber, yourself

3    included, given any instructions around this time?

4    A.    Yes.    The Capitol police officer on the -- who was standing

5    by the presiding officer's chair, his purpose there was to

6    instruct us that there was a threat and to give us further

7    instructions from the Capitol Police for our safety.

8    Q.    Shortly after that, did you come to notice any additional

9    Capitol police officers with any weapons inside of the Senate

10   chamber?

11   A.    Yes.    I took particular notice of a Capitol police

12   officer -- who I assumed to be a Capitol police officer.    He was

13   in plain clothes but with an orange sash and a very long, very

14   large long gun standing right in the center of the chamber right

15   between the majority leader's desk and the minority leader's

16   desk.

17   Q.    Had you experienced that during any of the drills you had

18   practiced?

19   A.    I don't recall if they ever used an actual gun in those

20   drills or not.    Nothing stands out to me that I've ever seen

21   something like that.

22   Q.    What did you think when you saw a Capitol police officer

23   with a long gun standing in the well of the Senate chamber?

24   A.    Again, I was already in a state of alarm, and things like

25   that, frankly, comforted me, because I already knew there was

1    a -- my perception already was that we were under severe threat.

2    Q.    Did there come a time when you left the Senate chamber?

3    A.    There did.

4    Q.    And why did you leave the Senate chamber?

5    A.    We were instructed by the Capitol Police to evacuate.

6    Q.    What, if anything, did you do with the boxes containing the

7    certificates of the votes at the time that you were leaving the

8    Senate chamber?

9    A.    I had moved closer to the table before we evacuated, the

10    table where the ballots were, to make sure that while we were

11    standing there waiting for instructions -- lots of people were

12    moving around, and I wanted to make sure nobody was opening the

13    boxes or touching the ballots.

14        At the time we evacuated, a number of our staff and floor

15    staff took the ballot boxes and other paraphernalia of the

16    proceeding with us.  I did not personally carry a ballot box at

17    that time.  I carried some other paraphernalia.

18    Q.    And why was it important to take the ballot boxes and other

19    paraphernalia with you as you evacuated the Senate chamber?

20    A.    First of all, we need to maintain custody of the ballots

21    and make sure nothing happens to them.  There are, by law, other

22    sets, but these were the ones we were using for the proceeding,

23    and we needed to protect those.

24        In addition, it was possible that we would need to

25    reconvene in another location to complete the proceeding.  I

1  knew the mission was to complete the proceeding, and so whether

2  we did it in the chamber or whether we had to reconvene in

3  another location, we needed those with us for the proceeding.

4  Q.   Were the senators able to continue meeting when they were

5  not in the chamber here?

6  A.   Were they able to?  They did not reconvene outside of the

7  chamber.  They -- if it had become necessary, we could have.

8  Q.   I'm talking about in the Senate chamber here.  Did the

9  senators -- were they able to meet in the Senate chamber after

10  the time you evacuated?

11  A.   Yes.

12  Q.   While you were evacuated, were the senators meeting in the

13  Senate chamber?

14  A.   No, I'm sorry, not until we had come back at a later time.

15          MR. NESTLER:  Thank you.  No further questions.

16          THE COURT:  Mr. Welch?

17          MR. WELCH:  Thank you, Your Honor.

18                   CROSS-EXAMINATION

19          BY MR. WELCH:

20  Q.   Good morning, Mr. Schwager.

21  A.   Good morning.

22  Q.   My name is Bill Welch.  I'm also going to ask you some

23  questions.

24  A.   Certainly.

25  Q.   To the best of your recollection, was the time stamp of

1    approximately 1:14 p.m. on January 6 accurate as far as when the

2    joint session in the House chamber adjourned?

3    A.    I wasn't looking at my watch.  So I don't have an

4    independent recollection.

5    Q.    Okay.  Would that be the same as far as the other time

6    stamps that we saw in Government Exhibit 507?

7    A.    Yeah, I don't have any independent recollection of the

8    exact second at which any of these proceedings happened.

9    Q.    Okay.  Would you have any reason to believe that any of

10   them were incorrect?

11   A.    No.

12   Q.    When you were in the Senate chamber and we saw you on

13   Government Exhibit 507, you didn't see my client, Mr. Reffitt,

14   did you?

15   A.    No.

16   Q.    So when you left the Senate chamber at the direction of the

17   Capitol Police and had to go wherever you went, you did not see

18   my client, Mr. Reffitt, did you?

19   A.    I don't know if he was in the periphery of my vision in one

20   of the groups that we might have passed by.  So I don't know.

21   Q.    As you sit there right now -- please, feel free, take a

22   look.  Mr. Reffitt, take your mask down.

23        As you look at him, have you ever seen this man before?

24   A.    I don't know.

25              MR. WELCH:  Pass the witness.

1    THE COURT:  Any further questioning?

2    MR. NESTLER:  Thank you, Your Honor.

3                REDIRECT EXAMINATION

4    BY MR. NESTLER:

5    Q.   Just briefly, Mr. Schwager, Mr. Welch asked you about the

6    word "adjourned," the House adjourning or the Senate adjourning

7    to its chamber.

8         During the joint session of Congress, when the two Houses

9    are no longer meeting as a joint body but as separate bodies,

10   what do you call that?

11   A.   I'm sorry.  I missed that the word "adjourned" was used.  I

12   would have corrected that.

13        Adjourning is at the end of a session for the day or

14   proceeding.  We had recessed for the purpose of reconvening.  So

15   we had withdrawn to the Senate chamber.  But the proceeding for

16   the day had not been adjourned officially.

17   Q.   And we went over the law earlier that used the

18   word "dissolved."  What happens when the joint session is

19   dissolved?  What's going on at that point?

20   A.   The Vice President, President of the Senate, presiding

21   officer of the joint session, would have gaveled us out is how

22   we say it, and he would have declared the session dissolved.

23        And then I think -- I don't recall whether he adjourned the

24   joint session in the Senate or whether the Speaker did or what

25   happened at that point.

1    Q.   But until the joint session is dissolved, is the joint

2    session still ongoing?

3    A.   It is, and it could have been for a long time.

4         But yes, the joint session was not dissolved until some

5    time after 3:00 a.m.

6    Q.   And were you still there?

7    A.   I was.

8              MR. NESTLER:  No further questions.

9              THE COURT:  May this witness be excused?

10             MR. WELCH:  Yes, Your Honor.

11             THE COURT:  All right.  Thank you, sir.

12             THE WITNESS:  Thank you.

13             THE COURT:  Mr. Nestler, your next witness?

14             MR. NESTLER:  Thank you, Your Honor.  The United

15   States calls United States Secret Service Special Agent Paul

16   Wade.

17             THE COURT:  Mr. Nestler, will there be multiple

18   exhibits for this witness?

19             MR. NESTLER:  There will be three.  Two of them have

20   not been moved in yet, but I will move them in now.

21             THE COURT:  Do you have any objection, Mr. Welch, to

22   the government admitting the two exhibits?  Which numbers?

23             MR. NESTLER:  Exhibit 410, the Head of State

24   Notification Worksheet.

25             MR. WELCH:  No objection to that.

1          MR. NESTLER:  And Exhibit 221 is a surveillance video

2     clip.

3          MR. WELCH:  No objection to that.

4          THE COURT:  All right.  Those exhibits are admitted.

5        (Government Exhibits 410 and 221 received into evidence.)

6          MR. NESTLER:  Thank you, Your Honor.

7          PAUL WADE, WITNESS FOR THE GOVERNMENT, SWORN

8                       DIRECT EXAMINATION

9          BY MR. NESTLER:

10    Q.   Good morning, sir.

11    A.   Good morning.

12    Q.   Can you please state and spell your name.

13    A.   Paul Wade, W-a-d-e.

14    Q.   And where do you work?

15    A.   I'm with the United States Secret Service.

16    Q.   And if you could do me a favor, that large black thing in

17    front of you is a microphone.  Move a little bit closer to it

18    when speaking.  Thank you.

19         What is your position with the United States Secret

20    Service?

21    A.   I am a assistant to the Special Agent-in-Charge.

22    Q.   Are you also a Special Agent?

23    A.   Correct.

24    Q.   What does the assistant to the Special Agent-in-Charge do?

25    A.   It's a supervisory special agent position.

1    Q.    And how many people do you supervise?

2    A.    Four special agent staff assistants.

3    Q.    Where is your physical office located?

4    A.    At the United States Capitol.

5    Q.    How long have you been with the United States Secret

6    Service?

7    A.    22-and-a-half years.

8    Q.    You say your physical office is at the United States

9    Capitol.  Which part of the United States Secret Service are you

10   in?  Which division?

11   A.    Liaison Division.

12   Q.    And what does the Liaison Division do?

13   A.    We primarily coordinate Secret Service protectee visits to

14   the Capitol.

15   Q.    And what is the mission of the United States Secret

16   Service?

17   A.    Dual mission.  It's investigations and protection.

18   Q.    And who are you supposed to protect?

19   A.    We protect the president, vice president, and their

20   families, and foreign heads of state that visit the country.

21   Q.    Is the Secret Service part of an executive department of

22   the United States government?

23   A.    Correct.

24   Q.    Which one?

25   A.    It is the Department of Homeland Security.

1   Q.   Let's talk about prior to January 6 of 2021.  What, if

2   anything, did you do to prepare for security on January 6th?

3   A.   Prior to January 6, we -- the security plan was primarily

4   under the Capitol Police Board, their policies and procedures.

5   We did conduct a couple walk-throughs and sent formal

6   notification to the Capitol Police.

7   Q.   And did you have various conversations with your colleagues

8   at the Capitol Police on a regular basis about security and

9   issues like that?

10  A.   Correct.  We were also planning for the inauguration.  So

11  yeah, almost daily.

12  Q.   Let's pull up on the screen, Ms. Rohde, Exhibit 410,

13  previously admitted into evidence.  And if you could highlight

14  the top portion.

15       Are we looking at an e-mail here, Special Agent Wade?

16  A.   Correct.

17  Q.   Who sent this e-mail?

18  A.   Lanelle Hawa.

19  Q.   Who is Lanelle Hawa?

20  A.   She was one of my agents that I supervised at that time.

21  Q.   Were you copied on this e-mail?

22  A.   Yes.

23  Q.   What was the purpose of her sending this e-mail?

24  A.   The HOS notification is a Head of State Notification, and

25  it is our formal notification to the United States Capitol

1    Police of a Secret Service protectee visit.

2    Q.    And in the subject line, there are three individuals

3    listed.  Vice President Michael Pence, was he a Secret Service

4    protectee?

5    A.    Yes.

6    Q.    Was Mrs. Pence?

7    A.    Yes.

8    Q.    And was Charlotte Pence?

9    A.    Yes.

10   Q.    And if we could scroll to the next page, please, and if we

11   could start at the "USCP (tail) car," and highlight that,

12   Ms. Rohde.

13       What is a USCP (tail) car rendezvous location, Agent Wade?

14   A.    That's the location the United States Capitol Police would

15   send a vehicle to join up with our protectee's motorcade.

16   Q.    And where was the Capitol Police's vehicle supposed to join

17   up with the protectee's motorcade for January 6 of 2021?

18   A.    The Naval Observatory.

19   Q.    And who lives at the Naval Observatory?

20   A.    The Vice President.

21   Q.    And if we could just scroll down, please, to the itinerary.

22       And why does the Secret Service include an itinerary on the

23   information it provides to the Capitol?

24   A.    It's the latest information derived from staff and

25   sergeant-at-arms entities on the Capitol complex of the

1    protectee's itinerary.

2    Q.    And so according to the proposed itinerary, approximately

3    what time was the Vice President supposed to arrive at the

4    United States Capitol?

5    A.    Approximately 12:30.

6    Q.    And when it says "via M/C to Senate carriage," what does

7    that mean?

8    A.    Via motorcade.

9    Q.    And why does the Vice President travel in a motorcade?

10   A.    It's an organized Secret Service-protected motorcade.

11   Q.    And why does he use a motorcade, not in a regular car, for

12   instance?

13   A.    For his protection.

14   Q.    And where was the motorcade supposed to stage and wait for

15   the Vice President while he was inside of the Capitol on

16   January 6?

17   A.    On the east side of the Capitol, known as the Plaza.

18   Q.    Which agency is ultimately responsible for the Vice

19   President's security and safety while he is at the Capitol

20   building?

21   A.    The United States Secret Service.

22   Q.    Let's pull up on the screen, if you could, Ms. Rohde,

23   Exhibit 601A, already admitted into evidence.

24          Do you recognize the building in the center of this

25   photograph, Agent Wade?

1    A.    Yes.

2    Q.    What is it?

3    A.    The United States Capitol.

4    Q.    I want to talk about the perimeter on the west side between

5    the Peace monument and the Garfield monument.  Are you familiar

6    with those monuments?

7    A.    Yes.

8    Q.    On the morning of January 6, 2021, did you personally

9    observe that security perimeter?

10   A.    Yes.

11   Q.    What role, if any, would you have had if you believed that

12   the Capitol Police's security perimeter on January 6 of 2021 was

13   inadequate to protect your protectees, including the Vice

14   President?

15   A.    We could have raised any objections to United States

16   Capitol Police.

17   Q.    And on January 6, did you believe the security perimeter to

18   be adequate to protect your protectee when you saw it that

19   morning?

20   A.    Yes.

21   Q.    If we can take this down, please, Ms. Rohde.

22         So, on January 6, 2021, Agent Wade, did the Vice President

23   actually arrive at the Capitol complex?

24   A.    Yes.

25   Q.    How do you know?

```
 1    A.    Because I saw him.

 2    Q.    Approximately what time did he arrive?

 3    A.    Approximately 12:37.

 4    Q.    And what was your role in facilitating his arrival?

 5    A.    I was there with an additional liaison to facilitate access

 6    for the Vice President, Mrs. Karen Pence, and their daughter

 7    Charlotte Pence.

 8    Q.    And what's your role with respect to his security while he

 9    is there?

10    A.    I was dedicated to Mrs. Pence and Charlotte Pence.

11    Q.    When the Vice President got to the United States Capitol,

12    did he make his way to the Senate chamber?

13    A.    Yes.  Well, he first went to his office.

14    Q.    And around the time he went to the Senate chamber, what did

15    you do?

16    A.    The Senate chamber -- well, first, they went there -- they

17    went to his office as a family.  He went onto the Senate floor.

18    And then I took Mrs. Pence and Charlotte up to the third floor,

19    to the gallery level.

20    Q.    And while they were watching the proceeding from the third

21    floor gallery level, what were you doing?

22    A.    I was in the hallway outside the gallery.

23    Q.    And did there come a time when the Vice President left the

24    Senate chamber to go to the House chamber?

25    A.    Yes.
```

1    Q.    At that time what did you do?

2    A.    I escorted Mrs. Pence and Charlotte Pence via the third

3    floor over to the House gallery.

4    Q.    And did they enter the House gallery?

5    A.    Yes.

6    Q.    And at the time they entered the House gallery, what did

7    you do?

8    A.    I stood outside the House gallery.

9    Q.    Did there come a time when you escorted Mrs. Pence and

10   Charlotte Pence from the House gallery back to the Senate

11   gallery?

12   A.    Yes.

13   Q.    When you arrived back at the Senate gallery, what did you

14   do?

15   A.    I staged again outside the Senate gallery and engaged my

16   counterparts from the Capitol Police and the vice presidential

17   detail.

18   Q.    Did there come a time when you left that area outside the

19   Senate gallery?

20   A.    Yes.

21   Q.    Why?

22   A.    After briefing up my counterparts on any potential

23   emergency action procedures, I then went to the basement --

24   responded to the basement level to obtain some inauguration

25   paperwork.

1    Q.   And the basement level of the Capitol, is that where your

2    office is?

3    A.   Yes.

4    Q.   And you mentioned earlier you were also planning for the

5    inauguration around this time; is that right?

6    A.   Yes.  I was the lead liaison planner for the inauguration.

7    Q.   While you were in the basement of the United States

8    Capitol, what, if anything, did you hear that was out of the

9    ordinary?

10   A.   I was only down there a few minutes, and then I heard

11   scuffling and running about outside my office.

12   Q.   What did you think at that time?

13   A.   As I went out -- as I went -- peered outside, I saw

14   officers running and scrambling and saying that people were

15   breaching the bike racks.

16   Q.   What did you think to do?

17   A.   I immediately went to the protectees on the second floor.

18   Q.   And is there a certain place that you went to meet up with

19   the protectees?

20   A.   Yes.  Knowing that his office was on the second floor

21   outside the chamber, that's where I responded.

22   Q.   That's the Vice President's ceremonial office?

23   A.   Correct.

24   Q.   And when you got to the Vice President's ceremonial office,

25   did you observe Mrs. Pence and Charlotte Pence?

1    A.   Yes.

2    Q.   Was the Vice President there as well?

3    A.   Yes.

4    Q.   Where is the Vice President's ceremonial office located

5    with respect to the Senate chamber itself?

6    A.   It's on the north side of the chamber.

7    Q.   Is it very close to the chamber?

8    A.   Yes, just outside the -- what they call the Senate floor.

9    Q.   Let's discuss the motorcade we talked about a little while

10   ago.  Around this time, did you have any concerns with respect

11   to the Vice President's motorcade?

12   A.   Yes.

13   Q.   What concerns were those?

14   A.   Based on the intel we were receiving from officers and from

15   folks outside in the motorcade, that people were breaching the

16   bike rack and running onto the plaza.  So at that point, our

17   first thought is to relocate the motorcade if we could not use

18   it to relocate the Vice President, if needed.

19   Q.   And why is it important to relocate the motorcade if people

20   were around it?  In other words, what's the problem if people

21   are near the motorcade?

22   A.   The way the intel was, there was perceived threat on the

23   plaza from people breaching the bike racks.

24   Q.   At this time I'm going to pull up Government Exhibit 220,

25   which has been admitted.

1    And are you familiar with this view?

2  A.   Yes.  That's the east plaza.

3  Q.   And all of those cars in the center of this view, do you

4  know what those cars are?

5  A.   Yes.  The Vice President's motorcade.

6  Q.   And is this what the Vice President's motorcade looked like

7  approximately on January 6 of 2021 at around 1:58 p.m.?

8  A.   I did not witness it get staged there, but that is a common

9  staging location for the motorcade.

10 Q.   Got it.

11    So if we could play this forward.

12    (Video playing.)

13 Q.   Do you see all those cars moving?

14 A.   Yes.

15 Q.   Which cars are those?

16 A.   Those are -- that's the motorcade package for the Vice

17 President.

18 Q.   And are they at this time leaving the east plaza, where

19 they were supposed to be staged?

20 A.   Correct.

21 Q.   Okay.  You can stop it there, Ms. Rohde.  Thank you.

22    Let's go back to your presence in the Vice President's

23 ceremonial office, Agent Wade.  Did there come a time when the

24 Secret Service escorted the Vice President out of his ceremonial

25 office?

1    A.   Yes.

2    Q.   What role did you have with respect to that?

3    A.   After communicating with my liaison and additional Capitol

4    Police, the information received led us to believe that there

5    was imminent threat, as people were breaching the building at

6    that time.  So the decision was made that the Vice President

7    should be relocated.

8    Q.   And did you escort him while he was being relocated?

9    A.   Yes.

10   Q.   I'm going to pull up on the screen Government Exhibit 221,

11   already admitted into evidence.

12        And before we start playing it, Ms. Rohde, can you help us

13   understand, Agent Wade, what we're looking at here?  Where was

14   this view?

15   A.   You're looking at a lobby area just outside the rear of the

16   Senate chamber.  So that wooden and glass door enters the back

17   lobby area of the Senate floor, which goes into the Senate

18   chamber.

19   Q.   And how close is the Vice President's ceremonial office

20   once one enters through these wooden doors with the glass

21   inserts?

22   A.   Just inside to the right.

23   Q.   Do you see a blonde woman down on the first landing here?

24   A.   Yes.

25   Q.   And who is that?

1    A.    That's Lanelle Hawa.

2    Q.    And she's the one who works for you who sent that e-mail

3    that we talked about earlier?

4    A.    Correct.

5    Q.    And the man with his arms outstretched, do you know what

6    agency he works for?

7    A.    Actually, if you could rewind that so I could be clearer.

8    Q.    Sure.  We can play it forward for a second.  If you could

9    pause it there.

10         Do you know what agency he works for?

11   A.    Yeah, the Secret Service.

12   Q.    And do you know what's about to happen here?

13   A.    Yes.  This was just prior to us moving the Vice President.

14   Q.    And if we could play it forward.

15         (Video played.)

16   Q.    And then stop.  This is at 2:25:54 p.m.

17         Who is the man who is just about to walk down the stairs?

18   A.    Which gentleman?

19   Q.    Sure.  Why don't we rewind for a second.

20         The back gentleman.

21   A.    That would be me.

22   Q.    So that's you right there where we see the back of your

23   head?

24   A.    Yes, the third person just about to get to the staircase.

25   Q.    And if we could play it forward, stopping at 2:26 even.

1    (Video played.)

2    Q.    Who is the woman with the darker blonde hair on the right

3    side?

4    A.    In the front, the first female is Karen Pence.

5    Q.    And who is the woman behind her with the lighter blonde

6    hair?

7    A.    Charlotte Pence.

8    Q.    And if we could play it forward for an extra two seconds.

9         (Video played.)

10   Q.    And stop it there.  Who is the person with the white hair

11   at 2:26:01 who is facing backwards briefly?

12   A.    That's Vice President Mike Pence.

13   Q.    And if we could play it forward, Ms. Rohde.

14        (Video played.)

15   Q.    Thank you, Ms. Rohde.  You can take it down.

16        Agent Wade, did you stay with the Vice President and his

17   family after he exited the area of the Senate chamber?

18   A.    Yes.

19   Q.    And did you return with the Vice President and his family

20   to the Senate chamber area in the evening of January 6 of 2021?

21   A.    Yes.

22   Q.    At approximately what time?

23   A.    Approximately 7:00 p.m.

24   Q.    Now, how would you compare the number of Secret Service

25   personnel at the time you left the chamber when we just looked

1    at it at about 2:25 to the time you returned to the chamber at

2    about 7:00 p.m.?

3    A.    We added additional agents for his return.

4    Q.    And why did the Secret Service add additional agents for

5    the Vice President's return?

6    A.    Even though the Capitol Police gave us the all clear and

7    they had several tactical teams sweeping the building, just to

8    ensure his safety.

9    Q.    Earlier in your testimony, you used a phrase "emergency

10   action."

11         Do you remember doing that?

12   A.    Yes.

13   Q.    Is that a Secret Service phrase?

14   A.    Yes.

15   Q.    What does an emergency action mean to a layperson?

16   A.    An emergency action plan is something you'd execute if a

17   threatening action or a threatening event happened to a

18   protectee where you had to either move, relocate, or extract a

19   protectee from a situation.

20   Q.    Did the Secret Service take any emergency actions on

21   January 6 with regard to the safety and security of Vice

22   President Pence and his family?

23   A.    Yes.

24   Q.    Can you name some of those emergency actions for us?

25   A.    Well, it was a relocation for his safety.

1   Q.   So when you relocated the Vice President and his family,

2   that was an emergency action?

3   A.   Yes.

4   Q.   And what about bringing additional Secret Service personnel

5   to the Capitol?

6   A.   That could be considered as well, yes.

7   Q.   And what about relocating the Vice President's motorcade?

8   A.   Yes.

9           MR. NESTLER:  Thank you.  No further questions.

10          THE COURT:  Mr. Welch?

11          MR. WELCH:  Thank you.

12                      CROSS-EXAMINATION

13          BY MR. WELCH:

14   Q.   Good morning, Agent Wade.

15   A.   Good morning, sir.

16   Q.   My name is Bill Welch.  I'm also going to ask you some

17   questions.

18          To the best of your recollection, was the time stamp on the

19   last video that we watched with you and Vice President Pence

20   walking down those stairs at 2:28 p.m., was that approximately

21   correct, to the best of your recollection?

22   A.   Yes.

23   Q.   When you initially went and -- when you initially arrived

24   at the Capitol on January 6, you did not see my client

25   Mr. Reffitt, did you?

1    A.    No.

2    Q.    Now, when you went to Mrs. Pence and Charlotte Pence and

3    met with them because you were assigned to protect them, you did

4    not see my client Mr. Reffitt, did you?

5    A.    No.

6    Q.    And when you went with them to the Senate gallery and you

7    were in the hall, you did not see my client Mr. Reffitt, did

8    you?

9    A.    At no point on January 6 did I see your client.

10   Q.    At no point?

11         MR. WELCH:    Court's indulgence.

12         I'll pass the witness.

13         THE COURT:    Anything further?

14         MR. NESTLER:    Just briefly, Your Honor.

15                    REDIRECT EXAMINATION

16         BY MR. NESTLER:

17   Q.    Agent Wade, did you take those emergency actions,

18   relocating the Vice President and his family and the motorcade,

19   because of a specific person's actions?

20   A.    No.

21   Q.    Why did you take all those actions?

22   A.    Because we were advised there were hundreds of people

23   breaching the U.S. Capitol building.

24         MR. NESTLER:    No further questions.

25         THE COURT:    All right.    May this witness be excused?

 1          MR. WELCH:  Yes, Your Honor.

 2          THE COURT:  All right.  Thank you, sir.

 3          THE WITNESS:  Thank you.

 4          THE COURT:  So ladies and gentlemen, we can take a

 5     break now or start with the government's next witness.  Does

 6     anyone need a break?

 7        Anyone on the trial teams need a break?

 8          MS. BERKOWER:  We're ready to start, Your Honor.  And

 9     there are three exhibits that are to be admitted:  405, 111, and

10     163.

11          THE COURT:  Why don't you confer with Mr. Welch and

12     see if we can pre-admit those.

13        (Pause.)

14          MS. BERKOWER:  Your Honor, I've spoken to Mr. Welch.

15     I believe he does not object to pre-admitting 405, 111, and 163.

16          THE COURT:  Is there any objection, Mr. Welch?

17          MR. WELCH:  No, Your Honor.

18          THE COURT:  All right.  Those exhibits are admitted.

19        (Government Exhibits 405, 111, and 163 received into

20     evidence.)

21          MS. BERKOWER:  Your Honor, the government calls Rocky

22     Hardie.

23         ROCKY HARDIE, WITNESS FOR THE GOVERNMENT, SWORN

24          THE WITNESS:  May I remove my mask?

25          MS. BERKOWER:  You may.

DIRECT EXAMINATION

BY MS. BERKOWER:

Q.   Good morning.

A.   Good morning.

Q.   Can you please say and spell your name.

A.   My whole name?

Q.   Yes.

A.   Rocky Hardie, R-o-c-k-y H-a-r-d-i-e.

Q.   What state are you from?

A.   Texas.

Q.   What part of Texas?

A.   In the Austin area.

Q.   And do you work?

A.   Yes, I do.

Q.   What kind of work do you do?

A.   I build -- I manufacture in-ear earphones for listening to music.

Q.   Did you previously belong to a group called the Texas Three Percenters?

A.   Yes.

Q.   Do you know someone named Guy Reffitt?

A.   Yes.

Q.   Did you meet him through that group?

A.   Yes.

Q.   And in January of last year, did you travel to D.C. with

1   him?

2   A.   Yes.

3   Q.   Were you present on the U.S. Capitol grounds on January 6?

4   A.   Yes.

5   Q.   Did you also travel back to Texas with Mr. Reffitt?

6            MR. WELCH:  Objection.

7            THE COURT:  Overruled.

8            BY MS. BERKOWER:

9   Q.   You may answer.

10  A.   Yes.

11  Q.   So I'm going to ask you questions about each of those

12  topics.  Okay?

13  A.   Okay.

14  Q.   But I'm going to ask you about a few other things first.

15       Starting with the Texas Three Percenters, you said you were

16  a member of that group?

17  A.   Yes.

18  Q.   Do you also call yourselves by an acronym?

19  A.   You mean the Three Percenters by an acronym or --

20  Q.   The Texas Three Percenters, do you go by an acronym?

21  A.   An acronym?

22  Q.   Is TTP something that you all call the group?

23            MR. WELCH:  Objection.

24            THE COURT:  Overruled.

25            THE WITNESS:  Yes, TTP is what we're known as also.

1    BY MS. BERKOWER:

2  Q.   Approximately when did you join TTP?

3  A.   I'm not exactly sure.  It was either the end of 2019 or the

4  first part of 2020.

5  Q.   Why did you join TTP?

6  A.   A matter of concern for my safety.  I was -- during the

7  summer, they had a lot of riots, and the news media that I would

8  watch on YouTube, for instance, showed a lot of antifa burning

9  things down, destroying things, breaking windows, throwing fire

10  bombs at police officers and everything.

11      There is this one video where a guy, they're a part of BLM

12  or somebody, and he says, "Oh, you think this is just down here?

13  We're coming to your community."  And I got to thinking, well,

14  in my community, I don't know -- I don't know anybody that

15  could, you know, could watch my back.

16      And so I started looking around for some group of people

17  that was like-minded, that if I got in trouble I could pick up

18  the phone and say hey, I need some help.

19  Q.   And when you were in TTP, did you have a role assigned to

20  you in the group?

21  A.   I did.

22  Q.   What was the role?

23  A.   I was the comms officer, state-level comms officer.

24  Q.   What does "comms" mean?

25  A.   Comms is short for communications.

1    Q.    And what are the beliefs of TTP?

2    A.    The beliefs of TTP?  Well, I will tell you, when I joined,

3    I asked if they were racists, and they said no.  I said are

4    you -- are you like a white supremacist group, and they said no.

5    I said do you hate the government, and they said no.

6    Q.    Mr. Hardie, could you please explain what the beliefs of

7    the group are?

8    A.    What they are?  Okay.  The beliefs of the group -- well,

9    part of it is that they support law enforcement, and they

10   believe in supporting the Constitution, and they believe in

11   supporting the government as long as it follows the

12   Constitution.

13   Q.    And what does the Three Percenters' part of the group name

14   mean?

15   A.    The term 3 percent comes from the concept that during the

16   Revolutionary War of 1776, out of the whole population, only

17   3 percent actually took action, and that the other 97 percent

18   were happy to be under the King's rule.

19   Q.    And did TTP ever have in-person meetings?

20   A.    Yes.

21   Q.    Who was the leader of TTP?

22   A.    The state leader was Russ Teer.

23   Q.    Did he have nicknames in the group?

24   A.    He did.

25   Q.    What are the nicknames?

1    A.    His was "Dead Shot."

2    Q.    Did he also have a handle on online communications?

3    A.    Bowen, William Bowen.

4    Q.    Now, was Guy Reffitt in this group?

5    A.    Yes.

6    Q.    Did he have a job assigned to him?

7    A.    Yes.  Well, I would say loosely assigned, but assigned,

8    yes.

9    Q.    What was his job?

10    A.    He was like a vetting officer.  So if anybody wanted to

11    join, he would do research on them to see what their background

12    was before they're admitted.

13    Q.    Did you meet him in person through the group?

14    A.    Yes.

15    Q.    And was one of the group meetings at his house?

16    A.    Yes.

17    Q.    Are you still a member of TTP?

18    A.    No.

19    Q.    Around when did you leave the group?

20    A.    It would -- I think late -- gosh.  It was -- I had a visit

21    by the FBI.  I don't remember the exact date, but it was shortly

22    thereafter I was thinking, well, okay, this is not really what I

23    want to --

24    Q.    Was that before or after January 6 of 2021?

25    A.    It was after January 6th.

1    Q.    Now let's talk about your relationship with Mr. Reffitt.

2    Okay?  Did you ever hang out with him?

3    A.    A little bit.

4    Q.    Let's talk about the first time you hung out with him.

5    Okay?

6    A.    Okay.

7    Q.    Where did you meet when you went to hang out with him?

8    A.    We met at a park.

9    Q.    And was this before or after the 2020 election?

10   A.    Before.

11   Q.    Why were you interested in meeting him in person?

12   A.    Because I had talked to him on the phone.  I thought he was

13   an interesting person, and I thought we had similar beliefs.

14   Q.    Was there anything else that drew you to him in particular?

15   A.    Yeah.  In life, most people talk, but they don't do.  And

16   he seems to be a person that actually does things.  He gets

17   things done.

18   Q.    And why was that significant to you?

19   A.    Well, because I'm kind of the same way, you know?  If I say

20   I'm going to do something, I'm going to do it.

21   Q.    And when you met, did you bring your cell phones with you?

22   A.    We did bring them, yes.

23   Q.    Did you have them with you while you were sitting in the

24   park together?

25   A.    Not on my person, no.

1    Q.    Do you know if he had his on his person?

2    A.    I believe he did not.

3    Q.    And why didn't you have your phones with you?

4    A.    Because we have a general belief that we can be listened

5    to, and we didn't want to be listened to.

6    Q.    So where was your phone?

7    A.    In my car.

8    Q.    Did you talk about politics when you were in the park with

9    him?

10   A.    Yes.  We talked about a variety of things, but yes,

11   politics.

12   Q.    Generally speaking, did you have similar views?

13   A.    Yes.

14   Q.    And what did you talk about with respect to politics that

15   day?

16   A.    We talked about how the country is pretty much going down

17   the tubes, and we talked about what's going on in Washington and

18   the people that seemed to be corrupt and destroying our country.

19   Q.    Were there any people in particular that you felt were

20   destroying the country?

21   A.    Well, yes, there were.  We talked about a few.

22   Q.    Who?

23   A.    Well, one would be Nancy Pelosi.  We pretty much felt like

24   she's evil incarnate.

25   Q.    And anyone else?

1    A.    Let me think.  Well, we talked about President Trump, you

2    know, and we talked about what he stood for in the country and

3    everything and trying to make things right.

4    Q.    Now, you mentioned you were drawn to Mr. Reffitt because

5    you felt he was someone who did things?

6    A.    Yes.

7    Q.    Did you talk about doing things with him?

8    A.    We -- let's see.  I don't remember specifically at that

9    time if we talked about doing things.  There were -- there was a

10   thing in Temple at one point, but I don't remember exactly what

11   we talked about.

12   Q.    Did you speak about your philosophy on when it might be

13   appropriate to take action?

14   A.    I don't have a specific memory, but I would say that we --

15   we do ask ourselves, or we did ask ourselves, you know, how far

16   do you let things go before you have to take action and protect

17   your country.

18   Q.    And when you say "take action to protect your country,"

19   what kind of action were you talking about?

20   A.    I don't think that we had a specific -- we didn't have a

21   specific action, but -- let me think just a moment.

22        There was no singular event, for instance, that we were

23   discussing.

24   Q.    Well, let me be clear.  When you were referring to action,

25   were you talking about political action?

1    A.    It was nebulous.  Political action is one.

2    Q.    Did you also talk about when it might be appropriate to use

3    violent action?

4    A.    I know at various times that topic came up.  I don't recall

5    at that particular meeting if we talked about any kind of

6    violent action, but we knew that something has to be done at

7    some point.

8    Q.    Did the term "1776" come up at that meeting?

9    A.    At that particular meeting?  I don't recall if that term

10   came up, but I'm familiar with the term and what it means.

11   Q.    Did you previously tell the FBI that at that meeting you

12   talked about it being 1776?

13   A.    Oh, you mean like the scenario that we're in is like 1776?

14   Q.    Yes.

15   A.    Yes.

16   Q.    Can you explain what that part of the conversation was

17   about?

18   A.    Okay.  Well, during 1776 is the time of the Revolutionary

19   War when the colonists were rebelling against the King of

20   England.  And the idea was that the king was a tyrant and the

21   people had no redress of grievances.

22         And so basically, the -- this time frame that we're in now

23   is analogous to 1776, where a lot of people in society feel like

24   their government's not listening to them, and so they have no

25   choice but to rebel in some form.

1    Q.   So let's go on to a different topic.  After the 2020

2    election, did you have concerns about the integrity of the

3    election?

4    A.   Yes, I did.

5    Q.   Did you believe the results needed to be recounted?

6    A.   Yes.

7    Q.   Do you still -- or excuse me.

8         Did you believe the election was stolen?

9    A.   Yes, I did.

10   Q.   Do you hold those beliefs today?

11   A.   Today?  Yes, I do.

12   Q.   After the election but before January 6, did you

13   communicate with others in TTP about these views?

14   A.   Yes.

15   Q.   And did other people in TTP share those views?

16   A.   Yes.

17   Q.   Did you discuss this issue with Mr. Reffitt?

18   A.   Yes.

19   Q.   What was his view of whether the election was stolen?

20   A.   He agreed.  He felt like the election was stolen.

21   Q.   Let's talk now about your trip to D.C.  When did you start

22   considering traveling to D.C. for January 6?

23   A.   It was probably a week or ten days, something like that,

24   beforehand.

25   Q.   And during that time period, were you on a messaging chain

1  with TTP members?

2  A.    Yes.

3  Q.    Why were you considering going to D.C. initially?

4  A.    I guess a couple of reasons.  One, I felt like what's

5  happening in our country right now has historical context.  I

6  felt like the -- my perception that the election was stolen is

7  very, very significant.  It's kind of a catastrophic event for

8  our country, and I felt like I needed to be there.  The

9  president said hey, you know, I'd like 10 million people to show

10  up, and I said, well, I think maybe I need to be counted.

11      And then we had some communications on -- on the Telegram,

12  and then I saw something and said, well, okay, I think I need to

13  go.

14  Q.    So let's pull up some of that Telegram now.  Ms. Rohde, if

15  we could have Government Exhibit 1B4.1, going to PowerPoint

16  slide 2 and 3, and we will start with 2.

17      Mr. Hardie, do recognize you this to be a message that you

18  received over Telegram?

19  A.    Yes.

20  Q.    Who sent this message?

21  A.    That would be Mr. Reffitt, who is also known as Call to

22  Arms.

23  Q.    Was that his handle on Telegram?

24  A.    Yes.

25  Q.    Could you read this message out loud, please.

1    A.    Okay.  "We march on D.C. January the 6th with every beating

2    American heart.  We drain the swamp.  The House and Senate must

3    be held accountable for the tyrannical against the republic of

4    the people.  I will be leaving on January 4th to make the trip

5    and stand in solidarity or fight if needed.  Those of you

6    patriots that are true blooded warriors can join or you can join

7    or be tread on.  It's a commitment and that's no doubt, yet the

8    travel, commitment, and time will either be sacrificed now for

9    the greater good of the future.  Or we will lose the moment

10   forever.  Not making the sacrifice for this short time in your

11   life could be detrimental for the rest of your life.  Stand and

12   be counted."

13   Q.    What date was that sent?

14   A.    December 21st, 2020.

15   Q.    Was this one of the messages you considered when making a

16   decision to travel?

17   A.    Yes, I did, you know.

18   Q.    Could you explain how this impacted your decision?

19   A.    Well, I was already thinking about it, and then I read

20   this, and I said, well, I need to go.

21   Q.    And what about this in particular made you want to go?

22   A.    Stand and be counted, because it was pretty much what I was

23   thinking on my own.

24   Q.    Now, have you participated in various Telegram messaging

25   threads with members of TTP?

1    A.    Yes.

2    Q.    Did some of those include the defendant Mr. Reffitt?

3    A.    Yes.

4    Q.    Generally speaking, what is the tone of the exchanges in

5    those messaging threads?

6    A.    The tone?  Could you clarify "the tone" a little bit?

7    Q.    Well, generally speaking, do people speak in stark terms in

8    the messaging threads?

9    A.    In stark terms?  I think so.  I think there's kind of an

10   apocalyptic tone that permeates the thought process.

11   Q.    And before January 6, how seriously did you take messages

12   that had apocalyptic tone?

13   A.    I didn't take them that serious.  I understand that people

14   were concerned.  I was concerned.  But nobody -- you know, I

15   didn't think people would go down and do anything like other

16   than go to some local or regional protest and things like that.

17   Q.    Now, did you take the trip to D.C. with Mr. Reffitt?

18   A.    Yes.

19   Q.    How did you decide to travel with him?

20   A.    You mean what led to my decision?

21   Q.    How did it come about that the two of you traveled

22   together?

23   A.    Okay.  Well, I was already planning to go by myself, and

24   then I got word from Mister -- from the leader of TTP, Russ

25   Teer, and he said, Oh, well, Call to Arms wants to go, and his

1    travel companion dropped out.  He said, You might want to

2    contact him.

3        I did.  I called him, and he said yeah, and I said, okay,

4    great, we can save some money, let's go.

5    Q.   And after that, did you connect with Mr. Reffitt about the

6    plans?

7    A.   Yes.

8    Q.   So what did he tell you about the plan?

9    A.   What did he tell me?  Well, we discussed the travel.  I

10   said, Well, how are we going to get there, what's our path?  And

11   he said, We're going to travel up -- I forget what the

12   interstate is, and we will spend the night in Nashville, and

13   then we'll go from there to D.C. on the night before the event.

14   Q.   Did you discuss flying?

15   A.   I don't recall discussing flying.  I think we decided

16   immediately on that we were going to drive.

17   Q.   And who made the bookings for any hotels you were going to

18   stay at?

19   A.   Mr. Reffitt.

20   Q.   Now, during that conversation, did he explain the reason

21   why he wanted to go to D.C.?

22   A.   Well, he wanted to go to D.C. to -- do you have maybe a

23   specific question on that?

24   Q.   Well, did you talk about your separate reasons for wanting

25   to go?

1    A.    Yeah, we talked.

2    Q.    And you said you wanted to go to be counted --

3    A.    Right.

4    Q.    -- and to stand and be counted?  Is that what you testified

5    to a few minutes ago?

6    A.    Right.

7    Q.    What was his part of that conversation?  Why was he saying

8    he wanted to go?

9    A.    Well, we discussed and we talked about the need for the

10    people who are the corrupt people to be removed and replaced

11    with people who are not corrupt.

12    Q.    That was something that he raised or that you raised?

13    A.    He raised.

14    Q.    And what was he saying about needing to -- about these

15    corrupt people?  What did he express about them?

16    A.    That they need to be dragged out.  And he said no matter

17    whether they're Republican or Democrat, they're all corrupt,

18    they need to be dragged out and replaced with people that are

19    patriotic to the country.

20    Q.    What went through your mind as he said things like that?

21    A.    Well, I had pictures in my mind.  I'm a visual person.

22    So -- well, I didn't think it was something that anybody was

23    going to act on.  I had no concept before I went to D.C. that

24    there would be anything other than people standing around

25    listening to the president and then going and standing around

1    the Capitol building.

2    Q.   So did he share any specific plans with you to actually go

3    and remove people from the building?

4    A.   We had discussions that at the time it seemed like we were

5    joking around, and I considered it hyperbole.  And we talked

6    about Nancy Pelosi in particular.

7    Q.   Now, with regard to your plans in D.C., did you expect that

8    you would go to the Capitol area, the building, Capitol building

9    area?

10   A.   I didn't have a clear idea how it would unfold, because I

11   had never really been there.  I knew that the general plan was

12   that we would listen to the president speak, and then at some

13   point, the whole group of people can move toward the Capitol.

14        Other than that general idea, I didn't have anything

15   specific.

16   Q.   Well, what did you think was going to happen at the Capitol

17   itself?

18   A.   Well, you know, part of me counted -- I watched people do

19   protests on TV with signs and everything.  So I thought that

20   with that many people, there was probably over a million people

21   there, that's pretty significant, and I thought for sure that

22   people in the Capitol building would look out the window and say

23   wow, look at all those people, maybe we need to think about

24   this, you know.

25   Q.   Now, let me ask you a few follow-up questions on that.

1    A.    Okay.

2    Q.    Did you know what was happening inside the Capitol building

3    that day?

4    A.    Well, in general terms.  I knew what I read from the media

5    or heard, and that was that they were going to certify the vote.

6    Q.    So you knew they were meeting inside?

7    A.    Yes, uh-huh.

8    Q.    And when you said you were hoping they'd look outside, what

9    exactly were you hoping they would look outside and do?

10   A.    Well, I know that they were supposed to be certifying the

11   vote.  In my mind, I was like they would -- somebody would say

12   hey, you know -- there was a political struggle going on in that

13   building and in our society.  Some people want to stop the vote

14   or want to recertify or cancel it or whatever, and others don't.

15        And so I thought somewhere, somebody would look at it and

16   say okay, we're going to do something.  The end result would be

17   that they didn't certify the vote that day.

18   Q.    They did not certify?

19   A.    In my mind, that was the objection -- the objective, was

20   that by our presence there, that they would not certify the vote

21   that day.

22   Q.    Now, as you were planning the trip with Mr. Reffitt, did

23   you discuss bringing firearms to D.C.?

24   A.    Yes, we did.

25   Q.    Could you explain what discussion you had with him?

1    A.   The only thing that I -- well, there's a couple of things.

2    We discussed it.  I don't remember how it came about, but I

3    remember that we had a discussion.

4         And I have a concealed carry license in Texas, and I asked

5    what about reciprocity laws -- we're traveling through these

6    states, are we going to have any issues.  And we discussed,

7    well, it seems like every state that we're going to go through

8    is going to have reciprocity except for D.C.

9    Q.   And who had the information about what the laws were in the

10   different places you would be going?

11   A.   Well, I understood the basics of reciprocity.  I didn't

12   know anything about D.C. law.  And Mr. Reffitt knew a little bit

13   more than I did, and he said well, we can do these things, but

14   we can't do those things.

15   Q.   And when he said -- did he know about the laws in D.C.

16   specifically?

17   A.   I don't know how much he knew.

18   Q.   Did he give you information about the laws in D.C.?

19             MR. WELCH:  Objection.

20             THE COURT:  Overruled.

21             THE WITNESS:  I don't remember anything specific, but

22   I do remember that we discussed is it legal in D.C. to have a

23   handgun.

24             BY MS. BERKOWER:

25   Q.   And what was your discussion about that?

1  A.   Well, it's not legal.  And I said, Well, how about getting

2  a permit?  And he said, Well, you're not going to get a permit

3  in D.C.

4  Q.   So going into that conversation, did you know it was not

5  legal to have a handgun in D.C. without a permit?

6  A.   Yes, we did.

7  Q.   Did you personally know that before you spoke with

8  Mr. Reffitt?

9  A.   Yes, I did.

10  Q.   How did you know that?  I thought you just said you didn't

11  know much about the laws.

12  A.   Well, I know that I've read that it's almost impossible to

13  get a -- there may be laws that say yes, you can have a permit,

14  but in practical terms, you're probably not going to get one.

15  Q.   So who provided you with that information?

16  A.   I was reading the -- in that part, I was reading the media.

17  I think we both discussed and agreed that we weren't going to

18  get a permit.

19  Q.   So what conclusions did you reach, at the end of that

20  discussion about firearms, as to whether you would bring

21  firearms to D.C.?

22  A.   Well, first of all, what's the purpose?  The purpose was

23  for self-defense, you know.  And that's based on the things that

24  I had seen on the media before, with all the burning and the

25  looting and the fire bombing and stuff like that.  I had no idea

1    what to expect.

2        At one point, we discussed, you know, what are the

3    consequences, and are we willing to risk the consequences.  And

4    we decided that -- I think we used an expression it's better to

5    be tried by a jury of 12 than carried by six.

6    Q.   What does that mean to you?

7    A.   That means basically if you violate a handgun law and

8    you -- you'll probably go to jail, and at some point you will

9    get out, but if you die, you're not coming back.

10   Q.   And what conclusion did you reach about whether or not you

11   would bring guns to D.C. during that discussion?

12   A.   Well, we agreed on that one concept, and we said okay,

13   we're willing to take that risk.  We felt like that nobody would

14   ever know, nobody would ever get hurt.  We would be in, we would

15   be out, nobody would know, and we would go on with our life.

16   Q.   Now, before we go any further, I'm going to ask you a few

17   questions about an agreement you entered into with the

18   government.  Okay?

19   A.   Okay.

20   Q.   Ms. Rohde, if we could please have Government Exhibit 405,

21   which is in evidence, and may we publish it, please.

22       Mr. Hardie, do you recognize this exhibit?

23   A.   Yes, I do.

24   Q.   Is this an agreement you entered into with the government?

25   A.   Yes.

1    Q.    Did you sign this document?

2    A.    I did.

3    Q.    Did your attorneys sign this document?

4    A.    Yes.

5    Q.    And did Mr. Nestler sign this document on behalf of the

6    government?

7    A.    Yes.

8    Q.    So let's talk about the terms.  And Ms. Rohde, if we could

9    please go back to the first page.  Thank you for scrolling down.

10         Do you see the date on this document?

11   A.    It says May 19, 2021.

12   Q.    Did you first enter into this agreement in connection with

13   testimony you gave to the grand jury that was investigating this

14   matter?

15   A.    I'm sorry.  Could you repeat that, please?

16   Q.    Did you first enter into this agreement in connection with

17   testimony you gave to the grand jury?

18   A.    Yes.

19   Q.    And do you understand the agreement to also cover your

20   testimony here today?

21   A.    Yes.

22   Q.    Does this agreement require you to testify about both what

23   Mr. Reffitt did and what you did, even if that testimony

24   incriminates you?

25   A.    Yes.

1   Q.    And in exchange, has the government agreed not to use your

2   testimony to bring a criminal case against you?

3   A.    That's correct.

4   Q.    To be clear, though, does this mean the government cannot

5   charge you with a crime for what you did on January 6?

6   A.    I believe -- oh, okay.  Could you state that again, please?

7   Q.    Does this agreement prevent the government from charging

8   you with a crime for what you did on January 6?

9   A.    No.

10  Q.    So you can still be prosecuted for what you did?

11  A.    It's possible.

12  Q.    Is it the case that the government could bring a case

13  against you so long as it doesn't use the statements you gave in

14  connection with that agreement?

15  A.    Yes.

16  Q.    And does the FBI know information about you concerning

17  January 6 from sources other than your testimony?

18  A.    Yes.

19  Q.    Before this agreement existed, did you voluntarily talk to

20  FBI agents about what you did?

21  A.    Yes.

22  Q.    Did the FBI search your business?

23  A.    Yes.

24  Q.    Did the FBI search your house?

25  A.    Yes.

1   Q.    Did the FBI seize your firearms?

2   A.    Yes.

3   Q.    And did the FBI seize and search your electronic devices

4   such as your phone?

5   A.    Yes.

6   Q.    Court's brief indulgence.

7         So Ms. Rohde, you can take that down.

8         Mr. Hardie, let's talk now about your trip itself.  Okay?

9   A.    Okay.

10  Q.    Where did you leave from to go to D.C. for January 6?

11  A.    I left from my home near Austin.

12  Q.    How did you meet up with Mr. Reffitt?

13  A.    I drove to his home in Wylie.

14  Q.    When you got to his house, who else was there?

15  A.    To my knowledge, only Mr. Reffitt and myself.

16  Q.    And what did you -- what did you do when you got to his

17  house?

18  A.    We -- I pretty much transferred things from my car into his

19  car.

20  Q.    And what did you pack?

21  A.    Well, I packed clothing, and then I had an AR-15,

22  ammunition, and then I had a concealed handgun and extra

23  ammunition.

24  Q.    Where did you put your AR-15?

25  A.    The AR-15 was in a plastic case with a lock on it.  It was

1    broken down into two pieces, and it was put in the back cargo

2    area.

3    Q.   And I think, Ms. Rohde, if we could, please, show

4    Government's Exhibit 106 in evidence.   And Mr. Hopkins, please

5    publish it to the jury.   Thank you.

6        Do you recognize this vehicle?

7    A.   Yes.

8    Q.   What vehicle is it?

9    A.   It's a Chevy Equinox.   It's the vehicle we rode to D.C. in.

10   Q.   And where in this vehicle did you put your AR-15?

11   A.   Back in this back cargo area, you know.   They're long.   So

12   we just kind of put them in on kind of the left side in the

13   back.

14   Q.   And you said you brought ammunition for that firearm?

15   A.   Yes.

16   Q.   Where did you put the ammunition?

17   A.   The ammunition was under lock and key, and it was put on

18   the right side of the vehicle.

19   Q.   Did you also bring radios?

20   A.   Yes.

21   Q.   Why did you bring radios?

22   A.   So that we could remain in communication as we got

23   separated.

24   Q.   And how many radios did you bring?

25   A.   I brought two.

1   Q.   Now let's talk about some of the items that Mr. Reffitt

2   brought.  What did you see him pack into the car?

3   A.   Well, I saw that he had an AR, and he had his various gear,

4   various, you know, gear.  He had -- well, when he actually

5   packed the car, I didn't pay that close of attention, you know.

6   Q.   Well, you mentioned an AR.  Did you see him put his AR into

7   the vehicle?

8   A.   I saw him put his AR in the case in the vehicle, yes.

9   Q.   Did you see at that time what was inside the case?

10  A.   I don't recall what was in the case.  I don't think that he

11  actually opened the case.

12  Q.   At a later time, did he open the case, when you were in

13  D.C.?

14  A.   Hang on a second.  Let me think about that statement.  I

15  remember we had to make sure that they were broken down.  And so

16  we might have opened the cases and broken them down.  There's a

17  pivot pin.  You have to pull some pins and take the uppers and

18  lowers apart and set them aside.  We might have done that at

19  that location, but I don't recall specifically.

20  Q.   Did you know how to break yours down?

21  A.   I did, but it had been like 25 years.  I kind of forgot.

22  Q.   So how did you break yours down that day?

23  A.   Well, I had some assistance.  I asked, How do you do this?

24  I forgot.  It's kind of embarrassing.  So basically, you've

25  got -- an AR has a pivot pin here and another pin here, and you

1  pop the pin, and it can cause the rifle to break apart.  Then

2  you pull the other pin out, and you can separate the two halves.

3  Q.   And you said you asked someone a question about how to

4  break it down.  Who did you ask?

5  A.   I asked Mr. Reffitt.

6  Q.   And did he assist you?

7  A.   Yes.

8  Q.   Now, did Mr. Reffitt have any other weapons with him when

9  you were packing the car?

10  A.   Yes.

11  Q.   What other weapons?

12  A.   He had a handgun.

13  Q.   What kind of handgun?

14  A.   I'm not sure about the make and model, but I just know --

15  it was probably like a 9mm or something like that, I guess.

16  Q.   Well, did you examine it yourself?

17  A.   No, no, I didn't.

18  Q.   So 9mm is just a guess?

19  A.   Yeah, okay.  So I wouldn't know if it's 9 millimeters or

20  .45.

21  Q.   Now, where did you see this handgun?

22  A.   Well, in my course of knowing him --

23  Q.   Let's focus on the day you were packing the car.

24  A.   Okay.

25  Q.   Where did you see the handgun?

1    A.   Okay.  I don't know that I actually saw the handgun,

2    because it would have been concealed.  Mine is concealed.  So I

3    don't recall seeing it at that particular moment.

4    Q.   Did you later see it in D.C.?

5    A.   Yes.

6    Q.   And you said you had a handgun.  Could you explain where

7    you had your handgun?

8    A.   Yes.  I had a shoulder holster, and I kept my -- I have a

9    .45 caliber, and I kept it under my left armpit, and I had two

10    magazines under my right armpit.

11    Q.   I see you're gesturing under your jacket.  Do you have it

12    with you today?

13    A.   No, I don't.

14    Q.   Now, did you stay long at Mr. Reffitt's house before you

15    started the drive?

16    A.   Not terribly long, just long enough to transfer things over

17    and just kind of get everything organized.

18    Q.   Who drove?

19    A.   He did.

20    Q.   And did you talk along the way?

21    A.   Yes, we did.

22    Q.   About how many hours does it take to drive from that part

23    of Texas to Washington, D.C.?

24    A.   It's about 24 hours when you include your overnights.

25    Q.   And what did you talk about as you drove?

1    A.   We talked about family, and we talked about what's the

2    purpose of the trip and politics and things like that.

3    Q.   When you say "what's the purpose of the trip," what

4    specifically were you talking about?

5    A.   Talking about, again, you know, the condition of the

6    government and that people need to be -- people need to be taken

7    out of government and, you know, replaced with people who are

8    going to follow the Constitution.

9    Q.   Were there specific phrases that Mr. Reffitt used when he

10   was discussing removing people in government?

11   A.   Do you have like an example or --

12           MR. WELCH:  Objection.

13           MS. BERKOWER:  I can rephrase the question.

14           THE COURT:  Yes, please be more specific so he can

15   answer the question.

16           BY MS. BERKOWER:

17   Q.   Were there specific words Mr. Reffitt used when he talked

18   about removing people from the government?

19   A.   Let me think.  Specific words.  Well, we talked about we

20   gotta get the bastards out of there, and we talked about --

21   well, we kind of made a joke about Nancy Pelosi.

22   Q.   What joke did you make?

23   A.   Well, someone -- and I'm kind of going from a picture in my

24   mind, but we said something about she needs to be dragged out by

25   her ankles or by her feet or something.  And I made a joke,

1    because I could just imagine as she's going down, her head is

2    going boomp, boomp, boomp down the stairs, and I made a joke

3    about that.

4    Q.  When you talked about removing legislators, did you take

5    him serious at that point in time, as you're driving to D.C.?

6    A.  I didn't think he or anybody was going to get close to the

7    Capitol.  I thought that was impossible.

8    Q.  Why?

9    A.  You watch the news media and you always -- once in a while,

10    there's a news report about someone tries to jump the fence and

11    get close to the Capitol and he gets shot.  And I thought

12    nobody's going to get very close to the Capitol.  So I just

13    never took it seriously.

14    Q.  Did you also talk about TTP in the car?

15    A.  Yes.

16    Q.  What did you talk about with regard to TTP?

17    A.  Let me think.  I don't know specifically.  We talked --

18    Q.  I can ask a more specific question.

19    A.  Yeah.

20    Q.  Did you talk about whether people in TTP had joined you in

21    D.C.?

22    A.  Yeah, we did.  Basically, we were the only two that I know

23    that went up there, and we were kind of complaining about our

24    leader, because he was back there, I call, sorting his sock

25    drawer while he's telling everybody they need to go to D.C., and

1    he sits back at home with his family where it's nice and

2    comfortable.  And then that, you know, we made the commitment to

3    go stand and be counted.

4    Q.    When you say we made the decision to stand and be counted,

5    is that a reason that Mr. Reffitt gave you, or is that your

6    reason, or both?

7    A.    Let me think about that.  It was definitely my reason to be

8    counted.  He also wanted to be counted.

9        Do you have another --

10   Q.    I can ask you another question.  As you were driving, did

11   you stop anywhere overnight?

12   A.    Yes, we did.

13   Q.    Where did you stop?

14   A.    We stopped in Nashville, Tennessee.

15   Q.    And why did you stop there?

16   A.    To spend the night, sleep, get rested.

17   Q.    Is that about halfway between -- halfway point in the trip?

18   A.    Pretty much.

19   Q.    When you resumed the drive, in Virginia, did you do

20   something with your firearms before you arrived in D.C.?

21   A.    Yes, we did.

22   Q.    Could you explain what you did?

23   A.    Well, we already had broken down the ARs, because that's

24   what we thought was a legal way to transport them.  And we had

25   our handguns.  And so in Virginia, I believe that's where we

1    stopped, is right outside of D.C., then we took our handguns and

2    put them under lock and key.  We removed the ammunition from the

3    handguns, handguns in one case under lock and key, ammunition in

4    another case under lock and key.

5    Q.    And when you did that, did you see Mr. Reffitt's handgun?

6    A.    I didn't look at it specifically, because I was focused on

7    my own, but I know he had one, and he put it in a case.

8    Q.    And who was driving at the time that you stopped to put

9    these guns in a case?

10   A.    He was.

11   Q.    So did he pull over the car?

12   A.    Yes, he did.

13   Q.    Now, let's talk about what you did when you got to D.C.

14   A.    Okay.

15   Q.    Did you arrive on the night of January 5?

16   A.    Yes.

17   Q.    Did you go straight to the hotel?

18   A.    Yes.

19   Q.    And what hotel did you stay at?

20   A.    I always have a hard time remembering the name of the

21   hotel.  It was -- if you know the name -- I can't remember it,

22   but if you say it, I will remember yes or no if that was

23   correct.

24   Q.    Was it the Melrose Hotel?

25   A.    Yes.

1          THE COURT:  Ms. Berkower, sorry to interrupt, but can

2     you estimate how much more direct you have?

3          MS. BERKOWER:  I think we're about halfway done with

4     this witness, Your Honor.

5          THE COURT:  All right.  Ladies and gentlemen, I think

6     it's probably a good time to take a break.  So we will come back

7     in ten minutes, at approximately 11:35.  I will remind you all,

8     no talking, reading, or research.

9          (Jury exited courtroom.)

10          THE COURT:  All right.  You all good?  Any issues?

11          MR. WELCH:  May I be excused for a few minutes,

12     please?

13          THE COURT:  Of course.  You all take a break.

14          (Recess taken from 11:23 a.m. to 11:33 a.m.)

15          (Bench conference.)

16          THE COURT:  Just quickly while the jury is out, I

17     thought I would ask you, Mr. Welch, you've made a reference

18     several times to a witness having a Fifth Amendment issue.  Is

19     there anything we should be addressing now that you expect to

20     spring on cross that would require us to send the jury out?

21          MR. WELCH:  No, I don't imagine, because there's an

22     immunity letter on this witness.  So there wouldn't be a Fifth

23     Amendment privilege.

24          THE COURT:  You said someone might invoke the Fifth.

25     If that's going to happen with this witness -- maybe that's

1  coming with another witness, but I thought this might be the

2  witness.

3          MR. WELCH:  I had thought this might be the witness,

4  too, but if there's an immunity letter, he's probably not going

5  to do that.  And Jackson has already testified.

6          THE COURT:  All right.  I just wanted to check so that

7  we wouldn't keep them waiting.

8      Does the government have another witness on call after

9  Kennedy?

10          MS. BERKOWER:  We do.  We have several, actually, two

11  more.

12          THE COURT:  Great.  Thank you.

13      (End of bench conference.)

14      (Jury entered courtroom.)

15          MS. BERKOWER:  Your Honor, may we bring the witness

16  back in?

17          THE COURT:  Yes, of course.

18      (Witness resumed stand.)

19      THE COURT:  Sir, let me remind you that you're still under

20  oath.

21          BY MS. BERKOWER:

22  Q.  Good morning, again.

23  A.  Good morning.

24  Q.  Mr. Hardie, we were talking when we took a break about your

25  arrival at the hotel in D.C.

1    Do you remember being asked questions about that?

2    A.   Yes.

3    Q.   So let's pick back up there.

4    When you got to the hotel, what did you do?

5    A.   I was pretty tired.  I took a few -- I think maybe I took a

6    bag or something and was in the hotel lobby.

7    Q.   And what happened with the car?

8    A.   Mr. Reffitt parked the car.

9    Q.   Did you remove your firearms from the car at that time?

10   A.   No.

11   Q.   So where were the firearms being kept?

12   A.   They were still under lock and key in the compartment --

13   the cargo area of the vehicle.

14   Q.   And you didn't bring them inside, any of the guns that

15   evening, to your hotel room?

16   A.   No.

17   Q.   After you checked in, what did you do?

18   A.   Went upstairs and relaxed a little bit.

19   Q.   And Ms. Rohde, if we could, please, put up on the screen --

20   and this is admitted into evidence -- Government's Exhibit

21   1B20.1.1.

22   Mr. Hardie, do you recognize this exhibit?

23   A.   Yes, I do.

24   Q.   What is it?

25   A.   It's a selfie that I took of he and I together in the hotel

1    room.

2    Q.    And --

3    A.    Go ahead.

4    Q.    Could you explain who the person is on the left in this

5    photo?

6    A.    On the left is Mr. Reffitt.  On the right --

7    Q.    Who is on the right?

8    A.    Myself.

9    Q.    What do you have on your shoulders?

10   A.    That's my shoulder holster.

11   Q.    We can take that down, Ms. Rohde.  Thank you.

12         So let's go on now to what happened on January 6.  That

13   morning, did you and Mr. Reffitt prepare for the day's events at

14   the hotel?

15   A.    I'm sorry?  Say again, please.

16   Q.    Did you and Mr. Reffitt prepare for the day at your hotel

17   that morning on the 6th?

18   A.    Yes.

19   Q.    And in the room -- I should have asked you, when you stayed

20   at the hotel, did you have separate rooms or share a room with

21   Mr. Reffitt?

22   A.    We had a room with two separate beds.

23   Q.    So a shared room with two beds?

24   A.    Yes, uh-huh.

25   Q.    In the hotel room, what did you do to prepare for the day?

1  A.   I had an armored plate, but I didn't have the carrier vest.

2  And so I needed a way of securing it.  So I put newspaper and

3  Gorilla tape and made kind of a thing over my shoulders and

4  around my chest.

5  Q.   And who made the Gorilla tape -- who dealt with the Gorilla

6  tape?

7  A.   Well, I was assisted by Mr. Reffitt.

8  Q.   What else did you do to prepare for the day in your hotel

9  room?

10  A.   Let's see.  What did we do?  Let's see.  We organized --

11  what did we organize?

12  Q.   Well, I can ask you a more specific question.

13  A.   Okay.

14  Q.   Did Mr. Reffitt give you anything for the day?

15  A.   Yes.

16  Q.   What did he give you?

17  A.   He gave me some zip ties.

18  Q.   And what do you mean by -- what are these zip ties?  Why --

19  A.   These are like the real big heavy ones you use as

20  handcuffs.

21  Q.   And did you ask him about those items?

22  A.   Yes.  I said, What are these for?

23  Q.   What did he say?

24  A.   He said, well, in case we need to detain anybody or, you

25  know, something to that effect.

1    Q.    Ms. Rohde, if we could please have Government's Exhibit 11

2    in evidence.

3         Mr. Hardie, do you see any items that you recognize in this

4    exhibit?

5    A.    Yes.

6    Q.    Could you explain what they are?

7    A.    On the right is a helmet, and then in the middle is -- are

8    the zip ties.  And then I see --

9    Q.    Let me stop you there.

10   A.    Okay.

11   Q.    So the middle, could you describe what you're referring to

12   as zip ties?

13   A.    Well, they look like -- well, they're folded through and --

14   well, I don't know how you describe it.  It looks like a set of

15   eyeglasses turned sideways.

16   Q.    In this section of the photograph that Ms. Rohde just

17   expanded, are those the zip ties you're referring to?

18   A.    Yes.

19   Q.    Thank you, Ms. Rohde.

20        How many zip ties did the defendant give to you in the

21   hotel room?

22   A.    To the best of my recollection, it was two.

23   Q.    And what did you do with them?

24   A.    Put them on my -- somewhere on my belt or somewhere on my

25   side here.

1  Q.   Did he have any zip ties?

2  A.   Yes.

3  Q.   Where did he have zip ties?

4  A.   In a similar location, on his body.

5  Q.   Now, did you also -- you said that you had packed radios

6  for this trip.

7  A.   Yes.

8  Q.   What did you do with the radios on the morning of the 6th?

9  A.   I believe the radios were still in the vehicle, and then

10  when we left the hotel room, we went down to the vehicle, and we

11  started preparing for our walk to the Capitol.

12  Q.   Okay.  So let's talk about that now.  When you were down at

13  Mr. Reffitt's vehicle, did you take additional preparations for

14  the day?

15  A.   Yes.

16  Q.   Could you explain what you did?

17  A.   Okay.  We opened our cases for our ARs, and we reassembled

18  the ARs, you know, put the pivot pins back in so it's just one

19  long rifle.  We put it back in the case and locked the case.

20      We took out --

21  Q.   Well, let me stop you there and ask you a few more

22  questions about that.

23  A.   Okay.

24  Q.   Who assembled -- who reassembled your AR?

25  A.   I assembled my AR.

1   Q.   And did you see what the defendant was doing with his?

2   A.   I didn't specifically.  I was so focused on what I was

3   doing.  I was kind of in a hurry, nervous, and things like that.

4   Q.   And were you aware of whether he was doing anything with

5   his AR while you were doing that with yours?

6   A.   Well, he was doing the same thing.  He was reassembling his

7   and putting it back in the case.

8   Q.   And where was he standing in relation to you?

9   A.   He would be on my left side.  I'm on the right side.

10  Q.   And how much distance was between you?

11  A.   I don't know, three or four feet.

12  Q.   You're gesturing with your arm.  Fair to say an arm's

13  length between you?

14  A.   Something like that.  Pretty close.

15  Q.   So why were you reassembling your ARs?

16  A.   Because we were being prepared for like what if we needed

17  them, like what if something bad happened and we needed to get

18  them quickly; we don't have time to put everything together.

19  Q.   So what were you anticipating doing with them?

20  A.   Well, we were concerned for our safety, and we were

21  concerned for the safety of the people in general.  That's based

22  on the things that I saw on -- we saw on YouTube videos like

23  where police were being fire bombed, people were in precincts,

24  boarded up, and antifa is trying to burn them out alive, all

25  kinds of stuff like that.

1    We just said, well, we don't know what's going to happen,

2    but we may need to protect other people as well as ourselves.

3    Q.   Did your plan for the ARs relate to using them in the event

4    of violent action on the streets?

5    A.   By "violent action," you mean -- okay.  The concept that I

6    had, and I believe -- I'm going to speak for my own self.  The

7    concept that I had was there could be violence on the street

8    from these violent groups like antifa.

9    Q.   And what were you going to do with regard to your ARs if

10   there was violence that day?

11   A.   I didn't have a specific plan, but the idea was if these

12   people were hurting other human beings, then we would use the

13   ARs against them.

14   Q.   Mr. Hardie, didn't you previously say that your plan was to

15   come back and get your ARs if you needed them?

16   A.   Yes.

17   Q.   Is that true?

18   A.   Yes.

19   Q.   And did you discuss that with Mr. Reffitt --

20   A.   Yes.

21   Q.   -- prior to the 6th?

22   A.   Yes.

23   Q.   Now let's talk about other preparations that you made while

24   you were down at the car.

25       Did you see Mr. Reffitt put on any items of clothing?

1    A.    Yes.

2    Q.    What items did he put on?

3    A.    A plate carrier vest, I believe it was green, and there was

4    the helmet that you saw in that last picture, and a GoPro camera

5    on the helmet.

6    Q.    And what kind of vest was it?

7    A.    Well, it kind of looked like an armored vest like you would

8    use in the Army or something.

9    Q.    Did you pick it up?

10   A.    I didn't, no.

11   Q.    Do you know if it had plates in it?

12   A.    I didn't see the plates go in the vest, but I believe there

13   were plates in the vest.

14   Q.    Was that based on things he was saying?

15   A.    Well, it's based on the fact that over the course of time

16   people talked about the plates -- on the messaging, people

17   compared what they were buying:  I bought these plates, and I

18   bought those plates, and I got mine, did you get yours, you

19   know.

20   Q.    Now, did you -- you mentioned that you had left the radios

21   in the car.  So did you do anything with the radios when you got

22   down to the car?

23   A.    Yes.  I just quickly, you know, checked to make sure the

24   batteries were good and that they were on the proper channel and

25   the proper squelch numbers.

1    Q.    And did you take one of the radios for yourself?

2    A.    Yes.

3    Q.    What did do you with the other radio?

4    A.    Gave it to Mr. Reffitt.

5    Q.    Did Mr. Reffitt have a coat on?

6    A.    A coat?

7    Q.    Yeah.

8    A.    Yes.

9    Q.    What color?

10   A.    Blue.

11   Q.    And was there anything on top of Mr. Reffitt's helmet?

12   A.    Yes.

13   Q.    What was on top?

14   A.    A GoPro camera.

15   Q.    Did he bring any items -- well, let me rephrase that.

16         Did he give you any items to carry throughout the day?

17   A.    Yes.

18   Q.    What did he give you?

19   A.    Two American flags.

20   Q.    And did he have anything in his hands as you were walking?

21   A.    Yes.

22   Q.    What?

23   A.    He had a megaphone.

24   Q.    Now let's talk about the handguns.

25         You said that before you got to D.C. you had pulled over to

1    the side of the road and put them in a locked case; is that

2    right?

3    A.    Yes.

4    Q.    What did you do with the handgun you brought on the morning

5    of the 6th?

6    A.    I recovered my handgun from its case, and I loaded it with

7    a magazine, put the handgun in my shoulder holster, and I put

8    two additional magazines also in my shoulder holster.

9    Q.    What did Mr. Reffitt do with his handgun?

10   A.    I didn't see specifically, but he would have it on his hip.

11   Q.    And after that, what did you do next?

12   A.    We locked the car and began walking toward the Capitol.

13   Q.    And to be clear, where were the ARs when you locked the car

14   and walked off?

15   A.    Okay.  The ARs were in their respective carry cases under

16   lock and key in the cargo area, the rear cargo area of the car.

17   Q.    Were they assembled or disassembled?

18   A.    They were assembled.

19   Q.    So after you assembled them, you left them assembled?

20   A.    That's correct.

21   Q.    Court's brief indulgence.

22       Now, after this, where did you go?

23   A.    We walked on the street, kind of like in the front of the

24   hotel.  I don't remember the name of the street, but we were

25   walking in the general direction of the Capitol.

1  Q.  Did you go to the National Mall and the Ellipse area?

2  A.  Yes.

3  Q.  And were you with Mr. Reffitt at that time?

4  A.  Yes.

5  Q.  What did you find when you got to the Mall?

6  A.  A lot of people.

7  Q.  And what did you do at the Mall?

8  A.  I was there, I was watching -- well, let's see.  What did

9  we do at the Mall?  I took pictures.  Myself, I took pictures.

10 Mr. Reffitt was in the crowd as well.

11 Q.  Was Mr. Reffitt speaking with people?

12 A.  Yes.

13 Q.  Could you hear the content of what he was saying?

14 A.  No.  I wasn't really paying attention.

15 Q.  Now, Ms. Rohde, if we could, please, pull up -- and this is

16 already admitted into evidence, so we can have the jury screen

17 on as well -- Government Exhibit 1B20.2.1.

18     Mr. Hardie, do you see them on the screen in front of you?

19 A.  Yes.

20 Q.  Prior to coming to court, did you review this exhibit?

21 A.  Yes.

22 Q.  And can you tell us what you see on the screen in front of

23 you?

24 A.  It looks like a wide-angle view of Mr. Reffitt looking

25 upward from about the waist.

1    Q.   Do you see a black box in the center of the screen?

2    A.   A black box?

3    Q.   Well, a square item, rectangular item.

4    A.   Yes.  It looks like the radio that I provided.

5    Q.   Now, Ms. Rohde, if you could just play the video from the

6    start to 12 seconds.

7         (Video played.)

8    Q.   You can stop it there at 13 seconds.  Thank you.

9         Mr. Hardie, did you see yourself in those few seconds of

10   video?

11   A.   Yes, I did.

12   Q.   Where were you standing?

13   A.   I was standing in close proximity to Mr. Reffitt.

14   Q.   And did you hear him say "all right, Rocky," or "okay,

15   Rocky, gotta push forward"?

16   A.   I would have, but I turned my body to turn in another

17   direction, but yes.

18   Q.   Was he referring to you?

19   A.   If he said Rocky, he was referring to me.

20   Q.   While you were on the Mall, did you listen to the

21   president's speech?

22   A.   I listened to it on and off.  I wasn't really -- I couldn't

23   hear very well.  My attention was more on the people at the

24   crowd.

25   Q.   After the speech, what did you do next?

1    A.    After the speech, the whole crowd started just -- like a

2    herd of cattle started moving in one direction, and I just

3    followed along with them.

4    Q.    And where was Mr. Reffitt at this point?

5    A.    Well, just before that, somebody called and said oh, we

6    need help, somebody needs medical attention, or something to

7    that effect.  And I think he might have raised his voice and

8    said, I can help, or something like that.

9          Anyway, he was following through, and people were kind of

10   opening up, and he was going through, and I was trying to follow

11   behind him.

12   Q.    As far as you know, does Mr. Reffitt have any medical

13   training?

14   A.    I don't know that he does.

15   Q.    Okay.  And at that point, after he left through the crowd,

16   were you still with him, or were you separated?

17   A.    I lost track of him.

18   Q.    So did you continue to communicate with him after that

19   point?

20   A.    Yeah, at various times, yes, I would make radio contact.

21   Q.    Was that through the radios you had provided?

22   A.    Yes.

23   Q.    And so when -- after that point when he went through the

24   crowd, when did you next see him?  Not talk to him but actually

25   see him.

1   A.   Oh, back at the hotel that evening.

2   Q.   In the interim time, while you were still at the Mall and

3   walking to the Capitol, did you communicate with him on the

4   radio?

5   A.   Yes.

6   Q.   And what information did you get from him over the radio?

7   A.   His location.  He was well ahead of me.  And he said, "I'm

8   at the Capitol," and I said, "I'll be there soon."

9   Q.   And were you still heading in that direction?

10  A.   Yes.

11  Q.   Now, let's put a pin in what Mr. Reffitt was telling you

12  and talk about what you did at this point.  Okay?

13  A.   Okay.

14  Q.   Did you actually walk all the way down to the Capitol area

15  or the area of the Capitol building?

16  A.   Yes, I did.

17  Q.   What did you do when you got there?

18  A.   I was taking pictures and making videos and commentary and

19  just looking at people.

20  Q.   Did you go inside the building?

21  A.   No.

22  Q.   Did you go up the stairs, up to where the -- to the outside

23  of the building?

24  A.   Okay.  When I first got there, it was kind of what I call

25  the back of the building.  That's the place where people were

1  climbing up scaffolds and things like that.

2  Q.   What went through your mind when you saw people climbing up

3  scaffolds and things like that?

4  A.   Well, I first noticed it at a distance, and they looked

5  like spiders climbing up walls, and I said wow, these people are

6  really doing it, these guys are, like, climbing the walls of the

7  Capitol.

8  Q.   And when you got closer, what did you do?

9  A.   I continued taking pictures.  I got closer, and I got to

10 the point where there was a police barricade.

11 Q.   And what happened when you got to the police barricade?

12 A.   There were -- I could hear agitators around me, and then

13 there were people, you know, shouting, and then at one point,

14 police came out, and they just kind of did like this

15 (indicating).  And the police went back, and people started

16 shaking the barricades and pushed the barricades over.  And then

17 they started fighting with police and things like that.

18 Q.   Now, let's be clear about something.  Did you yourself have

19 any encounters with police that day?

20 A.   When you say "encounters," what do you mean?

21 Q.   Did you have any physical fights with police that day?

22 A.   No.

23 Q.   Did you have any verbal exchanges with police that day?

24 A.   I had a one-way.  When I was at the barricade, I said to

25 one of the -- there was a Capitol Police in riot gear in front

1    of me, and I said, "You know, we're all people."  I said, "Your

2    family is the same as my family.  It doesn't matter what color

3    we are or where we come from.  Those assholes up there are

4    making laws that affect us."  And I said, "I support law

5    enforcement.  I've got friends and family in law enforcement."

6         And that was the gist of what I said.

7    Q.    Did the police officer respond to you?

8    A.    No.

9    Q.    Did you engage in any other fights or physical

10   confrontations with people that day?

11   A.    No.

12   Q.    And how close did you get to the Capitol building?

13   A.    On the back wall, I actually got close enough to touch it.

14   Q.    Were you still on the ground, or had you climbed up?

15   A.    I never climbed.  I was always on the ground.

16   Q.    And how long did you stay in the area of the Capitol

17   building?

18   A.    I'm going to estimate about 30, 40 minutes on the back

19   side.

20   Q.    Why did you leave?

21   A.    I had a radio communication from Mr. Reffitt saying he was

22   going around to the other side.  At some point, I said, "Okay,

23   I'm going to go around there and meet you."

24   Q.    Let's talk more about the radio communications you were

25   getting from Mr. Reffitt.

1    A.    Okay.

2    Q.    What do you remember him telling you over the radio about

3    what he was doing at the Capitol?

4    A.    Well, at some point, he said he was trying to go inside the

5    building.

6    Q.    And could you see him at that point?

7    A.    No.

8    Q.    Did he mention whether or not he had gotten sprayed with

9    pepper spray?

10   A.    At some point, he did.

11   Q.    What did he say about that?

12   A.    He said, "I can't continue any farther.  This" -- I don't

13   remember specifically, but basically that he had gotten sprayed,

14   and he was in some pretty bad shape, and he was going to go back

15   to the hotel.

16   Q.    And did he -- did he tell you whether or not he was

17   continuing to try to advance toward the building?

18   A.    During the time we're at the Capitol, I don't recall

19   specifically that he said he did, but I know that we had a

20   conversation back at the hotel.

21   Q.    So while he was -- while you were at the Capitol building,

22   did you see Mr. Reffitt at all?

23   A.    No.

24   Q.    And the communications -- the information that you had

25   about him, where was that coming from?

1   A.   From my radios.

2   Q.   And about how many radio transmissions did you have with

3   him?

4   A.   Over the course of the day?

5   Q.   Just while you were at the Capitol building and you were

6   separated from each other.

7   A.   It could have been six, seven, something likes that.

8   Q.   Were they brief or long?

9   A.   Fairly brief.  The communication was broken because the

10  Capitol building blocked the signal.

11  Q.   So what did you do after that?

12  A.   Well, I -- are you asking what did I do after I left the

13  Capitol building?

14  Q.   Sorry.  I can ask a more specific question.

15       Let's go now to the next time you saw Mr. Reffitt.  Okay?

16  A.   Okay.

17  Q.   You said earlier that was when you were back at the hotel?

18  A.   Right, yeah.

19  Q.   So what happened when you saw Mr. Reffitt back at the

20  hotel?

21  A.   I walked in.  I was pretty tired.  And he said, "Man, this

22  bear spray or whatever," he said, "Man, this is kicking my ass."

23  He said, "My lips feel like they're on fire."

24  Q.   Did he give you details about his day?

25  A.   Over the course of time, yeah.

1  Q.   So what did he tell you about his day?

2  A.   Well, he said that he tried to get in, and he said there

3  was a lady Capitol Police and that she had been shooting him

4  with the rubber -- round rubber balls and shot him in the breast

5  plate.  And he said that she was really surprised that they

6  didn't phase him.  He said her eyes got big.  And then he said,

7  "Hmm, I thought for a moment she was going to shoot me in my

8  nuts, and she considered that and shot me in the legs instead."

9  Q.   What did he say about how far he got toward the building?

10 A.   Well, I remember him saying he didn't get inside, but he

11 was attempting to go inside, and then he was being shot.  And

12 this Capitol police officer was a female, and he said she just

13 looked oh, my God, you know.  And he said, "Lady, I don't want

14 to hurt you, but every time you shoot me, I'm going to keep

15 going forward."  He said at one point, "Would you just stop

16 doing that?  It hurts, you know."

17 Q.   And what else did he tell you about going -- his

18 interaction with the police?

19 A.   Let me think.  I don't know if it was that female officer

20 or if it was somebody else, but they had used a smaller canister

21 of --

22 Q.   Let me stop you there.  Did he tell you what you're

23 describing now?

24 A.   Yes.  I didn't see it.

25 Q.   So what did he tell you about the other officers?

1    A.   Basically, that one person tried to -- sprayed him with

2    some kind of pepper spray.  Then they brought out kind of like

3    bear spray, and he said it was all over after that.  He said, "I

4    just couldn't go any further."

5    Q.   And did he express to you whether or not he wanted to go

6    further but for this pepper spray?

7    A.   Yes.

8    Q.   What did he say?

9    A.   He said, "Well, I couldn't continue on, but I made it

10   possible for other people to continue."

11   Q.   What else did he tell you about the other people that

12   continued?

13   A.   Nothing specific comes to mind right now.  I mean, there's

14   one person, a female, who offered him water and assistance, and

15   he felt like that she was his angel, you know.  That's the only

16   thing I can think of.

17   Q.   And as he told you this, what, if any, emotion was he

18   expressing?

19   A.   Could you give me an example of emotion?

20            MR. WELCH:  Objection.

21            THE COURT:  Just answer the question.  If you can't

22   answer the question, just say that.

23            THE WITNESS:  All right.  Emotion.

24        Back at the hotel, well, there was pain, obviously, and

25   then there was -- we talked about what we did, and we were kind

1    of bragging a little bit.

2            BY MS. BERKOWER:

3    Q.   Was he proud?

4    A.   Yeah.

5    Q.   And how did he look physically?

6    A.   He looked in pretty bad shape.  His face was red --

7    Q.   Okay.  Sorry.  Describe what you mean by that.

8    A.   I'm sorry?

9    Q.   I'm sorry I interrupted you.  What did you mean by he

10   looked like he was in pretty bad shape?

11   A.   I guess it was bear spray or something, pretty strong

12   stuff.  He was red all over his body.  And then I took a picture

13   of his legs, where he had been shot with the little rubber

14   balls.

15   Q.   And Ms. Rohde, if we could please have Government's

16   Exhibit 163 in evidence.

17           Is this the photo you took?

18   A.   Yes.

19   Q.   And could you explain what's significant about this photo

20   to you?

21   A.   Well, he had told me that he got shot in the legs.  Of

22   course, this is where he got shot.

23   Q.   What are you referring to when you say "this is where he

24   got shot"?

25   A.   On each leg, there are round regular circles or disks.  On

1    the right side, you see one; on the left side, you see two.

2    Q.    And what did you understand those to be?

3    A.    The welts -- the welt marks from being shot by the Capitol

4    Police in the legs with the rubber balls.

5    Q.    You can take that down, Ms. Rohde.  Thank you.

6          When you got back to the hotel that day, how did you feel

7    about what you had done?

8    A.    I was kind of excited and a little fascinated.

9    Q.    What were you excited about?

10   A.    I think just having -- well, I had this experience that's

11   like a once-in-a-lifetime experience, and I felt like it was

12   kind of historically significant.  I actually showed up, and I

13   saw a lot of different things that I don't normally see.

14   Q.    Were you proud of what you had done?

15   A.    I would say yeah.  I wasn't ashamed.  I was proud, yeah.

16   Q.    And when Mr. Reffitt told you about what he had done, how

17   did you feel about what he had done?

18   A.    Well, I was pretty impressed that he did what he did.

19   Q.    Why were you impressed?

20   A.    Well, I felt like he had more courage than I did.  I wasn't

21   going to go up there.

22   Q.    Now, that night, did you stay again in that same hotel room

23   you had been in the night before in D.C.?

24   A.    Yes, we did.

25   Q.    And did you see Mr. Reffitt's handgun that evening?

1  A.    I did.

2  Q.    Where did you see it?

3  A.    It was on the nightstand between the two beds.

4  Q.    Was it in a holster or not?

5  A.    I'm not sure.  I'm trying to see a picture in my mind, and

6  I don't see a clear picture of whether it was in a holster.  I

7  just remember seeing from the back.  I remember kind of seeing

8  it from the back side.

9  Q.    And where did you have your handgun that night?

10  A.    I would have had it in my shoulder holster.

11  Q.    That night while you were sleeping?

12  A.    Okay.  So we're talking about when we came back from the

13  Capitol --

14  Q.    Yes.

15  A.    Well, I wasn't sleeping with it like a teddy bear, but I

16  had it somewhere in my room.

17  Q.    Court's brief indulgence.

18        All right.  Let's talk now about your trip back to Texas.

19  A.    Okay.

20  Q.    When did you leave?

21  A.    The morning of the 7th.

22  Q.    And what did you do to prepare for your trip home?

23  A.    We packed our bags and took -- of course, we wore our

24  handguns going down to the parking garage, and we took our bags

25  down and put them in the car.

1    Q.   So coming in to D.C., you had disassembled and locked up

2    your handguns; is that right?

3    A.   That's correct.

4    Q.   Returning to Texas, did you follow that same procedure?

5    A.   Yes.  We returned our handguns to their case and the

6    ammunition to its case.  We opened the cases for the ARs, and we

7    disassembled them and relocked the cases and left them basically

8    in the rear area of the vehicle.

9    Q.   And did you do that for your AR?

10   A.   Yes.

11   Q.   Did you see Mr. Reffitt do that for his AR?

12   A.   Yes.  I know that he also disassembled his.

13   Q.   And what about the handguns?  Did you see Mr. Reffitt

14   disassemble his?

15   A.   I don't recall specifically seeing him, but -- I don't have

16   a specific visual memory of him doing that.

17   Q.   And did you disassemble yours, or did you just bring it on

18   your person for the drive home?

19   A.   I disassembled mine and -- I disassembled -- I've got to

20   stop and think for a moment.  I'm trying to remember specifics.

21   Q.   Take your time.

22   A.   Okay.  Yeah, we -- so we took our handguns and put them

23   back in the cases and the ammunition as we're preparing to

24   drive.

25   Q.   When did you reassemble the handguns?

1   A.   I don't recall specifically.

2   Q.   While you were driving back, did you make another overnight

3   stop?

4   A.   Yes.

5   Q.   Where did you stop?

6   A.   We stopped in Nashville.

7   Q.   Again?

8   A.   Yes, uh-huh.

9   Q.   Did you have your handguns on your persons while you were

10   in Nashville?

11   A.   I want to say we did, and I don't recall -- I don't recall

12   specifically what happened, but I think we did.

13   Q.   When you got back to Texas, did you have your handgun on

14   your person?

15   A.   Yes.

16   Q.   So at some point after leaving D.C., did you return your

17   handgun to your shoulder holster?

18   A.   Yes.

19   Q.   And what about Mr. Reffitt?  When he got back to Texas, did

20   he have his handgun out again?

21   A.   I -- well, okay.  I don't have a visual recollection of

22   seeing his handgun on him, but I believe that he did, because it

23   was our habit to carry them.

24   Q.   So -- hold on a second.

25              THE COURT:  Ms. Berkower, can you pick up?

1    (Bench conference.)

2    THE COURT:  How much longer are you going to go on the

3    handguns back in Texas?  Why is this so relevant?

4    MS. BERKOWER:  I believe Jackson Reffitt testified

5    that when Mr. Reffitt walked in the door his handgun was on his

6    hip.

7    THE COURT:  But the whole trip to Texas?

8    MS. BERKOWER:  Understood, Your Honor.  I'm trying to

9    see --

10    (End of bench conference.)

11    BY MS. BERKOWER:

12    Q.   During your trip home, did you speak with Mr. Reffitt about

13    the events of January 6?

14    A.   Yes.

15    Q.   And what was the conversation on the way home?

16    A.   We talked about -- kind of rehashed some of the things that

17    happened there.

18    Q.   And did you view that conversation differently than you had

19    viewed the conversation on the way up to D.C.?

20    A.   How do you mean?

21    Q.   Well, did you talk about similar topics that you talked

22    about on your way to D.C.?

23    A.   Similar, yes.

24    Q.   And you said previously when you drove up to D.C., you

25    didn't take it very seriously; right?

1    A.    Yeah.

2    Q.    Did you view this conversation differently on your way home

3    to Texas?

4    A.    Yes.

5    Q.    Why?

6    A.    Because when we were going up, everything was hypothetical,

7    and then the actual events happened.  Then people were climbing

8    the walls and trying to get into the Capitol building, and so

9    that was something I didn't anticipate whatever happened, and I

10   saw it happen.  So I said wow, people are serious.

11   Q.    And what about specifically with regard to Mr. Reffitt?

12   A.    Well, I guess he was serious.

13   Q.    And was that based on what he told you about the events of

14   January 6?

15   A.    It was based on my knowing from conversation that he had

16   attempted to go into the building, yes.

17   Q.    When you got back to Mr. Reffitt's house, what did you do?

18   A.    I transferred my equipment from his car to mine, and then I

19   went inside their home.

20   Q.    What did you do inside his home?

21   A.    I met his wife and his son and daughter.

22   Q.    How long did you stay there?

23   A.    I'm going to guess maybe it was 45 minutes.  I'm guessing.

24   Q.    What did you do while you were there?

25   A.    Talked to his wife, and we just kind of in general talked

1   about the trip.

2   Q.   After that, did you return to your home?

3   A.   I did.

4   Q.   Now, when you got back to D.C., did you continue to

5   communicate with members of TTP?

6   A.   I'm sorry.  Could you repeat that, please.

7   Q.   I'm sorry.  Mr. Nestler pointed out I misspoke.

8        After you left Mr. Reffitt's house, did you return to your

9   home?

10  A.   Yes.

11  Q.   When you got back to D.C. -- sorry.

12       When you got back to Austin or home --

13  A.   Yes.

14  Q.   -- did you continue to communicate with members of TTP?

15  A.   Yes.

16  Q.   What platform did you use?

17  A.   Primarily Telegram.

18  Q.   Did you also have -- participate in a Zoom meeting with two

19  other people from TTP?

20  A.   I did.

21  Q.   Who were those other two people?

22  A.   The other two that I remember were Mr. Russ Teer and then

23  Mr. Reffitt and myself.

24  Q.   Were you there for the very start of the conversation?

25  A.   I was a little bit late, I think, and I was trying to

1   get -- they had already started, and I entered into the meeting.

2   Q.   Ms. Rohde, if you can pull up what's already been admitted

3   into evidence as Government Exhibit 1B.20.2.3.2.  If we could

4   publish to the jury.  If you could, please, play that exhibit

5   now.

6        Actually, before you push play, Mr. Hardie, do you

7   recognize the person on the screen?

8   A.   Yes.

9   Q.   Who is that?

10  A.   That's Mr. Reffitt.

11  Q.   Please play the exhibit.

12       (Video played.)

13  Q.   Mr. Hardie, do you recognize who that person is?

14  A.   Yes.

15  Q.   Who is it?

16  A.   That's Russ Teer.

17       (Video played.)

18  Q.   So in that clip that you just watched, was that you joining

19  that Zoom meeting?

20  A.   Yes, yes, it was.

21  Q.   Did you stay for the rest of the meeting?

22  A.   I believe I did.

23  Q.   Did you hear Mr. Reffitt refer to you as Oracle?

24  A.   Yes.

25  Q.   What is that a reference to?

1  A.    People have different handles.  Like Mr. Reffitt had Call

2  to Arms, and Mr. Teer had Dead Shot, and somebody else had

3  something else.  And I asked Mr. Teer -- I said, "Well, what

4  kind of handle would you give me?"  And he thought, and he said,

5  "Oracle."

6  Q.    Did you hear Mr. Reffitt reference Oscar and Tango in that

7  clip?

8  A.    Yes.

9  Q.    What was he talking about?

10  A.    When we used the radios, it was an abbreviation.  So Oscar

11  is the phonetic phrase for the letter O of the alphabet, because

12  O for Oracle.  And Call to Arms, Tango would be for the T in the

13  Call to Arms, so Tango and Oscar.

14  Q.    And when you said you were communicating with Oscar and

15  Tango, when were you using those names?

16  A.    That would be during the time we're -- of January the 6th

17  in the area of the Capitol.

18  Q.    Is that when you were separated and communicating by radio?

19  A.    Right.

20  Q.    Now, after this meeting, did someone learn that the leader

21  of TTP had been taken in for questioning?

22  A.    Yes.

23  Q.    Questioning by who?

24  A.    Law enforcement.  I don't know exactly who.

25  Q.    And did you learn that from a Telegram message?

1158

1    A.   Yes.

2    Q.   Ms. Rohde, if we could, please, have what's been already

3    admitted into evidence as Government's Exhibit 1B4 and go to

4    PowerPoint slide 34.

5        Mr. Hardie, do you recognize this message?

6    A.   Yes.

7    Q.   Could you read it, please.

8    A.   "Everyone be aware.  As of this very minute, our state

9    leader is being escorted by three state officers for questioning

10   of things said on an app.  This is not a drill.  This is not a

11   drill.  He has just called me to spread the word.  Be prepared,

12   the shit is now hitting the fan."

13   Q.   What date was that?

14   A.   January the 10th, 2021.

15   Q.   And who sent that message to the group?

16   A.   That was -- it says Call to Arms.  That would be

17   Mr. Reffitt.

18   Q.   When you saw this message, what went through your mind?

19   A.   Huh-oh.  That's what came to my mind, is --

20   Q.   Why huh-oh?

21   A.   I know that we had gone to D.C., and it seems like for

22   some -- for whatever reason, things were coming back to us.

23   Q.   And Ms. Rohde, if we could go on to slide 39, please.  I

24   think we're one before that -- two before that, actually, 39.

25   Oh, I'm sorry.  The one before that.

1       Did Mr. Reffitt also send this message to the group?

2   A.   Yes.

3   Q.   Could you read it, please.

4   A.   "Start purge of all previous conversations."

5   Q.   What did you understand this to be a reference to?

6   A.   To delete any of the Telegram conversations or any kind of

7   conversation on your mobile phone.

8   Q.   Did you do that?

9   A.   I did delete some things, yes.

10  Q.   And what things did you delete?

11  A.   I had -- there was like the main Telegram, and then also I

12  had -- at one point, I had different sub-Telegrams for different

13  topics.  I don't remember specifics, but I did delete messages.

14  Q.   What were those messages about that you deleted?

15  A.   They would have been messages leading up to and following

16  January 6th.

17       MS. BERKOWER:  No further questions, Your Honor.

18       THE COURT:  All right.  Mr. Welch?

19       MR. WELCH:  Yes, Your Honor.

20                    CROSS-EXAMINATION

21       BY MR. WELCH:

22  Q.   Good afternoon, Mr. Hardie.

23  A.   Hello.

24  Q.   My name is Bill Welch.  I'm also going to ask you some

25  questions.

1    A.    Okay.

2    Q.    Around the 16th of January, 2020, some agents came to your

3    house, didn't they?

4    A.    Yes.

5    Q.    And they wanted to speak with you; correct?

6    A.    Yes.

7    Q.    And you agreed to do so?

8    A.    Yes.

9    Q.    They asked you about where you had been; correct?

10    A.    Yes.

11    Q.    They asked you what you had been doing there; correct?

12    A.    They asked several questions, but in general, yes.

13    Q.    They asked to take a look at your phone; correct?

14    A.    At that particular meeting?  There was two visits.  There

15    was -- the first visit was on a Saturday morning, and then there

16    was a subsequent, you might say, raid on my home and my business

17    a few days afterwards.

18         So which one are you referring to?

19    Q.    I'm referring to the first one.

20    A.    Okay.

21    Q.    Do you remember that, the one at your home?

22    A.    Yeah.  When they went to my home, I don't recall them

23    asking to see anything on my phone, and I didn't offer it.

24    Q.    So you didn't share anything with -- you didn't give your

25    phone to the agents when they came to your house?

1    A.    No.

2    Q.    In fact, you didn't give them anything when they came to

3    your house; correct?

4    A.    Right.  They had asked if they could come inside, and I

5    declined.

6    Q.    And you answered some of their questions, but you didn't

7    answer all of their questions that day, did you?

8    A.    I probably -- well, I don't know what it means, all of

9    them.  I believe I answered the questions that they asked me.

10   Q.    Well, isn't it true that they asked you about whether you

11   had a firearm with you in D.C., and you didn't answer that?

12   A.    Probably not, not at that time.

13   Q.    And you did agree to send them some items by e-mail; is

14   that right?

15   A.    I don't remember that discussion.

16   Q.    Okay.  Well, then, several days after that, they show up at

17   your place of business with a warrant; correct?

18   A.    Yes, uh-huh.

19   Q.    And they ultimately seized a lot of stuff from your

20   business; correct?

21   A.    Yes.

22   Q.    They seized your computers?

23   A.    Yeah -- well, my laptop.  Not every computer in the office,

24   but my laptop specifically.

25   Q.    They seized your firearms; correct?

1  A.   They seized my AR-15, related ammunition, and they seized

2  my .45-caliber handgun and related ammunition.

3  Q.   And they showed you a copy of the search warrant on which

4  they were relying; correct?

5  A.   Yes.

6  Q.   And did you look at it?

7  A.   I was pretty nervous.  I looked at it, but I wasn't really

8  focused on everything that it said.

9  Q.   Eventually, did you sit down and read it?

10  A.   I looked at it again.  I don't remember how closely I

11  looked at it.

12  Q.   Do you recall seeing whether it indicated that you were

13  under investigation for crimes involving restricted buildings or

14  grounds?

15  A.   I don't remember that.

16  Q.   Do you recall whether it indicated that you were under

17  investigation for interstate travel with intent to riot?

18  A.   I remember reading that somewhere.  I don't remember if I

19  read it from a warrant.  But something to that effect, I did see

20  something like that.

21  Q.   Do you recall reading whether you were under investigation

22  for obstruction of Congress?

23  A.   These types of questions, I don't specifically recall

24  reading.  I mean, I got a search warrant, yes.  I was pretty

25  nervous that day.

1    Q.    And then eventually things progress, and a few months

2    later, you enter into the immunity agreement with the

3    government, which is Government's Exhibit 405.

4         You remember that; right?

5    A.    Yes.  That's the one we saw earlier.

6    Q.    Now, do you recall who has discretion under that agreement

7    about whether you have honored it or not?

8    A.    Who has discretion?

9    Q.    Yes.

10   A.    On whether I've honored it or not?

11   Q.    Yes.

12   A.    I think what you mean is who is deciding if I've honored it

13   or not?

14   Q.    Yes.

15   A.    Is that what you mean?  Okay.  I think that would be the

16   government.

17   Q.    Correct.  And who represents the government in this case?

18   A.    Well, it would be the attorney -- I'm sorry.  Nestler and

19   Berkower.

20   Q.    So for instance, it's not up to Judge Friedrich whether

21   you've honored that agreement or not; right?

22   A.    Well, that's a good question.  I never thought about it in

23   that detail.  Somebody in the government is going to decide did

24   I lie or did I not lie.

25   Q.    And it is your understanding that it is they, Mr. Nestler

1    and Ms. Berkower, who would decide whether you've lied or not;

2    correct?

3    A.    I would assume that would be the case.

4    Q.    Ms. Berkower, when she was asking you about the agreement,

5    said that there's no guarantee that you wouldn't be charged with

6    a crime; correct?

7    A.    Right.

8    Q.    But as of now, you have not been charged with a crime as a

9    result of your conduct on January 6; correct?

10   A.    That's correct.

11   Q.    And you would agree that you have testified here today that

12   you went on restricted grounds; correct?

13   A.    That I went on restricted grounds?  Yes.

14   Q.    You would agree that you have testified here today you

15   carried a firearm onto restricted grounds; correct?

16   A.    Correct.

17   Q.    But you still haven't been charged with a crime; correct?

18   A.    That's true.

19   Q.    And you've been allowed in the meantime to go about your

20   business; isn't that right?

21   A.    That's true.

22   Q.    You've been able to travel to Mexico on business?

23   A.    Yes.

24   Q.    Florida on business?

25   A.    Yes.

1    Q.    And you have another trip for business planned for next

2    month; isn't that right?

3    A.    I have another trip, yes.

4    Q.    And where is that?

5    A.    That's going to be to Thailand.

6    Q.    Court's indulgence, please.

7          You would agree that Mr. Reffitt brags, doesn't he?

8    A.    Yes.

9    Q.    You would agree that Mr. Reffitt uses hyperbole, doesn't

10   he?

11   A.    Yes.

12   Q.    A lot, doesn't he?

13   A.    From time to time.

14   Q.    You would also agree that things he says are embellished;

15   correct?

16   A.    Yes.

17   Q.    And that things he says are dramatized; correct?

18   A.    Yes.

19            MR. WELCH:  Court's indulgence, please.

20        I pass this witness.

21            THE COURT:  Ms. Berkower?

22                         REDIRECT EXAMINATION

23            BY MS. BERKOWER:

24   Q.    Good afternoon.

25   A.    Good afternoon.

1    Q.    Mr. Hardie, did you meet Mr. Reffitt in person in 2020?

2    A.    2020?  Yes.

3    Q.    And I think you testified earlier about a meeting in a

4    park --

5    A.    Yes.

6    Q.    -- with Mr. Reffitt.  That was the first time you met him

7    in person?

8    A.    Yes.

9    Q.    How many times after that did you see him in person before

10   you took this trip with him?

11   A.    The time that comes to mind was when I drove up to his home

12   for a meeting.

13   Q.    Did you have any other one-on-one hangouts?

14   A.    Hangouts?

15   Q.    Or social occasions with him.

16   A.    Let me think.  There was a time when, you know, people were

17   tearing down statues, like it was related to the BLM things.

18   And so in Temple, there was an event there where people were

19   going to go and just kind of help just kind of keep the peace,

20   so to speak, and I was there.

21   Q.    Was he there as well?

22   A.    I believe so.

23   Q.    Were other members of TTP there?

24   A.    Well, there were other members of TTP.  I'm trying to

25   remember if I saw him specifically there.  That's a fuzzy part

1   of my memory.

2   Q.   Sitting here today --

3          THE COURT:  Wait.  Let him finish his answer.

4          THE WITNESS:  I can't say -- I just brought this up.

5   I mentioned this thing in Temple, but right now, I'm trying to

6   visualize if I saw him.  I don't recall a picture in my mind

7   where I saw him.  But I was there.

8        Let me think.

9          THE COURT:  It's all right, sir, if you can't

10  remember.

11         THE WITNESS:  I want to be accurate, but -- okay.

12         BY MS. BERKOWER:

13  Q.   Sitting here today, how many times do you remember seeing

14  Mr. Reffitt in person after that initial meeting you described

15  in the park before you went to D.C. with him?

16  A.   Okay.  I saw him at his home at that meeting.  I can't

17  think of a specific event other than that.  I believe we --

18  wait, wait.  Before or after -- oh, before.  Let me think.

19       Okay.  I had a meeting in my office warehouse.

20  Q.   Was that another TTP meeting?

21  A.   Yes.  I volunteered to host it.

22  Q.   So did he come to that?

23  A.   Yes.

24  Q.   So we have the meeting in the park; is that right?

25  A.   Uh-huh.

1   Q.   The TTP meeting at his house, is that what you were

2   referring to?

3   A.   Yes, and then my location.

4   Q.   And then the other meeting of TTP members at your business?

5   A.   Right, right.  So right now, we're discussing three; right?

6   Q.   Yes.

7   A.   Okay.  Yeah.

8   Q.   Now I'm going to ask you, do you remember seeing him in

9   person any other time before you met up with him to travel to

10  D.C.?

11  A.   I can't recall anything specifically.  These three main

12  events I can recall.

13  Q.   And about how far away is Austin from Wylie, drivewise?

14  A.   Probably close to 200 miles.

15  Q.   And was your contact with Mr. Reffitt primarily in

16  TTP-related messaging?

17  A.   Yes.  We would send messages through Telegram, or we would

18  make telephone calls to each other through Telegram.

19  Q.   One last question.  Mr. Welch mentioned the FBI coming to

20  your home.  Did you leave TTP of your own free will or because

21  of something that the FBI did?

22  A.   After the FBI came to visit me, I said oh, crap, this is

23  getting really weird.  I didn't really want any part of what

24  was -- well, I left of my own choice, basically.  Nobody

25  suggested it.  Nobody twisted my arm or anything like that.

1          MS. BERKOWER:  Nothing further, Your Honor.  Thank

2    you.

3          THE COURT:  May this witness be excused?

4          MR. WELCH:  Yes.

5          THE COURT:  All right.  Thank you, sir.

6      Ladies and gentlemen, I think this is a good time to take a

7    break for lunch.  So if you could, please, come back at 1:35,

8    and we will resume with the rest of the government's case.

9      Again, another reminder, no talking about the case or

10   reading or doing any research, please.

11     (Jury exited courtroom.)

12          THE COURT:  All right.  So we will see you back at

13   1:35.

14     And counsel, I'm going to warn you, I'm going to start

15   cutting you off in front of the jury.  You're asking a lot of

16   cumulative questions.  There's jurors who, you know, are getting

17   frustrated.  You guys can move this more quickly.  I don't

18   understand why you're asking the same point ten different ways.

19     All right.  Anything we need to address?

20          MR. WELCH:  No, Your Honor.

21     (Recess taken at 12:38 p.m.)

22     (Afternoon session of this proceeding was reported by

23   Lorraine Herman and is bound under separate cover.)

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    /s/ Sara A. Wick_____          March 5, 2022_____

9    SIGNATURE OF COURT REPORTER               DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25