# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

GUY WESLEY REFFITT,

*Defendant.*

No. 21-cr-32 (DLF)

## MEMORANDUM OPINION

On March 8, 2022, a jury convicted Guy Wesley Reffitt of five counts related to his actions during and shortly after the Capitol riot on January 6, 2021. Before the Court is Reffitt's Motion for Judgment of Acquittal, Dkt. 128, Motion for a New Trial or in the Alternative Judgment on Count 3(a), Dkt. 129, and Motion to Arrest Judgment on Count Two, Dkt. 130. For the reasons that follow, the Court will deny the motions.

## I.      BACKGROUND

After his participation in the January 6 Capitol riot, Reffitt was charged with two counts of civil disorder, in violation of 18 U.S.C. § 231(a)(2) and (a)(3); one count of obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; one count of entering and remaining in a restricted building or grounds with a deadly weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); and one count of obstruction of justice, in violation of 18 U.S.C. § 1512(a)(2)(C). *See* Second Superseding Indictment, Dkt. 34. On March 8, 2022, a jury found him guilty of all five counts. *See* Verdict Form, Dkt. 123.

At the close of the government's case, Reffitt moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(a). March 7, 2022 A.M. Trial Tr. at 1397:19–20, Dkt. 143. The Court reserved ruling until after the jury verdict. *Id.* at 1398:3–5; *see* Fed. R. Crim. P. 29(b). After the

jury convicted Reffitt on all counts, the Court denied his motion, finding that a rational jury could find the essential elements of each crime charged beyond a reasonable doubt.  March 8, 2022 Trial Tr. at 1498:23–25, 1499:1, Dkt. 145.

Reffitt now renews his motion for a judgment of acquittal on all counts under Fed. R. Crim. P. 29(c).  *See* Mot. for Judgment of Acquittal.  He also moves for a new trial, or alternatively, for the Court to enter a guilty finding on Count 3(a), entering and remaining in a restricted building or grounds.  *See* Mot. for New Trial.  Finally, he moves to arrest judgment on Count Two, obstruction of an official proceeding.  *See* Mot. to Arrest Judgment.  He argues that the evidence is insufficient to sustain a conviction on all counts, *see* Mot. for Judgment of Acquittal at 1, and that a new trial is in the interest of justice, *see* Mot. for New Trial at 1. Further, he renews his arguments from his Motion to Dismiss Count Two, Dkt. 38,[1] claiming that his conduct did not fall within the scope of § 1512(c)(2), and that the statute is unconstitutionally vague as applied.  *See* Mot. for Judgment of Acquittal at 8–12.  Finally, he contends that the Court lacks jurisdiction over Count Two.  *See* Mot. to Arrest Judgment.  The government filed an omnibus opposition brief to all three motions, Dkt. 132.  The motions are now ripe for resolution.

## II.    LEGAL STANDARDS

A defendant may move for a judgment of acquittal after the close of the evidence or after a jury verdict on the ground that the evidence is insufficient to sustain a conviction.  Fed. R. Crim. P. 29(a), (c).  The Court must affirm a guilty verdict if, considering the evidence in the light most favorable to the government, it finds that "*any* rational trier of fact could have found

---

[1] The Court denied Reffitt's motion to dismiss, finding that his alleged conduct fell within the statute's ambit, and that his as-applied vagueness challenge was premature.  *See* Order on Mot. to Dismiss at 4, 7, Dkt. 81.

the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). And it "must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983). "[A] judgment of acquittal is appropriate only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt." *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983).

Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Granting a new trial "is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal quotation marks and citation omitted). The Court has "broad discretion" in deciding a motion for a new trial. *Id.* The party seeking a new trial bears the burden of proving that it is justified. *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).

Under Rule 34, "the court must arrest judgment if [it] does not have jurisdiction of the charged offense." Fed. R. Crim. P. 34(a). "[D]efects in an indictment do not deprive a court" of jurisdiction over the case. *United States v. Cotton*, 535 U.S. 625, 630 (2002).

## III.     ANALYSIS

According to Reffitt, the evidence is insufficient to support a guilty verdict on any of the charged counts. He also argues that his conduct did not violate § 1512(c)(2) under a narrow interpretation that the Court previously rejected. Finally, he attacks the factual sufficiency of Count Two of the indictment.

As the Court explained at the close of trial, a rational jury could find Reffitt guilty on each count. March 8, 2022 Trial Tr. at 1498:23–25, 1499:1. Further, the Court indicated that it was not inclined to reconsider its conclusions regarding the scope of § 1512(c)(2) or the sufficiency of the indictment. *Id.*; *see also* Order on Mot. to Dismiss at 4, 6–7 & n.5; *United States v. Sandlin*, No. 21-cr-88, 2021 WL 5865006, at *5–10 (D.D.C. Dec. 10, 2021). And the Court declines to do so here.

### A. Insufficiency of the Evidence

Reffitt's motion for acquittal mainly questions the credibility of the government's witnesses and evidence. *See* Mot. for Judgment of Acquittal at 6–8, 13–14, 18. But it is the role of the jury, not the Court, to weigh the evidence and assess witnesses' credibility. *United States v. Battle*, 613 F.3d 258, 264–65 (D.C. Cir. 2010). Reffitt also emphasizes that he did not assault anyone or damage or steal any property. *See* Mot. for Acquittal at 12, 15–17. None of the charges, however, required the government to prove that he took such actions.

#### 1. Transporting a Firearm (Count One) and Entering or Remaining in a Restricted Area with a Firearm (Count Three)

Count One charged Reffitt with transporting a firearm in furtherance of a civil disorder, in violation of 18 U.S.C. § 231(a)(2). To convict him of that offense, the jury had to find that he transported a firearm in commerce while knowing, having reason to know, or intending that the firearm would be used unlawfully in furtherance of a civil disorder. *See* Final Jury Instructions at 24, Dkt. 119. There was ample evidence in the record to support the jury's findings.

Two of the governments' witnesses testified that Reffitt traveled to and from Washington, D.C. with firearms. Rocky Hardie, who traveled with Reffitt from Wylie, Texas to Washington, D.C., testified that Reffitt brought an AR-15 rifle and a handgun on the trip. March

4, 2022 A.M. Trial Tr. at 1119–20, Dkt. 142.  Further, Reffitt's son Jackson testified that he saw his father bring the AR-15 rifle and handgun back into their house upon his return.  March 3, 2022 P.M. Trial Tr. at 973:15–24, 974:12–25, 975:1–6, Dkt. 141.

The Court must give "full play" to the jury's credibility determinations.  *Battle*, 613 F.3d at 264.  In any event, Reffitt fails to cast sufficient doubt on either witnesses' credibility.  *See* Mot. for Judgment of Acquittal at 6.  The jury was aware of Hardie's immunity agreement with the government and witnessed his moments of confusion while testifying.  March 4, 2022 A.M. Trial Tr. at 1114:20–25, 1115–16, 1117:1–5, 1163:1–5.  And Reffitt does not even address Jackson's testimony on this point.  Thus, a reasonable jury could find that he transported firearms in commerce.  *See* Final Jury Instructions at 24 (commerce means travel between one state and the District of Columbia).

Plus, there was sufficient evidence to support the jury's finding that Reffitt knew or intended that the firearm would be used unlawfully in furtherance of a civil disorder.  Reffitt does not dispute that the January 6 riot constituted a "civil disorder"—a public disturbance involving acts of violence by three or more people that caused an immediate danger to persons and property.  *See* Final Jury Instructions at 24; Gov't Ex. 204 (surveillance video montage of the Capitol riot).  A jury could also reasonably infer that he intended that his firearm would be used unlawfully in furtherance of the disorder.  To be sure, Hardie suggested that Reffitt intended to use the guns for self-defense.  March 4, 2022 A.M. Trial Tr. at 1113:22–25; *see* Mot. for Judgment of Acquittal at 6.  But the jury also could credit Reffitt's own statements that he was prepared to use his gun to forcibly remove members of Congress from the Capitol.  *See, e.g.*, Gov't Ex. 1B20.2.2 (when asked about taking the Capitol, replying that "a hell rain of fire [will] come[] back cause every one of my guys are here and I assure you they came in hot.  So did I.").

5

Further, Reffitt's text messages and Hardie's testimony demonstrate Reffitt's awareness of and willingness to break D.C.'s gun laws on January 6. *See, e.g.*, Gov't Ex. 1B4.1; March 4, 2022 A.M. Trial Tr. at 1113:1–18. Accordingly, a jury could conclude that Reffitt knew or intended to use his guns unlawfully to further the Capitol riot.

In Count Three, Reffitt was charged with entering or remaining in a restricted area or grounds with a firearm, in violation of 18 U.S.C. § 1752(a)(1) and (b)(2). Reffitt concedes the first two elements of the crime: that he entered or remained on restricted grounds without lawful authority, knowing that the grounds were restricted and that he lacked lawful authority. *See* Mot. for New Trial at 1; Final Jury Instructions at 30. But he contests the final element, that he knowingly used or carried a firearm during and in relation to the offense. *See* Mot. for Judgment of Acquittal at 13–14; Final Jury Instructions at 30. In doing so, he repeats his attacks on Hardie's credibility and emphasizes that the Capitol police witnesses did not testify that he had a gun. *See* Mot. for Judgment of Acquittal at 13–14. He also insinuates that the photo exhibit showing a holster on his hip at the Capitol was edited or altered, though he presented no concrete evidence of that at trial. *Id.* at 14. Again, the Court defers to the jury's assessment of witness and evidence credibility. The government also presented evidence that Reffitt himself said that he had a gun at the Capitol. *See, e.g.*, Gov't Exs. 1B20.2.2 (explaining at the Ellipse that he "came in hot"), 1B20.2.2.3.1 ("I had my . . . 40 on my side."). A reasonable jury could thus find beyond a reasonable doubt that he knowingly carried a firearm while remaining in a restricted area. For these reasons, the Court will not enter judgment on Count 3(a), the lesser-included offense of remaining on restricted grounds. *See* Mot. for New Trial at 1. The jury's verdict on Count 3 stands.

### 2. Obstruction of an Official Proceeding and Aiding and Abetting (Count Two)

In Count Two, Reffitt was charged with obstructing an official proceeding and aiding and abetting that offense, in violation of 18 U.S.C. §§ 1512(c)(2) and 2.  Reffitt's motion primarily challenges the Court's interpretation of § 1512(c)(2) and its instructions to the jury on this count. The Court addresses and rejects that challenge in Part III.B.  To the extent that Reffitt argues that the evidence was insufficient to support a guilty verdict even under the Court's instructions, that claim also fails.  The jury could reasonably find that he attempted to or did obstruct or impede an official proceeding, acted with the intent to do so, and knew that the natural and probable effect of his conduct would be to obstruct or impede the proceeding.  It could also find that he did so corruptly.  *See* Final Jury Instructions at 25.  The evidence further supports a finding that Reffitt aided and abetted others who committed the offense.

Congress's Joint Session to certify the Electoral College results qualifies as an "official proceeding."  *See id.* at 25–26; *Sandlin*, 2021 WL 5865006, at *4.  And the riot and ensuing breach of the Capitol forced Congress to halt the session.  *See, e.g.*, March 4, 2022 A.M. Trial Tr. at 1071–73 (testimony of Dan Schwager, counsel to the Secretary of the Senate).  True, Reffitt never entered the Capitol building, and his interactions with the Capitol police took place before members of Congress evacuated the chamber.  See Mot. for Judgment of Acquittal at 10–11.  But video evidence showed that Reffitt ascended the west stairs and led the throng of people who first breached the Capitol.  *See, e.g.*, Gov't Ex. 205.  The police officers he confronted said the same.  The officers testified that Reffitt appeared to lead the crowd because every time he took a step, the people behind him followed.  *See, e.g.*, March 2, 2022 P.M. Trial Tr. at 646:23, 709:23–24, Dkt. 138.  After Reffitt was pepper sprayed, he gestured to the crowd to continue moving forward.  *See, e.g.*, Gov't Ex. 205.  As he wrote, he was "the lead up the Capitol stairs"

and "the insurrection began immediately after."  Gov't Ex. 1B4.1.  And his "job was done" when the crowd "broke through the doors."  Gov't Ex. 1B4.6.  According to a police witness, the officers "were the only thing standing between thousands of these people and the Congress" that was "confirming the electoral vote."  March 2, 2022 P.M. Trial Tr. at 632:16–19.  Thus, a jury could reasonably find that Reffitt, by leading a crowd to breach the police line, helped to halt, and thus obstruct, Congress's Joint Session.  At the very least, he attempted to obstruct, or aided and abetted those who obstructed, the proceeding.  He also acknowledged that Congress was "there when we went in" and could not finish the Joint Session until later because "we disrupted."  Gov't Ex. 1B20.2.3.5.  Accordingly, a jury could find that he knew and intended that his disruptive actions would obstruct or impede the proceeding.

Ample evidence supports the charge that Reffitt acted corruptly.  To act "corruptly," the defendant must use unlawful means or act with an unlawful purpose, and act with consciousness of wrongdoing.  *See* Final Jury Instructions at 26.  The evidence shows that Reffitt did all three.  By clearing the way, gesturing, and leading the violent mob behind him, Reffitt assisted and encouraged others to use unlawful means to breach the Capitol.  As Sergeant DesCamps—one of the officers who faced off with Reffitt—testified, rioters who followed Reffitt up the stairs "directly assaulted [the officer] with a carbon choke cleaner or WD-40" and "bear spray."  *See, e.g.*, March 7 A.M. Trial Tr. at 1298:8–15.  A rational trier of fact could reasonably find that Reffitt aided and abetted those who forcibly assaulted and overcame officers to enter the Capitol building.  Moreover, Reffitt acted with an unlawful purpose to physically overthrow Congress, a sentiment he expressed numerous times before, during, and after January 6.  For instance, he said that he was going to D.C. to "drag the traitors out," *see* Gov't Ex. 1B4.1.  He wanted to drag lawmakers out of the Capitol by their heels, with their heads hitting every step, *see* Gov't Ex.

1B20.2.1.  A rational jury could infer from these statements that he acted with an unlawful purpose.  Finally, Reffitt acted with consciousness of wrongdoing.  He acknowledged that he knew that the police officers were faithfully doing their jobs when they ordered him to retreat, yet he continually refused.  *See* Gov't Ex. 218.  A jury thus could reasonably interpret these statements as demonstrating that Reffitt knew that his actions were wrong.

It is immaterial that the government did not prove that Reffitt assaulted anyone.  *Cf.* Mot. for Judgment of Acquittal at 12.  Contrary to his contention, the Court never said that the government could only prove that Reffitt acted corruptly only if it showed that he committed an assault.  *See* Reply in Support of Post-Trial Motions at 1, Dkt. 146.  In fact, the Court explained that "aiding and abetting the assaults" would qualify as unlawful means.  Feb. 18, 2022 Tr. at 10:19–21, Dkt. 112.  When the Court suggested during a pretrial conference that the government would have difficulty proving Reffitt's "corrupt" mens rea unless it proved unlawful means, it was in the context of discussing the government's "unlawful purpose" theory.  In the Court's view, the government had implied that Reffitt's unlawful purpose was simply his intent to obstruct the official proceeding.  *See id.* at 9:2–11.  The Court explained that this would not be a viable theory of a corrupt—that is, an unlawful—purpose, as it simply recast "corruptly" as "intentionally."  *See id.* at 8:24–9:1.  In that scenario, the Court stressed to the government that it would need to be prepared to prove that Reffitt used unlawful means, such as assaulting officers or aiding and abetting those assaults.  *See id.* at 10:14–21.  At trial, however, the government *did* present sufficient evidence of Reffitt's unlawful purpose, and it went far beyond an intent merely to obstruct the proceeding.  *See supra* at 8.  Therefore, the jury could find that Reffitt acted corruptly under multiple theories.

Before trial, Reffitt argued that the term "corruptly" rendered § 1512(c)(2) unconstitutionally vague as applied to him. *See* Mot. to Dismiss at 12–17, Dkt. 38. But from the face of the indictment alone, the Court could not determine whether he acted "corruptly" within the term's core meaning such that he was sufficiently on notice of the criminality of his conduct. *See* Order on Mot. to Dismiss at 5–6. Given the facts that emerged at trial, the Court can now address Reffitt's as-applied vagueness challenge. In *Sandlin*, the Court held that "corruptly" covered at least those defendants who engaged in "independently criminal" and "inherently malign" conduct with the intent to obstruct an official proceeding. 2021 WL 5865006, at *13. It also acknowledged that difficult vagueness questions could arise where a defendant used *lawful* means, albeit with an improper purpose. *Id.* at *13 n.14. Here, Reffitt led and encouraged others who used "obvious criminal means," *id.* at *13, and his purpose—to physically remove members of Congress—was obviously unlawful. Therefore, he had "fair notice" that his conduct was punishable under the statute, and the Court will deny his vagueness challenge. *See* Mot. for Judgment of Acquittal at 8.

### 3. Obstructing Officers During a Civil Disorder (Count 4)

In Count Four, Reffitt was charged with obstructing officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3). To convict Reffitt of this offense, the government had to prove that he committed, or attempted to commit, an act with the intent to obstruct, impede, or interfere with law enforcement officers who were lawfully carrying out their official duties incident to a civil disorder. *See* Final Jury Instructions at 32. The January 6 riot was a "civil disorder," as explained above. And Reffitt does not contest that the officers were lawfully performing their official duties during the disorder, nor does he refute that the civil disorder adversely affected commerce or the performance of a federally protected function. *See* Mot. for

Judgment of Acquittal at 15–17.  He challenges only that he acted with the intent to obstruct, impede, or interfere with the officers, again by insisting that he did not assault or attempt to assault them.  *See id.*  The Court disagrees.

The police witnesses testified that Reffitt climbed up the stairs toward them, refused their commands to stop, and encouraged the crowd behind him to continue moving forward to breach the police line.  *See, e.g.*, March 2, 2022 P.M. Trial Tr. at 642–50.  Reffitt himself confirmed his intent to interfere with the officers as they carried out their duties—he acknowledged that they were simply doing their jobs, yet still he did not heed their warning to retreat.  *See* Gov't Ex. 218.  That he was "incapacitated" for a brief time after he was pepper sprayed is irrelevant.  *Cf.* Mot. for Judgment of Acquittal at 16.  As Reffitt later explained to Hardie, he "couldn't continue on, but [he] made it possible for other people to continue."  March 4, 2022 A.M. Trial Tr. at 1147:9–10.  Thus, a jury could find that Reffitt committed, or at least attempted, to commit an act with the intent to interfere with or obstruct law enforcement officers.

### 4. Obstruction of Justice (Count 5)

In Count Five, Reffitt is charged with obstructing justice by hindering communication through threat of physical force, in violation of 18 U.S.C. § 1512(a)(2)(C).  For this offense, the jury had to find that Reffitt knowingly used or attempted to use physical force or the threat of physical force against his children, Jackson or Peyton Reffitt, with the intent to hinder or prevent them from communicating to law enforcement about the commission of an offense.  *See* Final Jury Instructions at 34.  The jury also had to find that it was reasonably likely that the communication would have been made to a federal officer about a federal offense.  *Id.*

Jackson Reffitt testified that after the January 6 riot, his father told him and his sister Peyton, "[i]f you turn me in, you are [a] traitor.  Traitors get shot."  March 3, 2022 P.M. Trial Tr.

at 1003:6–8.  Jackson explained that he understood the remark as a "threat" and felt "scared" for

him and his sister.  *Id.* at 1004:5, 7–9.  He further testified that his father told Peyton, "You better

not be recording this or I will put a bullet in your phone."  *Id.* at 1004:19–23.  According to

Jackson, Reffitt was "clearly very, very, very upset."  *Id.* at 1005:20.  Jackson later told the FBI

about these threats and Reffitt's activities before and on January 6.  *Id.* at 1007–08; *see also*

March 4, 2022 P.M. Trial Tr. at 1229:13–19, Dkt. 140 (Agent Hightower's testimony about

Jackson's report of the threat).  Considering this testimony, the jury could reasonably conclude

that Reffitt threatened his children with physical force to prevent them from telling law

enforcement, such as the FBI, about his activities on January 6 (which were federal offenses).

Reffitt's insufficient evidence challenge rests solely on his attacks on Jackson's credibility.  *See*

Mot. for Judgment of Acquittal at 18.  But as explained above, it is for the jury to decide witness

credibility, and the Court will respect those conclusions.  Reffitt's motion for acquittal on this

count thus fails.

### B.  Obstruction of an Official Proceeding

Reffitt continues to challenge the Court's interpretation of § 1512(c)(2), regarding both

the scope of the statute's actus reus terms and the requirements of its mens rea term, "corruptly."

Section 1512(c), in full, states:

Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts
to do so, with the intent to impair the object's integrity or availability for use in an
official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do
so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).

The Court previously addressed most of Reffitt's arguments at length, and therefore, will briefly reiterate its conclusions here. Reffitt also now points to a recent decision that departs from this Court's ruling in *Sandlin*.[2] *See United States v. Miller*, No. 21-cr-119, 2022 WL 823070 (D.D.C. Mar. 7, 2022) (Nichols, J.). For the reasons explained below, the Court does not find *Miller* persuasive.

### 1. Definition of "corruptly"

According to Reffitt, a defendant acts "corruptly" under § 1512(c)(2) where he "act[s] corruptly to obstruct, influence, or impede the due administration of justice, that is, [that he] act[s] knowingly and dishonestly with the intent to obtain an unlawful advantage for himself or an associate, and that he influence[s] another to violate their legal duty." Mot. for Judgment of Acquittal at 9. As it has explained on multiple occasions, *see* Feb. 3, 2022 Tr. at 10–11, Dkt. 111; Feb. 18, 2022 Tr. at 12–13, the Court disagrees.

First, the defendant need not have intended to obstruct, impede, or influence the "due administration of justice." While some courts have included that element in their § 1512(c)(2) instruction, they have simply borrowed from pattern instructions for § 1503. *See United States v. Matthews*, 505 F.3d 698, 706 n.2 (7th Cir. 2007). But § 1503 prohibits corruptly influencing, obstructing, or impeding "the due administration of justice," whereas § 1512(c)(2) prohibits corruptly obstructing, influencing, or impeding "an official proceeding." Thus, the latter statute

---

[2] Other judges in this District have followed *Sandlin*. *See United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718 (D.D.C. Dec. 20, 2021) (Mehta, J.); *United States v. Mostofsky*, No. 21-cr-138, 2021 WL 6049891 (D.D.C. Dec. 21, 2021) (Boasberg, J.); *United States v. Montgomery*, No. 21-cr-46, Dkt. 87 (D.D.C. Dec. 28, 2021) (Moss, J.); *United States v. Nordean*, No. 21-cr-175, Dkt. 263 (D.D.C. Dec. 28, 2021) (Kelly, J.); *United States v. Grider*, 21-cr-22, 2022 WL 392307 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); *United States v. Bozell*, 21-cr-216, 2022 WL 474144 (D.D.C. Feb. 16, 2022) (Bates, J.); *United States v. Puma*, 21-cr-454, 2022 WL 823079 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. McHugh*, No. 21-cr-453, 2022 WL 1302880 (D.D.C. May 2, 2022) (Bates, J.).

requires an intent to obstruct an official proceeding, as opposed the due administration of justice. *See Montgomery*, 2021 WL 6134591, at *21. After all, official proceedings include proceedings before Congress, which need not relate to the administration of justice. *See id.*; *Sandlin*, 2021 WL 5865006, at *4.

Nor is the defendant required to act "dishonestly" to violate § 1512(c)(2). In *Arthur Andersen LLP v. United States*, the Supreme Court reviewed jury instructions for 18 U.S.C. § 1512(b) that omitted the word "dishonestly." 544 U.S. 696, 706 (2005). The Court found that the instructions were flawed because they "failed to convey the requisite consciousness of wrongdoing," as the jury was told that "even if [petitioner] honestly and sincerely believed that its conduct was lawful, you may find [petitioner] guilty." *Id.* Here, the Court instructed the jury that Reffitt must have acted with "consciousness of wrongdoing" to be guilty of the offense, thus rendering the word "dishonestly" unnecessary. *See* Final Jury Instructions at 26.

Courts have interpreted "corruptly" to require the defendant to have influenced another to violate his legal duty when they read "corruptly" in its transitive sense—meaning that the defendant must have "corrupted" another person. *See United States v. Poindexter*, 951 F.2d 369, 379, 385 (D.C. Cir. 1991). But in § 1512(c)(2), "corruptly" is used in the intransitive, such that the defendant's *own* behavior must be corrupt, *see Caldwell*, 2021 WL 6062718, at *10, as it was here.

It is true that some courts have explained that a defendant acts corruptly when he seeks to obtain an improper advantage for himself or another. *See, e.g.*, *United States v. Ogle*, 613 F.2d 233, 238 (10th Cir. 1979). But others have clarified that "'corruptly' is ordinarily understood as referring to 'act[s] done voluntarily and intentionally and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means"—

14

and "[t]he motive to act corruptly is *ordinarily* a hope or expectation of either financial gain or other benefit to oneself or some profit or benefit to another." *United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir. 1990) (quoting *United States v. Brunson*, 882 F.2d 151, 154 n.2 (5th Cir. 1989) (emphasis added)). Thus, the desire to gain an advantage is typically the motive for a person to act corruptly, but not always. Reffitt points to *United States v. Reeves*, which noted that the "unlawful advantage or benefit" definition of "corruptly" guards against potential overbreadth, vagueness, and First Amendment concerns. Mot. for Judgment of Acquittal at 10 (citing *United States v. Reeves*, 752 F.2d 995, 1001 (5th Cir. 1995) (interpreting the corrupt tax obstruction statute)). But that court explained that those problems arise when interpreting "corruptly" to mean "with an *improper* motive or *bad* or *evil* purpose." *Reeves*, 752 F.2d at 1001 (emphasis added). The Court's jury instructions did not define corruptly in that way.

To avoid these vagueness concerns, *see Poindexter*, 951 F.2d at 379–80, the Court rejected the government's proposal to define "corruptly" as requiring either unlawful means or an improper, or wrongful, purpose. *See* Gov't Proposed Jury Instructions at 4, Dkt. 86; Gov't Proposed Jury Instructions at 6, Dkt. 109. Instead, the Court instructed the jury that a defendant acts corruptly when he uses unlawful means or acts with an *unlawful* purpose, *see* Final Jury Instructions at 26, echoing the *McElroy* court's definition, *see* 910 F.2d at 1021. *See also United States v. Aguilar*, 515 U.S. 593, 616–17 (1995) (Scalia, J., concurring in part and dissenting in part) (approvingly citing similar jury instructions for § 1503); *United States v. Norris*, 419 Fed. App'x 190, 194 (3d Cir. 2011) (affirming a similar instruction for § 1512(b)); *United States v. Fumo*, No. 06-cr-319, 2009 WL 1688482, at *54 (E.D. Pa. June 17, 2009) (using a similar

15

instruction for § 1512(c)(1)).[3]  Thus, the Court's instruction regarding the "corruptly" prong of §

1512(c)(2) was proper.

### 2. Section 1512(c)(2)'s scope

Reffitt continues to challenge the Court's finding that his conduct constitutes

"obstruction" within the meaning of § 1512(c)(2).  He maintains that a defendant obstructs,

impedes, or influences an official proceeding only if he "impairs the integrity and availability of

non-object information to be used in the official proceeding."  Mot. for Judgment of Acquittal at

9.  In *Sandlin*, and again when denying Reffitt's motion to dismiss, the Court rejected this type of

limiting construction for § 1512(c)(2), concluding that the plain meaning of the statute's broad

terms cover more than just acts affecting evidence.  *See* Order on Mot. to Dismiss at 4 (citing

*Sandlin*, 2021 WL 5865006, at *5–10).  The Court found nothing in the statute's structure,

context, or history that alters or overcomes its plain meaning.  *Sandlin*, 2021 WL 5865006, at

*5–10.  The Court has carefully considered Judge Nichols' recent decision in *United States v.*

*Miller*, 2022 WL 823070, upon which Reffitt relies, *see* Mot. for Judgment of Acquittal at 8–9,

and will not change its original conclusion.

*Miller* holds that § 1512(c)(2) requires the defendant to have "taken some action with

respect to a document, record, or other object in order to corruptly obstruct, impede or influence

---

[3] Applying this definition also ensures that innocent conduct is not deemed "corrupt" under §
1512(c)(2)'s adjacent provision, § 1512(c)(1).  Merely "altering" a document with the intent to
impair its integrity or availability for use in an official proceeding is not necessarily "inherently
malign."  *Arthur Andersen*, 544 U.S. at 703–04.  For example, a lawyer's decision to redact a
document pursuant to a valid claim of privilege would not be "corrupt."  But where a lawyer uses
unlawful means (e.g.: steals and alters a document) or pursues an unlawful purpose (e.g.: alters a
document to cover up his *own* legal liability), he does act corruptly.  *See United States v. North*,
910 F.2d 843, 943 (D.C. Cir. 1990) (Silberman, J., concurring in part and dissenting in part)
(considering an analogous hypothetical about a lawyer who persuades his client not to testify).

an official proceeding." 2022 WL 823070, at *15.[4] Judge Nichols identified a key interpretive question: "whether or how the word 'otherwise' ties § 1512(c)(2) to the prior subsection—§1512(c)(1)." *Id.* at *6. He then presented three options: First, "otherwise" could serve as a "clean break" such that there is no relationship between the subsections. *Id.* This option, he explained, is possible, but problematic, as it would ignore that "otherwise" "implies a relationship to something else," and it would render the word surplusage. *Id.* Plus, this reading would conflict with the Supreme Court's decision in *Begay v. United States*, 553 U.S. 137 (2008). *Id.* at *6–8. Next, "otherwise" could link the subsections by indicating that § 1512(c)(1) provides examples of conduct that violates § 1512(c)(2). *Id.* at *8. While Judge Nichols found this option more plausible than the first, he still identified other issues. The second subsection would be far broader than the first; indeed, it would swallow it. *Id.* at *8–9. Finally, "otherwise" could mean that § 1512(c)(2) is a residual clause or catchall for § 1512(c)(1), ensuring that *all* corrupt acts on records, documents, or other objects are covered by the statute. *Id.* at *9. Judge Nichols found this option to be most consistent with *Begay*. *Id.* at *9–10. Considering structure, context, history, he deemed the catchall option as the most plausible. *Id.* at *11–14. Finding remaining ambiguity in the statute, the court applied the rule of lenity to adopt that narrow interpretation. *Id.* at *15.

This Court continues to focus first and foremost on the plain meaning of § 1512(c)(2)'s key terms. *See Sandlin*, 2021 WL 5865006, at *5 (defining "obstruct," "impede," and "influence" and recognizing their "expansive[ness]"). As the Court explained in *Sandlin*, "otherwise" means "in a different manner" or "by other means." *Id.* (quoting *Otherwise*, def.

---

[4] Reffitt's proposal differs from *Miller*'s construction, as it is limited to acts impairing "non-object information," Mot. for Judgment of Acquittal at 9, as opposed to acts affecting documents, records, or other objects, *see Miller*, 2022 WL 823070, at *15.

B(1)(a), Oxford English Dictionary (3d ed. 2004)).[5]  The Court cannot discern anything from these definitions that plausibly limits the breadth of § 1512(c)(2)'s verbs, so it struggles to accept *Miller*'s third, narrow bucket.  Its interpretation of the statute, however, is not reflected by the *Miller* court's first two broad buckets either.  It found that a defendant *otherwise* obstructs, impedes, or influences a proceeding under § 1512(c)(2) when he does so by means *different* than those proscribed by the preceding § 1512(c)(1)—for instance, by destroying or altering documents with the intent to impair them for use in an official proceeding.  *Id.*  Thus, the Court both recognized a link between the subsections and gave meaning to the word "otherwise," contra *Miller*'s first bucket.  And it underscored that § 1512(c)(2) covers actions that are different than those covered by § 1512(c)(1), contra *Miller*'s second bucket.[6]

Nor can the Court place so much weight on *Begay*.  Interpreting the Armed Career Criminal Act, the Supreme Court held that a "violent felony" that "*otherwise* involves conduct that presents a serious physical risk of injury to another" must be similar in kind to the example crimes listed *before* that catchall clause.  *Begay*, 553 U.S. at 142.  But the Court also indicated that its interpretation of the word "otherwise" was not the only permissible one.  Instead, it recognized that, in other contexts, it could instead be interpreted as a link to what *follows* the word as opposed to the examples preceding it.  *Id.* at 144.

---

[5] The definitions provided by the *Miller* court are similar: "in a different way or manner: differently"; "in different circumstances: under other conditions"; and "in other respects."  2022 WL 823070, at *6 (quoting *Otherwise*, Webster's Third New Int'l Dictionary of the English Language Unabridged (2002)).

[6] The Court agrees with Judge Moss that "otherwise" also serves to "signal[s] a shift in emphasis from actions directed at evidence to actions directed at the official proceeding itself."  *Montgomery*, 2021 WL 6134591, at *12 (internal quotation omitted).

Section 1512(c) presents a very different context.  In *Begay*, the Supreme Court found that the four example crimes in the ACCA statute did not pose a similar degree of "serious physical risk of injury" (the catchall following "otherwise"); thus, it concluded that the other "violent felonies" must be similar to those examples beyond their degree of risk.  *Id.* at 142–43. In contrast, § 1512(c)(2) does not contain language, like "serious," that demands a quantitative analysis of the degree to which certain conduct obstructs a proceeding.  The acts prohibited by § 1512(c)(1) have the capacity to obstruct, influence, or impede a proceeding, and § 1512(c)(2) simply covers any different manner of obstructing, impeding, or influencing.  That is, interpreting "otherwise" in relation to the terms that follow does not pose the same problem presented by the ACCA.  Further, *Begay* relied on the particular statutory history of the ACCA, which is not replicated here.  *Id.* at 143–44.

And, as *Miller* acknowledged, the two statutes are structured differently.  Section 1512(c)(2) is housed in a separate subsection, as opposed to the same sentence.  *Miller*, 2022 WL 823070, at *10; *Sandlin*, 2021 WL 5865006, at *6.  And "a key feature of [the ACCA]—namely, the four example crimes intended to illustrate what kind of 'violent felony' the statute covers," *Begay*, 553 U.S. at 147, is missing here.  Section 1512(c)(1) "is not a list of example crimes from which some common feature can be gleaned."  *Caldwell*, 2021 WL 6062718, at *14.

As the Court noted in *Sandlin*, the more apt structural comparison is to § 1503.  2021 WL 5865006, at *7.  The specific provisions in that statute cover actions relating to jurors and court officers, while the omnibus clause at the end covers the obstruction of the due administration of justice in general.  *See United States v. Aguilar*, 515 U.S. 593, 598 (1995).  *Miller* claims that the Supreme Court in *Aguilar* rejected a "broad reading" of the omnibus clause and instead placed "metes and bounds" on its expansive language.  2022 WL 823070, at *8 (quoting *Aguilar*, 515

19

U.S. at 599–600). That is true, but irrelevant to the interpretive question at hand. The Court held that a defendant's act must have "a relationship in time, causation, or logic with the judicial proceedings," as opposed to "some ancillary proceeding." *Aguilar*, 515 U.S. at 599. This Court adopted a similar nexus requirement for § 1512(c)(2). *Sandlin*, 2021 WL 5865006, at *12; Final Jury Instructions at 25. The *Aguilar* majority did not, however, consider whether the omnibus clause is limited to acts directed at jurors and court officers (like *Miller*'s limit of § 1512(c)(2) to acts affecting records, documents, or objects). Concurring, Justice Scalia reached that proposition and rejected it because the omnibus clause is not a general item following a list, but instead is "one of several distinct and independent prohibitions" in the statute. *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part); *see also United States v. Howard*, 569 F.2d 1331, 1334 (5th Cir. 1978) (same); *Sandlin*, 2021 WL 5865006, at *7 (explaining the similarities between §§ 1503 and 1512(c)). Thus, the scope of § 1503's omnibus clause has not been artificially restricted to mimic that of the statute's specific clauses, and the same result should hold for § 1512(c).

Turning to statutory context, the Court agrees with *Miller* that a capacious interpretation of § 1512(c)(2) creates "substantial overlap" with the rest of § 1512(c). *Sandlin*, 2021 WL 5865006, at *7–8. But the Court disagrees that the superfluities "suggest[] that Congress did not mean [the subsection] to have so broad a scope," *Miller*, 2022 WL 823070, at *12. Rather, as Judge Bates recently explained, "that is simply how catch-alls work." *McHugh*, 2022 WL 1302880, at *7. And as previously noted, numerous provisions within the statute would not be subsumed under the broad reading of § 1512(c)(2). *Sandlin*, 2021 WL 5865006, at *8. Moreover, *Miller*'s construction itself renders § 1512(c)(1) superfluous. After all, altering, destroying, mutilating, or concealing an object with the intent to impair its use in an official

proceeding certainly qualifies as an action with respect to an object taken in order to obstruct, impede, or influence that proceeding. The surplusage canon should not invoked to "substitut[e] one instance of superfluous language for another." *United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013).[7] Besides, this canon is just a "rule[] of thumb that help[s] courts determine the meaning of legislation." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). It does not override "the cardinal canon" to which "a court should always turn first": "that a legislature says in a statute what it means and means in a statute what it says there." *Id.* The Court will thus not impose "an extra-textual limit on [§ 1512(c)(2)'s] compass" to avoid superfluity. *See Loughrin v. United States*, 573 U.S. 351, 357 & n.4 (2014).

To be sure, it is somewhat odd that § 1512(c)(2) is the only provision in the section that lacks "a narrow focus." *Cf. Miller*, 2022 WL 823070, at *11. But it would also be unnatural to read a phrase as expansive as "otherwise obstructs, influences, or impedes any official proceeding" as restricted just to acts affecting records, documents, or objects—especially because a whole host of such acts are already proscribed in § 1512(c)(1). And "[h]ad Congress intended to restrict [§ 1512(c)(2)] to [acts affecting records, documents, or objects], it presumably would have done so expressly as it did in the immediately [preceding] subsection." *Russello v. United States*, 464 U.S. 16, 23 (1983) (explaining that a broad construction of one provision is not "undermined" by surrounding narrow provisions). While "a reader would not expect to find in a statute that is otherwise narrowly (and consistently) tailored a criminal prohibition of exceptionally broad scope," *Miller*, 2022 WL 823070, at *12, nor would that reader expect a provision's expansive terms to in fact carry an extremely limited meaning.

---

[7] Reffitt's interpretation of § 1512(c)(2) as limited to acts impairing non-object information also yields superfluities. *See Sandlin*, 2021 WL 5865006, at *8.

21

*Miller* discusses statutory and legislative history, *see id.* at \*12–14, but the Court finds that neither sheds much light.  True, the history might support the notion that § 1512(c) was enacted just to close the loophole that allowed a defendant to escape liability for individual evidence spoliation.  *See id.*; Order on Mot. to Dismiss at 4.  But it also suggests that Congress intended to plug the gap to ensure that all forms of direct obstructive conduct would be covered.  *See McHugh*, 2022 WL 1302880, at \*7–12; *Montgomery*, 2021 WL 6134591, at \*15–16; *Caldwell*, 2021 WL 6062718, at \*16.  Indeed, that explanation helps explain why § 1512(c)(2) covers conduct that violates other provisions in § 1512.  "[B]ecause indirect obstruction is only one form of direct obstruction, *any* attempt to close the direct obstruction loophole while working within § 1512's pre-existing structure would have created substantial overlap."  *McHugh*, 2022 WL 1302880, at \*9.  Thus, the history does not cast doubt on the interpretation best supported by § 1512(c)(2)'s text: that the subsection creates direct liability for an individual's obstructive acts beyond those relating to physical evidence.[8]

---

[8] The Court also agrees with Judge Bates's conclusion that the source of § 1512(c)'s language does not indicate that it has a limited scope.  *Compare McHugh*, 2022 WL 1302880, at \*10 *with Miller*, 2022 WL 823070, at \*13.  It appears that § 1512(c)(2)'s actus reus terms were borrowed from those in §§ 1503(a) and 1505.  And those statutes are "expansive prohibitions on obstruction" that have not been interpreted to include "any limitation on the nature of the obstructive act."  *McHugh*, 2022 WL 1302880, at \*10.  Nor does § 1512's evolution prove that § 1512(c)(2) should be construed narrowly.  That § 1512(a)(2)(B) was enacted three months after § 1512(c) yet prohibits conduct that could be charged under a broad § 1512(c)(2) is not dispositive.  *See Miller*, 2022 WL 823070, at \*13.  "It is not unusual for a particular act to violate more than one criminal statute, and in such situations the Government may proceed under any statute that applies."  *Aguilar*, 515 U.S. at 616 (Scalia, J., concurring in part and dissenting in part) (internal citations omitted).  Plus, as Judge Bates notes, § 1512(a)(2) was written and approved nearly a year before it was enacted, thus predating § 1512(c).  *McHugh*, 2022 WL 1302880, at \*9 n.17.

Finally, contrary to *Miller*'s conclusion, the rule of lenity does not apply here.[9] This rule comes into play only when a statute is ambiguous "after seizing everything from which aid can be derived." *Ocasio v. United States*, 578 U. S. 282, 295 n.8 (2016) (quoting *Muscarello v. United States*, 524 U.S. 125, 138–139 (1998)). The Supreme Court has "underscore[d] that point" through its "repeated use of the term 'grievous ambiguity.'" *Wooden v. United States*, 142 S. Ct. 1063, 1075 (Kavanaugh, J., concurring) (citing *Shaw v. United States*, 580 U.S. 63, 71 (2016); *Salman v. United States*, 580 U.S. 39, 51 (2016); *Abramski v. United States*, 573 U.S. 169, 188 n.10 (2014)). And a statute is not ambiguous "merely because it [is] *possible* to articulate a construction more narrow than that urged by the Government." *Moskal v. United States*, 498 U.S. 103, 108 (1990). After "exhaust[ing] all the tools of statutory interpretation" and "determin[ing] the best reading of the statute," the Court has not identified a grievous ambiguity, and therefore will not apply the rule of lenity. *Wooden*, 142 S. Ct. at 1075 (Kavanaugh, J., concurring).

The Court recognizes that "the rule of lenity is venerable." *United States v. Nasir*, 17 F. 4th 459, 472 (3d Cir. 2021) (Bibas, J., concurring). It ensures that defendants are on notice of the criminality of their conduct, and that legislatures, rather than courts, define crimes and punishments. *Wooden*, 142 S. Ct. at 1082–83 (Gorsuch, J., concurring). But it is important to remember that "[t]he touchstone is the text: the 'ordinary,' evidently intended meaning of 'the words of the statute.'" *Nasir*, 17 F. 4th at 473 (Bibas, J., concurring) (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820)). That is, "though penal laws are to be construed strictly," this "maxim is not to be so applied as to narrow the words of the statute to the exclusion

---

[9] *Miller* invokes lenity as a background principle before it embarks on its statutory interpretation, 2022 WL 823070, at *4–5, though the rule "comes into operation at the end of the process of construing what Congress has expressed," *Callanan v. United States*, 364 U.S. 587, 596 (1961).

of cases which those words, in their ordinary acceptation . . . would comprehend." *Wiltberger*, 18 U.S. (5 Wheat.) at 95. When the plain text covers the defendant's conduct in terms that he can understand, the Court must apply the law as written. *Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring).

Such is the case here. Reffitt helped lead a mob of rioters up the steps of the Capitol to overwhelm the police officers guarding Congress during its Joint Session. As the jury found, those actions hindered or placed obstacles in the way of the official proceeding. *See also Sandlin*, 2021 WL 5865006, at *5. Because these acts fall under the "ordinary acceptation" of § 1512(c)(2)'s terms, the Court finds no reason to narrowly construe the statute to exclude them.

### 3. Motion to Arrest Judgment

The Court has jurisdiction over the § 1512(c)(2) offense—a federal crime that Reffitt committed in Washington, D.C.—and thus will not arrest judgment on Count Two under Rule 34. Reffitt's only argument in support of his jurisdictional challenge is that the indictment does not set forth "the essential facts constituting the offense charged." Mot. to Arrest Judgment at 2 (quoting Fed. R. Civ. P. 7(c)(1)).[10] First, defects in an indictment do not defeat a court's jurisdiction. *Cotton*, 535 U.S. at 630–31. Second, as the Court has already explained, the indictment is not in fact factually infirm: it tracks the statutory language and identifies the proceeding that Reffitt obstructed. *See* Order on Mot. to Dismiss at 6–7.[11] Thus, his motion to arrest judgment will be denied.

---

[10] Reffitt challenges the indictment on the ground that it fails to allege that he took action with respect to a document or impaired non-object information. *See* Mot. to Arrest Judgment at 1. Even if such allegations are required for the indictment to be factually sufficient, these are not elements that the government must prove under § 1512(c)(2), as explained in Part III.B.2.

[11] Reffitt did not move to dismiss the indictment on this basis, nor did he ever move for a Bill of Particulars. *See* Order on Mot. to Dismiss at 7 n.5.

### C.  Motion for New Trial

Reffitt makes little attempt to show that "the interest of justice" requires a new trial, *see* Fed. R. Crim. P. 33(a), reiterating only that the evidence is insufficient to sustain guilty verdicts, except on count 3(a), *see* Mot. for New Trial at 1.  In fact, the evidence amply supports his conviction on all counts.  *See supra* Part III.B.1.  And he points to no errors affecting his substantial rights.  *See United States v. Williamson*, 81 F. Supp. 3d 85, 92 (D.D.C. 2015).  Accordingly, the Court will deny his motion for a new trial.

### CONCLUSION

For the foregoing reasons, Reffitt's post-trial motions are denied.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

May 4, 2022