## THE UNITED STATES COURT DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                          )
UNITED STATES OF AMERICA,          )
                                                          )
                    v.                                )          No. 21-CR-53 (CJN)
                                                          )
EDWARD JACOB LANG,                       )
                                                          )
                              *Defendant.*         )
_____ )



## MEMORANDUM IN SUPPORT OF MOTION
## FOR A DUE PROCESS VIOLATION FINDING
## AND TO DISMISS INDICTMENT FOR
## WANT OF JURISDICTION OVER THE PERSON
## OF DEFENDANT LANG

## <u>TABLE OF CONTENTS</u>                    **Page**

TABLE OF CONTENTS…………………………………………………….... 2

STATEMENT OF ISSUES……………………………………………...……..3

PRELIMINARY STATEMENT…………………………………………...……..3

HISTORY AND BACKGROUND…………………………………...……..5

LAW AND ARGUMENT POINT ONE…………………………………... 16

LAW AND ARGUMENT POINT TWO………………………………..…... 18

LAW AND ARGUMENT POINT TWO………………………………..…... 20

LAW AND ARGUMENT POINT FOUR……………………………..…..34

CONCLUSION……………………………………………………...…..  37

## I.    <u>STATEMENT OF ISSUES</u>

(1) WHETHER MR. LANG HAS BEEN DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL IN LIEU OF UNCOSTITUTIONAL PRETRIAL CONDITIONS THAT HAS HINDERED THE ABILITY TO EFFECTIVELY ASSIST COUNSEL IN MOUNTING A RIGOROUS DEFENSE

(2) WHETHER THE DISTRICT COURT LACKS JURISDICTION OVER THE PERSON OF MR. LANG, WHERE THE FEDERAL GOVERNMENT USURPED STATE SOVEREIGNTY, AND THE EXTRADITION DUE PROCESS RIGHTS OF MR. LANG

## II.    <u>PRELIMINARY STATEMENT</u>

The first section of this memorandum, Points One and Two, requests a finding that Mr. Lang's Fifth Amendment's due process rights have been wholly violated, when as a pretrial detainee, his conditions of confinement subject him to exposure to serious illness. Because pretrial detainees are presumed innocent they are entitled to more considerate treatment and conditions of confinement than "convicted" criminals whose conditions of confinement are designed to punish.[1]  As such, the rights of pretrial detainees are different than the rights of post-conviction detainees.

---

[1] *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015) (*citing Younberg v. Romero*, 457 U.S. 307, 322, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)).

While the Eighth Amendment protects convicted prisoners only against cruel and unusual punishment, a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description.[2] The threshold, therefore, for establishing that a pretrial detainee's constitutional rights have been violated is clearly lower than the threshold for convicted prisoners who seek to establish the same. Those not yet convicted, "the question is whether the prison conditions amount to punishment of the detainee." A condition amounts to punishment if it is "not reasonably related to a legitimate institutional goal". *United States v. Riggins,* 456 F.Supp.3d 138 (2020) (*citing Bell v. Wolfish,* 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

The proper avenue for pretrial relief is the Fifth Amendment's due process clause, which is triggered when a pretrial detainee can demonstrate that their conditions of confinement subject them to exposure to serious illness, especially illness related to a preexisting condition that can lead to death. *United States v. Martin*, 447 F. Supp.3d. 999 (D. Md. 2020); *see also Bell v. Wolfish,* 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979).

Further, "if a condition or restriction is arbitrary or purposeless, a court may permissibly infer that the purpose of the governmental action is punishment that may

---

[2] *United States v. Riggins,* 456 F.Supp.3d 138 (2020) (*citing Hardy v. District of Columbia,* 601 F.Supp. 2d 182, 188 (D.D.C. 2009)).

not constitutionally be inflicted upon detainees *qua* detainees. " *Bell v. Wolfish*, 441 U.S. 520 (1979).

Further, this application, in Points Three and Four, explains and highlights how Mr. Lang was improperly arrested and then extradited to the sovereign jurisdiction of the United States. The statesmen who framed the Constitution were fully sensible that from the complex character of government it must fail unless the states mutually supported each other and the general government itself. The Federal Constitution places certain limits on the sovereign powers of the states and on the federal government, limits that are an essential part of the Framers' conception of national identity and Union. One such limit is found in Art. IV, § 2, cl. 2, the Extradition Clause.

### III.    HISTORY AND BACKGROUND

#### A.  D.C. JAIL- OTHERWISE KNOWN AS THE "DC GITMO JAIL"

1.    Throughout the time Lang was in the DC jail, he was sent to "The Hole"[3] on four separate occasions, and within a single year – Lang spent at least six months in these solitary confinement conditions. The first time Mr. Lang went into The Hole, was after asking for bible study and religious services, in that, on or about

---

[3] The Hole is the DC Jail solitary lockdown confinement, where inmates have no sunlight, no interaction with other individuals, the individual loses all rights to use the phone or a tablet, and to even purchase basic necessities such as food and hygiene productions.

March 20, 2021 Mr. Lang was dragged down to The Hole[4]. Mr. Lang remained in

The Hole until approximately April 12, 2021. During these three weeks, Mr. Lang

spent his 26th birthday in The Hole, with no human interaction, hygiene products, or

so much as a minute of sunlight. All because he requested a bible study group in his

unit.

2.      The second time Mr. Lang was sent to The Hole was after he was

speaking in an open forum to other J6 inmates in Lang's unit about not taking bad

deals, standing strong, and to have trust in God. The detention officers at the DC Jail

did not like what Lang was "saying to others" in relation to God,[5] or against the

government's actions against them, so again he was dragged down to The Hole. The

date was May 14, 2020, where in this episode Mr. Lang's time in The Hole lasted

for approximately three months.

3.      Mr. Lang was not charged with violating any jail facility rules, and was

not issued a single disciplinary ticket during such time. Rather, Lang was only

informed that his situation was "pending investigation".

---

[4] When being dragged down to The Hole, Lang was placed in cuffs while transported, and each time he left The Hole he had to stick his hands out of the door to be handcuffed again – then transported into the shower. While in the shower, he had to stick his hands out in order to be uncuffed.

[5] Throughout this time in the DC Jail, Officers, one in particular, mocked Lang's religion and requests for bible study, and then nicknamed Lang "the false prophet".

4.     Such circumstances should never be allowed or tolerated in a Federal Bureau of Prisons facility in this country. Disciplinary tickets, at a minimum, should be a prerequisite to even being moved into "solitary conferment", or "the Box", or "The Hole".

5.     Mr. Lang was released from The Hole in August 2021 for only 12 hours. Lang returned to his regular assigned housing unit without any disciplinary charges having been filed or adjudicated, only to be happily met by others in his unit.

6.     Following Mr. Lang's return to his regular housing unit, other inmates began to assemble at Mr. Lang's cell door to speak with him, where Mr. Lang entertained his fellow J6 detainees by sharing new family photos that he had received during his experience in The Hole.

7.     However, and again, the DC Jail housing unit detention officer did not like the display of fellowship and mutual support offered by the J6 detainees to Mr. Lang. So the next morning and without provocation, Mr. Lang received harsh instruction from the Supervisor of the Jail's Tactical Team, to pack up his belongings as he was being moved.

8.     As Mr. Lang was gathering his belongings, detention officers busted into his small cell, where Mr. Lang peacefully stood with a bible in his left hand and family photos in his right. Sergeant Robinson, who supervised the tactical team, entered the threshold to Mr. Lang's cell and engaged him with a burst of chemical

7

mace into the eyes and face. Sergeant Robinson unleased at least half of the bottle of mace into Lang's face, and eyes.

9.     Sergeant Robinson already has been accused of abuse, assault, and brutality unprovoked pepper sprayed.

10.     Lang's natural reaction after being mased in the face was to wipe his eyes, which officers refused to let him do. So instead, Lang had mase combined with an astronomical amounts of mucus dripping from his face, while officers paraded Lang around the unit as to show others what was just done to Lang's face.

11.     Lang was then thrown naked into The Hole after first being thrown in a shower designed for those who had just been mased. This specific shower, however, did not wash away the chemical agents from the mase in Lang's face. Instead, based on the substantial amount of mase used, the oils dripped all over Lang's body, burning his genital.

12.     Even female detention officers stood outside of the shower laughing at the mase soaked Mr. Lang.

13.     Lang was then thrown in The Hole, soaking wet with mase oil burning now not only his face and eyes, but also his lower body. The Hole this time consisted of the smallest room imaginable with a single mattress, not even covered with a sheet. While in The Hole for this particular time, the oils on Lang seeped into the

mattress, and continued to burn Lang for weeks on end. Such an example establishes how strong this mase was and the amount wrongfully sprayed on him.

14.     Again, Lang was just in The Hole for 3 months, to only return to his unit for approximately 12 hours.

15.     After hours without any clothes or sheets, Corporal Hayes (who would continuously taunt Mr. Lang and make fun of his Jewish religious affiliation and practices and continuously referred to Lang as a false prophet) showed up at Lang's door.

16.     Corporal Hayes said to Lang, "I have all of your belongings" and "I need you to sign for them". Lang looked outside of his door and saw a single bag, so he questioned, "where are all my books, photos, legal papers, clothes, towels, tooth brushes? My things cannot possibly fix into that little bag". Corporal Hayes then angrily looked at Lang and said, "This can happen one of two ways; either you sign this document or I am going to pepper spray you again. You have already been through enough today, so just sign."

17.     Simply stated, Corporal Hayes coerced Mr. Lang into signing for "all of his property", before literally providing to Lang a single bag containing only a blanket and a sheet.

18.     Mr. Lang was literally naked and had no clothes, and with inadequate clothing was forced to show up at his August 2021 court appearance with no

underwear or socks, and reported to this Court the sum and substance of these conditions during such appearance.

19.    It took over a week for before Mr. Lang received clothing. Two weeks later, Mr. Lang received his religious material, family photos, books, soap, purchased food items, shoes, towels and some of his legal material.

20.    Mr. Lang received three disciplinary tickets and was subsequently taken before an arbitrary Hearing Panel comprised of immigrant jail staff from the continent of Africa.

21.    During the Hearing, Mr. Lang was not afforded the most basic rights, such as his Inmate Rights under the Jails own Policy for the calling of witnesses, and there was no recording made available at the Hearing for further review. Four witnesses stood ready to testify that Lang stood peacefully in his cell and officers entered his room and unloaded half a can of mase in Lang's face for no reason. All any of these witnesses. A video in the unit would have established the same thing, yet no video was turned over to Lang or the hearing board.

22.    Further, Mr. Lang was not served with notice of the alleged jail violations within the 5-day period pursuant to the Jail's policy. Moreover, the proceeding was so absurd that even one of the panel members was uncomfortable with having the proceedings go forward.

23.     The next day when the opposing Hearing Officer was not on duty, the board went forward without any of Mr. Lang's witnesses or witness statements, and rather kept telling Mr. Lang that his only recourse was to file a grievance.

24.     Obviously, Mr. Lang was found guilty on all three tickets – and the imposed sanctions included losing all of his remaining inmate rights and privileges, e.g., (loss of social visits, the use a electronic tablet, and no commissary).  These sanctions lasted about 4-5 weeks.

25.     After spending 3 weeks, then 3 months in The Hole, this third round lasted another month before Lang got back out of The Hole. The amount of grievances Lang filed by this point is uncountable, most of which remain unanswered.

26.     Another example of the abuse and harsh treatment Lang has received, on August 18, 2021 there was a rally conducted at the DC Jail that was presented by a civic organization in opposition of detaining the J6 defendants. In the early morning hours and prior to start of the rally, Mr. Lang and every other J6 detainee was awakened from their sleep and ordered by approximately fifty members from the jail's Tactical Team to get up and step out of their respective cells carrying nothing except their issued mattress. The detainees were collectively informed that they were being moved.

27.    At no time was Mr. Lang or the other detainees alerted as to why or where they were being moved or when they would return. The detainees were moved into the basement of the jail.

28.    During the detainees' transition though the corridors of the jail, Mr. Lang began to sing the lyrics to the "Star Spangled Banner" in effort to psychologically ensure himself that he was not being led to a mass slaughtering for the detainees. During such journey, others actually spoke about how they were being led into a mass slaughtering.

29.    While still holding his mattress Mr. Lang was shoved against the corridor wall by Corp. Johnson, who physically assaulted Lang. Corp. Johnson literally struck Lang, with a closed fist, in Lang's ribs because he was signing.

30.    Lang and the other detainees spent the following 8 hours in the basement of the jail with no sink, toilet, or running water.

31.    Overall, Edward Jacob Lang is a pretrial defendant and has spent more than the majority of his time in 22 hour a day lock-down. That means he has had only two hours, some days to shower, call his family and loved ones, and interact with other human beings.

32.    In addition to being in The Hole for over six months, Lang has gone well over six months in a row without having a haircut, or a shave.

33.    Mr. Lang was given such little phone access that he was not even able to prepare for his own court hearings or speak with his attorney for months on end. Further, for the first six months of Mr. Lang's detention, there was no Securis phone system in place for secure communications between detainees and their attorneys.

34.    Mr. Lang, and being of the Jewish faith requires Kosher meals. However, all request for Mr. Lang's specific diet has been denied.

35.    Due in part to the denial of adequate meals, on approximately May 5, 2021, Mr. Lang began partaking in two hunger strikes. His first campaign lasting 4 days, and the second strike from Feb. 1, 2022 to Feb. 12, 2022, lasting for a period of 12 days. During the periods of the hunger strike Mr. Lang lost about 25-30 pounds and went to the medical ward for an overnight observation.

36.    In addition to the condition of his meals, Mr. Lang predicated his hunger strikes on: (1) justice for Ashley Babitt and Rosanne Boyland, calling for a congressional investigation, (2) that all non-violent criminal history J6 Defendants be released on Bond, pretrial, (3) proper redress of grievances of the potential fraudulent 2020 election, and (4) haircuts and video visits immediately for those in the DC Jail, unit C2B.

37.    While on his second hunger strike, Lang was frail and weak, and the jail moved Mr. Lang out of his regularly assigned housing unit and reassigned him to Housing Unit C2A, which is the two-week COVID-19 quarantine unit. So, Lang

was in a frail physical state prior to having been placed into an atmosphere with others who were either exposed to COVID, or sick from COVID.

38.    In December, Mr. Lang had a national interview with NewsMax where his call was cut off mid interview. Following the NewsMax disruption, Mr. Lang's Securis Account was completely cut-off and remained unavailable to Mr. Lang for all purposes until the end of December 2021.

39.    On January 5, 2022, Mr. Lang's account was again disrupted and without warning, and no disciplinary tickets.

40.    Also on or about January 5, 2022, all the entire J6 to include Mr. Lang was asked if they wanted to participate in COVID-9 testing on a voluntary basis. Jail staff gave no indication that failing to submit to the testing would result in a complete 14-day individual lock down.

41.    Mr. Lang declined to be tested. Between January 6, 2022 and January 22, 2022, Lang was restricted to his 70 square foot cell and only allowed to come out for a shower every three days. Also, he had no phone, no access to counsel, or religious services.

42.    This treatment continued, where throughout his time in the DC Jail, Lang is estimated to have filed at least fifty grievances. Then, out-of-nowhere, one night in early February, Lang was transferred to Lewisburg, PA.

**B.    LEWISBURG JAIL**

43.    It took some time for Lang to settle in while at Lewisburg jail. While at Lewisburg, Lang was first subject to a two-week double bunk confinement, where he was essentially in a cell with another, and under quarantine.

44.    Once Lang got access to the phone, he was only afforded 500 minutes a month, which is approximately 16 minutes per day. Lang did not have access to a computer or tablet, and only could use the general computer available to everyone. But, when Lang sent out messages, all of his messages were flagged and took over a week to be received by its intended party. Likewise, it took over a week for Lang to receive an incoming message, so by the time he got a message, it was a week old.

45.    Just as Lang and his counsel were figuring out the best way to communicate, in April of 2022, Lang was then moved by the U.S. Marshal to a pre-trial holding facility in Lewisburg, VA.

**C.    ARLINGTON, VA JAIL: STILL TO THIS DAY: 22 HOURS IN, AND 2 HOURS OUT.**

46.    Just when a system was put in place for Lang to communicate with his attorney, he was transferred again, out of nowhere, with no notice.

47.    Mr. Lang was again moved, this time to Arlington, VA., where he currently remains in a setting that is 22 hours in, and only 2 hours out. That means

that he has only two hours a day to make calls, take a shower, and have any interaction whatsoever. Such treatment is a demonstration of the disrupted nature to effective attorney / client communications and case preparations.

48.    Moreover, for the first six months of Mr. Lang's detention and in deprivation of Mr. Lang's due process rights and fundamental fairness, there was no secure phone access to attorneys with the Securis Inmate Telephone System. Securis is the sole inmate communications contractor to these jail facilities.

49.    When counsel was allowed to visit Mr. Lang, on or about April 2, 2022 the parties were then placed in a community room where there was no attorney client privileged means of communications at all. Further, Mr. Lang's meeting with counsel included three point body restraints which made Mr. Lang's attorney visit both painful and non productive.

50.    Then on July 13, 2022 Mr. Lang received a message that he was in violation of a Marshal policy, whereby he could not communicate with the media. Such threats for disruption of Mr. Lang's sole source of communication continues to the date of this filing.

51.    It is respectfully requested that this harsh, unconstitutional treatment cease immediately, and that Lang be ordered to have access to his own tablet, with all of his specific and general discovery on such devise; additionally, that the

Marshal's Office be ordered to not interfere with Lang exercising his First Amendment rights in speaking to whomever he chooses to.

## IV.   LAW AND ARGUMENT

### POINT ONE

**MR. LANG HAS BEEN DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL IN LIEU OF THE TOTALITY OF UNCOSTITUTIONAL PRETRIAL CONDITIONS THAT HAS HINDERED THE ABILITY TO EFFECTIVELY ASSIST COUNSEL IN MOUNTING A RIGOROUS DEFENSE**

As applied to a criminal matter, denial of due process is the failure to observe the fundamental fairness essential to the very concept of justice. In order to declare a denial of due process the Court must find absence of that fairness fatally in its totality infected the trial; and the acts complained of must be of such quality as necessarily prevents a fair trial. See - *Lisenba v. California*, 314 U.S. 219, 236 (1941). The totality of Lang's pre-trial due process violations as set out above caused either directly or indirectly by the Government have eroded the concept of fairness that's embodied within the fundamental protections of the Constitution and thus equates to a gross miscarriage of justice.

Because pretrial detainees are presumed innocent, they are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. As such, the rights of pretrial detainees are different than the rights of post-conviction detainees. While the Eighth

Amendment protects convicted prisoners only against cruel and unusual punishment, a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description.

The threshold, therefore for establishing that a pretrial detainee's constitutional due process rights have been violated is clearly lower than the threshold for convicted prisoners, thereby raising if "the pre-trial confinement conditions amount to punishment of the detainee." A condition amounts to punishment if it is "not reasonably related to a legitimate institutional goal". *United States v. Riggins*, 456 F.Supp.3d 138 (2020)(citing *Bell v. Wolfish*, 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979)). *Kingsley v. Hendrickson*, 576 U.S, 389m 135 S.Ct. 2466, 192 L.Ed,2d 416 (2015) (citing *Younberg v. Romero*, 457 U.S. 307, 322, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). *United States v. Riggins*, 456 F.Supp.3d 138 (2020) (*citing Hardy v. District of Columbia,* 601 F. Supp. 2d 182,188 (D.D.C. 2009)).

Again, the proper avenue for relief for pretrial relief is the Fifth Amendment's due process clause, which is triggered when a pretrial detainee can demonstrate that their conditions of confinement subject them to exposure to serious illness, especially illness related to a preexisting condition that can lead to death. *United States v. Martin*, 447 F.Supp.3d. 999 (D.Md. 2020); *see also Bell v. Wolfish*, 441 U.S. 520, 535, 239, 99, S.Ct. 1861, 60 L.Ed.2d 447 (1979).

Mr. Lang now moves for a finding that his due process rights have been violated; in addition for a dismissal of his Superseding Indictment.

## POINT TWO

### THE TOTALITY OF DUE PROCESS RIGHT VIOLATIONS ON A DAILY BASIS, WARRANT SPECIFIC FINDINGS IN THE INTEREST OF JUSTICE.

Edward Jacob Lang, has been held in the hole under 24-hour a day solitary confinement on four separate occasions, totaling more than six months. Mr. Lang's physical abuse includes being dragged, shoved, denied regular shower access, and getting a half of a can of mace in his face, while standing inside of cell with photos and a bible in his hand.

Mr. Lang's other abuses include sleep deprivation, verbal abuse, religious / Jewish abuses and being denied the right to counsel. As explained above, Lang was taken to "The Hole", where he remained for three straight months, without a single disciplinary ticket. After being taken out of "The Hole", he received a hero's welcome upon returning to the Patriot Unit.

Within 12-14 hours of being back on the Patriot Unit, the guards opened his' cell door and maces him directly in his eyes. As argued earlier, when Mr. Lang was mased he was standing in his cell with a bible in one hand and family photos in the other. He then was brought back to "The Hole", where he remained for a great period of time.

Further, Lang does not have access to all the discovery in this matter and has no guarantee that every time his name comes up in the jail that he will not continue to be harassed and used as *the* scapegoat inmate for raising false disciplinary charges as justification to throw Mr. Lang in the box.

Mr. Lang has been moved from jail-to-jail and from regular housing to The Hole (aka, the box or special housing unit) for no reasonable penological reason other than as a form of retaliation and/or harassment.

The D.C. District court has held, "with regard to the everyday administration of pretrial detention facilities, the Court is merely concerned with whether a "particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective". *United States v. Medina*, 628 F. Supp. 2d 52, 55 (D.D.C. 2009).

The Court in *Mednia*, supports the position that since the issues raised herein rise to the level of a Constitutional violation, this Court is empowered to grant relief. There is no doubt that the Government will argue that Mr. Lang should file a grievance to address the human rights issues that are violating his Constitutional rights on a daily basis. However, this court is empowered to eradicate those violations with specific findings allowing Lang better access to his discovery material and counsel, or even as drastic as dismissal of the case. None of Lang's treatment described above relates to any legitimate governmental penal interest. All

of this is designed to intimidate, punish, and cause physical and psychological pain.

Accordingly, it is incumbent on this Court to act.

### POINT THREE

**THE DISTRICT COURT LACKS JURISDICTION OVER THE PERSON OF MR. LANG, WHERE THE FEDERAL GOVERNMENT USURPED STATE SOVEREIGNTY, AND THE EXTRADITION DUE PROCESS RIGHTS OF MR. LANG**

> "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."

*Smith v. United,* 507 U.S. 244 (1991) at 248, quoting *EEOC v. Arabian, Oil Co.,* 499 U.S. 244 (1991) at 248.

Here, the New York State Governor never consented to or ceded jurisdiction pursuant to New York Laws, STL § Art. 3, over the locust, [**428 Liberty Street, Newburgh**][6] to the United States.

For the reasons herein stated, the relevant locus is situated beyond the statutory reach of 18 U.S.C. §§ 7, 13 and Federal Criminal Procedural Rule 4(c)(2) and systematically unreachable absent the due process afforded by state law.

Where the constitutional due process rights of Mr. Lang were grossly violated by arbitrary acts of the federal government while in its quest to obtain custodial authority over Mr. Lang, personal jurisdiction over the same, failed to be acquired

---

[6] Lang's address and where he was arrested by the FBI on or about January 16, 2021.

by the district court due to an improper transfer of Mr. Lang to the sovereignty of

the United States in accordance with applicable laws.

The United States of America, and the State of New York, both are exclusive

sovereigns which are governed by constitutional and statutory laws applicable to

their territorial jurisdictions.

> The Forbearance which courts of coordinate jurisdiction, administer under a single system, exercise towards each other, whereby conflicts are voided, by avoiding interference with the process of each other, in a principle of comity, with perhaps no higher sanction than the utility which comes from Concord; but between State courts and those of the United States it is something more. It is a principle of right and of law, and therefore, of necessity. It leaves nothing to discretion or mere convenience. [**These courts do not belong to the same system,**] as far as their jurisdiction is concerned; and although they coexist in the same space, [**they are independent, and have no common Superior**.] They exercise jurisdiction, it is true, within the same territory, but not in the same plane; and when one takes into its jurisdiction a specific thing, that res is as much withdrawn from the judicial power of the other, as if it had been carried physically into a different territorial sovereignty.

*Ponzi v. Fessenden,* 258 U.S. 254, 260-61 (1922).

The Constitutional sovereignty of the United States is established in Art. 1 §

8, cl 17, and codified by 18 U.S.C. § 7 (3), which highlights in relevant parts:

> The term "special maritime and territorial jurisdiction of the United States", as used in this title, includes:
>
> Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction

thereof, or any place or otherwise acquired by the United States by consent of the legislature of the state in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

Title 18 U.S.C. § 13 (a), also states:

Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in Section 7 of this title, or on, above, or below any portion of the territorial sea of the United States [**not within the jurisdiction of any state**,] commonwealth, territory, possession, or district is guilty of any act or omission which, although not made punishable if committed or omitted within the jurisdiction of the state, territory, possession, or district in which such place is situated, by the laws thereof enforced at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment. (Emp added)

The *Griffen* Court established that the term "out of the jurisdiction of any particular State", as used synonymously in 18 U.S.C § 13, entitles an act for punishment of certain crimes against the United States, and "must be construed to mean, out of the jurisdiction of any particular state of the United States." *United States v. Griffen,* 18 U.S. 184, 204 (1820). Further, in *Neff* it was held that a "tribunal's jurisdiction over persons reaches no farther than the geographic bounds of the forum." *Pennoyer v. Neff*, 95 US 714 (1878). "A state claims the right of sovereignty, commensurate with her territory, as the United States claims its, in their proper sphere to the extent of the federal limits." *Worcester v. the State of Georgia*, 31 U.S. 515, 591 (1832). "The power of the State in this respect follows from her

sovereignty within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the federal government." *United States v. Fox*, 94 U.S. 315, 321 (1876). The disbursement of such control would be foreign to the purposes for which the Federal government was created, and would seriously embarrass the landed interests of the State. *Id.*

Under *Pennoyer* any attempt "directly" to assert extraterritorial jurisdiction over the person of Mr. Lang would offend the States of New York and exceed the inherent limits of federal power. *Pennoyer v. Neff*, 95 US 714 (1878).

By enacting § 13, Congress established a range for criminal enforcement and sanctions that may be imposed within the geographical boundaries of federal extraterritorial jurisdiction. Congress was careful to articulate that, to enforce criminal laws under this Section, the criminal conduct must first be committed outside the territorial "jurisdiction of any state".

Congress further mandated under § 13, that the accused person must be charged and punished in the federal extraterritorial jurisdiction, "upon a like offense" and as if the criminal act [had] been committed within the jurisdiction of the particular state, commonwealth, territory, possession, or district. This is because it is the States who exercise traditional police powers to define the criminal law and to protect the health, safety and welfare of their citizens. *Gonzales v. Raich,* 545 U.S. 1, 42 (2005).

Here, on January 16, 2021, Special Agents from the Federal Bureau of Investigation (FBI) although having been in possession of a Criminal Complaint and Warrant of Arrest from the United States District Court for the District of Columbia, had neither federal or state statutory authority to execute the warrant or to seize Mr. Lang at his Newburgh, New York, residence. Agents neither had authority to transport Mr. Lang from the territorial sovereignty of the State of New York, [**without**] mandatory State court extradition processes to the sovereignty of the United States.

"The only limitation of a district court's power to exercise personal jurisdiction derives from the due process clause of the Fifth Amendment." *Omni Capital International v. Rufolf Wolff,* 484 U.S. 97, 102 (1987). "It represents not as a matter of sovereignty but as a matter of individual liberty." *Id*. at 104.

New York's sovereignty is well established within the Constitution of the State of New York at Chapter 6 § 2, which highlights:

> Supreme sovereignty in the people. No authority can, on any pretence whatsoever, be exercised over the citizens of this state, but such as is or shall be derived from and granted by the people of this state.

Both sovereigns, that is, the United States and the State of New York, have extradition procedures promulgated by specified statutory laws. Accordingly, there is a grave misunderstanding among jurist as to the distinction between the federal "Removal" process pursuant to Rules 5(2)(A)(i) and Federal Rules of Criminal

25

Procedural, Rule 40, and the federal criminal "Extradition" process under 18 U.S.C

§§ 3182 -83. *See also United States v. Love,* 425 F. Supp. 1248 (S.D.N.Y. 1977).

"Removal proceedings under Rule 40, are designed to return federal fugitives

to federal custody pursuant to federal warrants based on an underlying federal

offense, with a view towards federal prosecution in the district where the prosecution

is pending." The *Love* court's decision was based on the premise that unless such

procedure is followed in accordance with due process, substantial questions could

be raised in the underlying prosecution concerning that state arrestee's "right to

formal extradition proceedings and waiver of extradition pursuant to the Uniform

Criminal Extradition Act." *See United States v. Love,* 425 F. Supp. 1248 (S.D.N.Y.

1977).

Accordingly, the *Love* court articulated the distinctions between a federal

"removal" proceeding and the inherent due process rights attached to a federal

"extradition" proceeding which first commences in the state court. New York

Criminal Procedure Law (hereafter referred to as the "CPL"), Section 570.24,

prescribes in relevant part:

> No person arrested upon such warrant [**shall be delivered
> over to the agent of the executive authority demanding
> him**] shall have appointed to receive him [**unless**] he
> [**shall first be taken before a justice or judge of a court
> of record of this state,**] who shall inform him of the
> demand made for his surrender and of the crime with
> which he is charged; and that that he has the [**right to**]
> demand and procure legal counsel; and if the prisoner or

26

his counsel shall state that he or they desire to test the legality of his arrest, the judge of the court of record [shall fix a reasonable time to be allowed the person in which to apply for a writ of habeas corpus]. When such writ is applied for, notice thereof; and of the time and place of hearing there on, shall be given to the prosecuting officer of the county in which the arrest was made and in which the accused is in custody, [**and the said agent of the demanding state**.]

A prisoner transferred under the Extradition Act is explicitly granted a right to a pre-transfer hearing at which he is informed of the receiving State's request for custody, his right to counsel, and his right to apply for a writ of habeas corpus challenging the custody request. *Cutler v. Adams,* 449 U.S. 433 (1981). Further, New York law specifically provides that no person in the State shall be surrendered up to another sovereign, absent knowledge of the governor of the state. *Cf.* C.P.L. § 570.08 (highlighting "No demand for extradition of a person charged with crime in another state shall be recognized by the governor unless in writing, alleging, that the accused was present in the demanding State at the time of the commission of the alleged crime, and that thereafter he fled from the state . . .").

The federal government did not formally become a party to the Uniform Criminal Extradition *"Compact"* which controls the consorted efforts by the states to effectuate interstate extraditions. However the United States and the District of Columbia are in fact parties to the Uniform Criminal Extradition Act (hereafter referred to as the "UCEA"). *See* 18 U.S.C § 3182; *See also* 28 U.S.C § 88

(highlighting Congress effectively bound the federal government to the terms and provisions of the Compact that was formulated among the states).

The federal government is affectively bound by the terms of the "UCEA". The terms of 18 U.S.C § 3182, does congressionally bind the United States to the statutory provisions of the Compact including various due processes, in respect and recognition of territorial sovereignty of the states in regard to extradition.

The provisions of § 3182 are expressly directed to the federal government and no other. "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Smith v. United,* 507 U.S. 244, 248 (1991) (quoting *EEOC v. Arabian, Oil Co.,* 499 U.S. 244 (1991)).

"We start, as always, with the language of the statute, -- it is well established that, when the statutory language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman,* 555 U.S. 113 (2009). Title 18 U.S.C § 3182, explains:

> Whenever the executive authority of any state or territory demands any person as a fugitive from justice, of the executive authority of any state, district, or territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the state or territory from which the person so charged has fled, the executive authority of the state, district, or territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority

making such demand, or the agent of such authority
appointed to receive the fugitive, and shall cause the
fugitive to be delivered to such agent when he shall appear.
If no such agent appears within 30 days from the time of
the arrest, the prisoner may be discharged.

Congress further enacted 18 U.S.C § 3041, thus, reinforcing its intent to bind

the federal government to the extradition laws and the Compact of the sovereign

States, including the state of New York, under the Uniform Criminal Extradition

Act.

The terms of § 3041, demonstrate that Congress clearly recognized the

existence of sovereignty in extradition processes. Under 18 U.S.C § 3041, Congress

prescribes:

Any *[state judge or magistrate]* acting hereunder *[may
proceed according to the usual mode of procedure of his
state]* but his acts and orders shall have no effect beyond
determining, pursuant to the provisions of section 3142 of
this title, rather to detain or conditionally release the
prisoner prior to trial or to discharge him from arrest. (Emp
added)

The statutory provisions of § 3041, coexist with CPL, § 705.36, which

highlights:

If from the examination before the local criminal court it
appears that the person is the person charged with having
committed the crime alleged, and, in cases arising under
section 570.14 or 570.16, that he had fled from justice, the
local criminal court must, by a warrant citing the
accusation commit him to the county jail for a period not
exceeding thirty days and specified in the warrant, as will
enable the arrest of the accused to be made under a warrant

29

of the governor on a requisition of the executive authority of the state having jurisdiction of the offense, ***unless the accused gives bail as provided in the next section, or until he shall be legally discharged***.

The Governor of the State of New York can rightfully decline to honor the extradition request of the United States, if there is any reason based on the Constitution and laws of the United States of America, and more specifically, due process for justifying such denial. *Basing v. Cady,* 208 U.S. 386, 391 (1908).

The courts of the custodial states may do no more than ascertain whether the requisites of the Extradition Act have been met. The Act leaves only four issues open for consideration before the fugitive is delivered up: (a) whether the extradition documents on their face are in order; (b) whether Mr. Lang has been charged with a crime in the demanding state; (c) whether Mr. Lang is the person named in the request for extradition; and (d) whether Mr. Lang is a fugitive." *California v. Superior Court of California*, 482 U.S. 400, 408 (1987).

Pursuant to the terms of 18 U.S.C § 3182, Congress unambiguously authorized the law enforcement power to arrest Mr. Lang in this case, and by constitutional due processes with the State of New York.

By the express terms of § 3182, "the executive authority of the [State] to which such person has fled shall cause him to be arrested".

Nowhere within the statutory language of § 3182 does Congress authorize an agent or agents, from the executive branch of the demanding state, commonwealth,

territory, district, or the United States, to "arrest" and "secure" a person deemed to be a fugitive who has been located within the territorial sovereignty of any custodial State, including the State of New York.

The language, history, and subsequent construction of the Extradition Act make clear that Congress intended extradition to be a summary procedure. As the Supreme Court has repeatedly held, extradition proceedings are "to be kept within narrow bounds"; they are "emphatically" not the appropriate time or place for entertaining defenses or determining the guilt or innocence of the charged party. *Biddinger* v. *Commissioner of Police*, 245 U.S. 128, 135 (1917); *see also Michigan* v. *Doran*, 439 U.S. 282, 288 (1978); *Drew v. Thaw*, 235 U.S. 432, 440 (1914); *Pierce* v. *Creecy*, 210 U.S. 387, 405 (1908); *In re Strauss*, 197 U.S. 324, 332-333 (1905).

The FBI cannot use its law enforcement authority under the Constitution's Extradition Clause to contravene the principle of state sovereignty embodied in the Tenth Amendment. Likewise, that authority must be used in a manner consistent with the notion of enumerated powers — a structural principle that is as much part of the Constitution as the Tenth Amendment's explicit textual command. *Gonzales v. Raich*, 545 U.S. 1, 52 (2005).

Accordingly, the statutory language of § 3182 again reinforces the intent of Congress to respect the territorial sovereignty of the states in effort to curtail acts of

31

encroachment or usurpation by the federal government into custodial states or the demanding state, commonwealth, territory, or district's encroachment upon the sovereignty of the federal government. Moreover, the arresting custodial state and the federal government is mandated under the plain language of respective UCEA statutes to inform the executive authority of the demanding sovereign as to the capture of the fugitive, and further demands that the arresting authority "shall cause the fugitive to be delivered to such agent when he shall appear."

This statutory language with regards to § 3182 would be futile if agents of the federal government were authorized to arbitrarily execute fugitive arrest warrants within the sovereignty of a particular state.

By the expressed terms of § 3182, Congress has clearly prescribed the manner in which a fugitive, "federal" or "state", shall be arrested and delivered up when such a person is found within the exclusive territorial sovereignty of a state or that of the federal government.

Finally, federal statutory law itself prohibits agents and officers of the federal government from executing federal arrest warrants beyond the exclusive or extra-territorial jurisdiction of the United States. Title 18 U.S.C § 3046 gives directions only to, "See Rule 4" for arrest warrants issued upon a Criminal Complaint and "Rule 9 of FED.R.CRIM.P", for arrest warrants issued upon an Indictment.

Federal Criminal Procedural Rule 4(c)(2) explains in relevant part: "A warrant may be executed, or a summons served, within the [jurisdiction of the United States] or anywhere else a federal statute authorizes an arrest."

The jurisdiction of the United States, as used in Rule 4, by way of § 3046 is controlled by the express terms of 18 U.S.C §§ 7 and 13, where "exclusive" and "extraterritorial" jurisdiction of the United States is Congressionally defined throughout all of Title 18, and no more.

It is irrefutable from the terms of the relevant statutes relied upon above that Congress gave recognition to the sovereignty and territorial jurisdiction of the states, including the State of New York, in relations to the power of arrest upon fugitives for violations of federal law.

The working harmony of all statutes both state and federal, forecloses any doubt that the United States through the appropriate Acts of Congress, is bound by the extradition laws and due process rights afforded to persons within the territorial and sovereign boundaries of the states, including the state of New York.

Therefore, the FBI essentially abducted Mr. Lang at gunpoint from his residence located at 428 Liberty Street, Newburgh, New York, and immediately transported him to a [federal] building, the Metropolitan Correctional Facility, located within the extraterritorial jurisdiction or otherwise sovereignty of the United

States, and subsequently to the District of Columbia[7]. These actions were all done

without a single thought about first affording to Mr. Lang, Congressional and New

York state extradition procedures that Amendments Five and Fourteen to the United

States Constitution guarantee under their due process clauses. Further, Rule 40(b),

directs to Rule 5(c)(3), which states:

> (4) Procedure for persons extradited to the United States.
> - if the defendant is surrendered to the United States in
> accordance with a request for the defendant's extradition,
> the initial appearance must be in the district where the
> event is charged.

Accordingly, Rule 5(4) mandates that Mr. Lang must be, and should have

made his "first appearance" before a judge in the United States District Court for the

District of Columbia, as opposed to having first been delivered before a Magistrate

within the federal District of New York. The extradition laws are clear with regard

to the manner in which federal fugitives must be presented for adjudication. The

federal government violated the law, which affected substantial rights of Mr. Lang

and the personal jurisdiction of the district court.

### POINT FOUR

**THE DISTRICT COURT LACKED JURISDICTION OVER THE PERSON
OF MR. LANG, WHERE THE FEDERAL GOVERNMENT USURPED**

---

[7] On January 19, 2021 Mr. Lang by and through counsel made his initial appearance before the
United States Magistrate where he waive the Rule 5(c)(3) removal proceeding but at no time was
extradition addressed.

**STATE SOVEREIGNTY, AND THE EXTRADITION DUE PROCESS RIGHTS OF MR. LANG**

The United States District Court for the District of Columbia, failed to acquire jurisdiction over the "person" of Mr. Lang, under 18 U.S.C § 3182 (highlighting "that federal courts must ground their personal jurisdiction on federal statutes or rules"). Title 18 USC § 3182, expressly states "if no such agent appears within 30 days from the time of arrest, the prisoner may be discharged."

The terms of the statute are jurisdictional in nature, and are invoked upon the lawfulness of the person's arrest. It is axiomatic that no person shall be deprived of liberty without the due process of the law. "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement must be satisfied. *Omni Capital Int'l v. Rudolf Wolff Co.*, 484 U.S. 97, 104 (1987).

Accordingly, any arrest of a person must be a "lawful" arrest in accordance with the Constitution and statutory laws. Otherwise an unlawful arrest or seizure violates due process principles.

Congress, by the statutory provisions of § 3182, gave exclusive arrest powers to ["the executive authority of the state to which such person has fled."] The language enacted under § 3182, clearly forecloses the power to arrest a fugitive to all others, including the FBI, whereby § 3182 prescribes that "if no such agent appears within 30 days from the time of arrest, the prisoner may be discharged."

It is clear that discharge of the prisoner would be dispositive to the criminal matter, as well as the demanding court's jurisdiction over the person of the arrestee less he be forever branded a fugitive from justice. It is equally clear pursuant to the statutory 30 days window under § 3182, that the Court's jurisdictional period attaches not from the time of lawful arrest, but in particular, at the time of "delivery" of the fugitive to the agent. The delivery of the fugitive through the executive of the State, effectively concludes all judicial proceedings in the surrendering state courts, thereby transferring jurisdiction over the person of the arrestee to the custody of the demanding sovereign by way of its appointed agent. And the Governor's grant of extradition is prima facie evidence that the constitutional and statutory requirements have been met. *Michigan v. Doran,* 439 U.S. 282, 289 (1978).

Due to the federal government's violation of § 3182, Mr. Lang failed to be "arrested", secured, and "delivered", by the "executive authorities" of the "State of New York", pursuant to the plain language of the statute.

Hence, jurisdiction over the person of Mr. Lang was never acquired by the trial court, and this case should be dismissed for the want of jurisdiction. Respectfully, while the district court did have jurisdiction to issue the Criminal Complaint and Arrest Warrant against Mr. Lang, and did have jurisdiction over the question of law involved in the criminal subject-matter – the district court did not

acquire jurisdiction over the person of Mr. Lang in lieu of his unconstitutional abduction by federal agents.

Therefore, to subject Lang to trial pre-trial detention or a plea of guilty is premature because jurisdiction was improperly inferred upon him at this stage. *United States v. Rauscher,* 119 U.S. 407, 433 (1886).

## **CONCLUSION**

WHEREFORE, Mr. Lang by and through the undersigned counsel pray that the herein MOTION FOR A DUE PROCESS VIOLATION FINDING AND TO DISMISS INDICTMENT FOR WANT OF JURISDICTION OVER THE PERSON OF DEFENDANT LANG is granted, and all other relief which this Honorable Court deems just and proper.

Respectfully Submitted,

*/s/ Steven Alan Metcalf II*

_____

STEVEN A. METCALF II, ESQ.
Metcalf & Metcalf, P.C.
99 Park Avenue, 6th Flr.
New York, NY 10016
(*Office*) 646.253.0514
(*Fax*) 646.219.2012

*Counsel for Defendant Edward Jacob Lang*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been served upon counsel for all parties to this proceeding as identified below through the court's electronic filing system as follows:

/s/ _____

STEVEN A. METCALF II

*Attorney for Edward Jacob Lang*

Dated: 7/15/22