**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                            )
UNITED STATES OF AMERICA,          )
                                                            )
*v.*                                                        )          No. 21-CR-53 (CJN)
                                                            )
EDWARD JACOB LANG,                      )
                                                            )
          *Defendant.*                               )
_____ )

## LANG'S REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR A DUE PROCESS VIOLATION FINDING AND TO DISMISS INDICTMENT

Now comes Defendant, EDWARD JACOB LANG, by and through his undersigned counsel, and submits its Reply to the Government's Opposition to Defendant's Motion for a Due Process Violation Finding and to Dismiss his Indictment.

In response to the government's opposition the Defendant though his counsel stresses how Lang's First Amendment to the United States Constitution, Fourth Amendment to the United States Constitution, Fifth Amendment to the United States Constitution, Sixth Amendment to the United States Constitution, and the Eighth Amendment to the United States Constitution have been violated, as follows:

## POINT ONE

**I.  LANG CAN CLEARLY DEMONSTRATE THAT THE PRE-TRIAL, JAIL TREATMENT HE HAS ENDURED SINCE HIS ARREST IN THIS CASE WILL HAVE PSYCHOLOGICAL EFFECTS, AND ARE CRUEL AND UNUSUAL PUNISHMENT, JUSTIFYING HIS RELEASE.**

### (RESPONDING TO GOVERNMENT'S POINT ONE)

1.  The instant application, in conjunction with Lang's initial Bond application have explained to this Court various circumstances that have hindered Lang's ability to assist in his own defense.

2.  We have outlined every deprivation that one individual can endure.

3.  Lang is an American citizen, pretrial detainee, who is being detained under egregious conditions that violate his constitutional and human rights.

4.  Lang has been in federal custody since being arrested on January 16, 2021.

5.  After being moved from jail-to-jail, Lang is currently detained in Administrative Segregation at Alexandra Detention Center, in Alexandria Virginia.[1]

---

[1] Defendant Lang's instant application addressed that Lang has been at Alexandria Detention center since the beginning of April, 2022. To recap, just days thereafter, we appeared for an in-person appearance, where I informed the Court on the record of Lang's "potential transfer" because at the time we did not know if it was permanent.  It is admitted that the instant application, in paragraph 49, addressing a April 2, 2022 meeting with Lang was is error. (*See* Instant Application at ¶ 49, ECF Doc. # 69). That date was most likely April of 2021, and did not belong under the Alexandria, VA section, so that is an admitted error. Otherwise, anything addressing "for the first six months of Mr. Lang's detention" was to recap and actually address the "first" six months of Lang's detention; not his "detention" in Alexandria, VA for six months because to date he still has not been in Alexandria, VA for six months. (*See* Instant Application at ¶ 48, ECF Doc. # 69); (*compare to* Government's motion suggesting that "for the first six months" at Alexandria jail at p. 6, ECF Doc.#: 71).

6.     In going back through these deprivations, lets first address all the grievances that have not even really been addressed, and how each adds up in the grand scheme of things.

7.     In doing so, it is respectfully submitted to this Court, that Lang, while at Alexandria, VA, since **April of 2022**, is still undergoing a systematic deprivation, that in no way shape or form has been alleviated with his most recent transfer to such facility.

**A.     LANG'S CONTINUED ONGOING DEPRIVATION CAUSING PREJUDICE REMAINS AND ONGOING PREJUDICE AND INJURY.**

8.     In our prior applications to this Court, we explained how over a year-and-a-half, Lang was being deprived of the most basis human needs. Such injuries and prejudices remain current to this day, where the examples of what remains ongoing to this day, in Alexandria, VA jail are as follows:

(1)  Lang is daily being sleep deprived (currently ongoing in that a light must remain on all night);

(2)  he has recently been searched in the middle of the night, where all the legal documents he maintained and collected since his arrest were just thrown in the garage (still ongoing injury in reviewing relevant legal documents);

(3)  he remains in a cell 22 hours a day, without a chair to sit down, thereby forcing him to either stand up or lay down on his little bed (current ongoing injury);

(4)  being denied medical care (still ongoing injury);

(5)   no access to a legal library (still ongoing, where legal library in Alexandria VA jail has not a single legal book, and the computers have been out since May 2022); and

(6)   his daily calorie intake is that which no man can survive on (still ongoing).[2]

9.    Additionally, Lang has not had sunlight in months. All of these circumstances, collectively, place Lang in a mentally, emotionally, socially, physically, and spiritually state of disrepair. The psychological – permanent – effects of this treatment are yet to be determined because Lang is doing everything in his power to remain strong and optimistic. But, he cannot continue to put on this front for much longer, under these situations. The psychological effects of this treatment will manifest in Lang, if not already, in the near future and *to an extent* that will result in permanent damage.

10.    These cruel and unconstitutional conditions and treatment remain ongoing to this day. Further, every day of this treatment effects Lang's ability to have a fair trial. He cannot assist in his own defense, and every piece of legal paper he has maintained was recently taken away from him and thrown away as trash.

---

[2] This list is far from exhaustive, as Lang has also been denied religious services, and can literally have one, non-legal visit, each week for only 30 minutes. Some weeks he cannot even get a visit with a family member approved. Stated otherwise, 1 (one) family member can see Lang once a week for 30 minutes, if such request even gets approved for that week. All of Lang's family is more than five hours, in one direction from where Lang is currently housed in Alexandria, VA.

11.    To make matters worse, and strip him of his First Amendment Rights, Lang has also been threatened to have his few hours out of his cell each day (2 hours per day) taken away if he continues to speak to the media.

12.    This all amounts to a substantial hinderance of his First, Fourth, Fifth, Sixth, and Eight Amendment rights to the United States Constitution.

13.    Its undisputed that there are no cases on point, citing an indictment should be dismissed because of that Defendant's conditions of confinement. However, we urge this Court to look at these deprivations, not as conditions of confinement, but rather as fundamental right violations, happening on a daily basis, all of which remain ongoing.

**B.    THIS A PREJUDICE FROM CONFINEMENT ISSUE, NOT A CONDITION TO CONFINEMENT.**

14.    Lang raises the issues of him being deprived his fundamental right to assist in his own defense, and defend against the charges against him. Dismissal is the only appropriate remedy when such violations to his human, and legal rights occurs, and remain ongoing.

15.    What has been raised in Lang's prior Bond application, and the instant application highlight systematic government misconduct (of the jail, not the AUSA), where the prejudice is substantial, and will never change no matter what jail Lang is transferred to because in each jail he will always be deemed a "Trump supporter", who is a danger, regardless of his lack of a criminal history.

**C.  GRIEVANCES AND COMPLAINTS IN THE JAIL SERVE LITERALLY NO PURPOSE OTHER THAN TO SHOW THIS COURT SUCH INSTANCES ACTUALLY WERE <u>DOCUMENTED</u>.**

16.    Mr. Lang was recently evaluated by a Dr. Berrill to determine if his current situation, and such deprivations, will have a future psychological effect on Mr. Lang, and to what extent. Respectfully, within 7-10 from this submission, an initial report from Dr. Berrill will be submitted to me based on Dr. Berrill's determination of the emotional impact that Lang has incurred and the manner in which his mistreatment at the jail since his arrest will affect him psychologically.

### i.    *Lack of Daily, Effective, Legal Communication: (Still ongoing)*

17.    This bring us to the first point, which is *access to speak with Mr. Lang*. Where Lang is currently housed, in Alexandria, VA, he has two hours out a day, which should all be used for personal use, such as showering, exercising, and speaking with loved ones. Instead, his attorneys have to spend hours figuring out how to have legal calls during these times, let alone including a doctor to conduct any evaluation.

18.    Video visits were cut off over a month ago, so Lang's legal team, all of which is far from the state of Virginia, can only physically go there to see him. This example is crucial because it creates an impossibility for someone such as Dr. Berrill.

19.    First, Lang gets a different two hours out of his cell each day, where four of the days are late nights, and well past normal business hours. This

complicates the process that much more. For example, on Monday, Lang's two hours are from 9:00-11:00 pm, and on Tuesday his two hours are from 11:00 pm to 1:00 am.

### ii.   *Lack of an Appropriate Diet: Grievances in VA (Still ongoing)*

20.     First, on **April 10, 2022** Lang filed a grievance: "For breakfast Sunday 4/10 I was supposed to receive 1 cup of fruit, milk, cereal, 2 slices of bread and 2 packets of jelly. I received NONE of these. I am on a kosher diet. Need this resolved ASAP. Happens often".

21.     No response from Alexandria, VA jail.

22.     Second, on **June 13, 2022** Lang filed another grievance stating, "The kosher tray is only 350 calories . . . There isn't enough calories per meal to satisfy a clown man. We need 2500-3000 calories a day. You are starving us!!"

23.     Alexandria VA jails response:  "We are following the approved Kosher menu for this facility. . . ." 6/15/2022 Brandon Lewis.

24.     Third, on **July 25, 2022** Lang filed yet another grievance explaining, "Kosher meals are lacking in (1) fruit every meal, (2) daily calories, (3) daily protein." Specifically, he highlighted:

> **Breakfast** 1oz of Peanut butter 150 cals, 1 milk 110 cals., cereal 200 cals, bread 100 cals.
> **Lunch** (My own meal) 350 Cals, bread 100 cals, juice 60 cals
> **Dinner** (My own meal) 350 cals, bread 100 cals, juice 60 cals, 2 cookies 80 cals = 1650 cals daily!!

Malnourishment!! Need 2500 cals a day, grown man.

25.    Alexandria VA jails response: "I follow the approved menu for this facility. I do not have the authority to change any menu or make alterations. The menu was made by the dietician and approved by the jail." Signed by Deputy on 8/3/2022, and Supervisor on 8/4/2022.

26.    Fourth, not realizing the most basis response, the jail signed off on August 3rd and 4th, Lang filed another grievance on **August 20, 2022**, stating, "I grievanced you 3 weeks ago about inadequate kosher tray nutrition. . . Please Answer."

27.    Alexandria VA jails response: "I respond to all grievances as soon as I receive them. And also the Kosher diet is based on a 3000 calorie daily average. The kosher bag is counted in the calorie counts. The dictician (sic) reviewed and the Centre approved." 8/21/2022 Brandon Lewis.

28.    A dinner tray that is so small as to be described as "**Dinner** (My own meal) 350 cals, bread 100 cals, juice 60 cals, 2 cookies 80 cals" is simply not enough nutrition for a grown man, especially when the jail will not remedy the issue and responses to grievances with "your Kosher trays" are based on "a 3000 calorie daily average". Such response is clearly inaccurate and not taking the situation seriously.

### iii. *Lack of any Medical Treatment or Reasonable Accommodations to Work or be Mobile: Grievances in VA (Still ongoing)*

29.    First, on April 20, 2022 Lang put in a "Health Services Request" stating: "I am having back pains, I was a gymnast and fracture my spin years ago! Also having an allergy to the soy in my kosher trays."

30.    Response from the Alexandria VA jail: "Task for lab work + pain medication ordered."

31.    Yet to this day, requests such as this, which were made approximately five months ago have still gone unaddressed.

32.    Second, on June 15, 2022 Lang's request to do housing work was DENIED "by Classification".

33.    Third, on July 22, 2022, Lang filed a grievance highlighting, "I am being denied access to General Population & being kept in Solitary confinement 22 hours a day because of my political affiliations. I am suffering inhumane conditions, social isolation, no religious services; because of political bias."

34.    Response from the Alexandria VA jail on July 27, 2022 was as follows:

> Mr. Lang,
>
> As it has been explained to you several times, you are not being held in Solitary Confinement. You are classified as administrative segregation status. . . Classification systems vary according to the facility and according to ours you are appropriately classified based upon your charges, continuous media coverage/high profile cases

which is a potential disruption to the safety, security, and
orderly operation of the facility.

35.    Instead of Lang being told that he must remain in "administrative
segregation status" because he is "a *potential* disruption", he should be able to
challenge such arbitrary decision that keeps him locked in a cell for 22 hours a day.

36.    Further, Lang's current cell does not have a chair or any other place for
him to sit. So Lang, for 22 hours a day can only stand or lay down. Respectfully, the
inability to sit down – at all – creates a psychological toll over time.

37.    Fourth, on July 26, 2022, Lang filed a grievance stating "the Nurse
refused to give me medical care & to let me see a medical doctor/physician. He also
refused to give me his name. I had to ask a deputy. This is the second time I have
received unprofessional behavior and refusal of medical rights by the nurse. ".

38.    Response from the Alexandria VA jail on July 27, 2022 was as follows:

Mr. Lang, I have reviewed your medical record, I noted
you were seen on 7/12/2022 for the same concern. The
request for a second mattress has been denied. The request
for a water pitcher has been denied. Those are concerns
the nurses can manage.

39.    On July 26, 2022 Lang also filed a "Health Services Request"
highlighting "I had a spinal fracture from years of gymnastics . . . I would like a
second mattress to help ease my pain. Also, I am dehydrated & and the large medical
grey cup helps me stay properly hydrated. Can I have permission to keep mine?

Thank you!". The response to the "Patient/comments" was "The second mattress + water pitcher was not approved by MD."

40.     In addition to having nothing to sit on in his cell, Lang is being denied a decent mattress, despite his prior medical circumstances, and to top it off, he has nothing to even drink from, not even a single watch pitcher.

### iv.     Lack of a Law Library: Grievances in VA (Still ongoing)

41.     On May 12, 2022, Lang filed a grievance stating "My due process rights are being violated for 2 + weeks, no access to legal library to assist in my legal defense. This is unconstitutional."

42.     Response from the Alexandria VA jail: "As discussed with you during command staff inspection on Thursday May 12, 2022, Due to Covid the jail was placed on restricted inmate movement in the facility per the recommendation by the medical officials on Saturday, May 7, 2022. . . The law library was reopened to normal status on May 12, 2022."

43.     On May 28, 2022, Lang filed a grievance stating "Last week I visited the law library and this week- both weeks the computers aren't working, not able to login/do any legal research . . . There aren't any legal books in "Law Library" either. This is making it impossible for me to prepare for trial & assist in my legal defense."

44.     Response from the Alexandria VA jail: "I do not have anything to do with the computers in the law library." Signed Lt. Hardy on 5/31/2022.

45.     Our instant application explained to this Court that on June 27, 2022, Chief Deputy Williams wrote Lang a Memorandum entitled "Media Violation". Such memo stated to Lang, who is an American citizen, pretrial detainee, that "[a]ny further actions of this nature may result in disciplinary action and/or temporary restrictions of the above privileges." Lang already is in a cell 22 hours a day without so much as a chair or a cup to drink from, so any further restrictions are insurmountable.

46.     Then on July 8, 2022, Lang filed another grievance stating: "Since at least May 12th the Law Library Computers haven't been working & there are zero (0) books in the legal library. Making it impossible to assist in my own defense. I checked last week & twice this week. Not working."

47.     Response from the Alexandria VA jail: "… However, the library computers have not been down since May . . . ."

48.     As a follow up, on July 22, 2022, Lang responded with another grievance stating: My access to the legal liberty/legal research to assist in my own defense has in fact been hindered/denied since May 12th, I checked weekly for months. Computers not working/no legal books." This grievance to this day has not been responded to.

49.     To add insult to injury, on August 14, 2022, all of Lang's legal paperwork was literally thrown in the trash, when his cell was raided at 1:30am. On

August 14, 2022, Lang filed a grievance documenting such instance, and highlighted:

> I was targeted by the facility/executives! In the middle of the night (1:30 am) my cell was raided & the Deputy's took . . . legal documents. I have saved . . . (Newspaper articles & clippings of me & my case, written by Congressmen Gomer that were to be used at Court as Exhibits. I have been collecting extensive legal records of Jan6tharticles to prove bias & they were taken from me, violating my rights & ability to assist in my case.

50.    Response from the Alexandria VA jail: "…If you would like to save them as you stated they are from your case, you can request to have them placed in your property. The other option would be to clip the articles and store them in a folder and discard the rest of the paper."

51.    Based on the prejudice and injuries caused to Lang, this Court can remedy these circumstances in various ways, such as ordering the prisoner released unless the unlawful conditions are rectified, leaving it up to the government whether to respond by transferring the petitioner to a place where the unlawful conditions are absent or by eliminating the unlawful conditions in the petitioner's current place of confinement. *Aamer v. Obama,* 742 F.3d 1023, 408 U.S. App. D.C. 291 (2014).

52.    Further, the Due Process Clause of the Fifth Amendment forbids the government from depriving a person of life, liberty, or property without due process

of law.[3] Pretrial detainees have a Constitutional right to be free from punishment prior to conviction. *See Bell v. Wolfish*, 441 U.S. 520, 99 (1979) ("holding that, under Due Process Clause, a detainee may not be punished prior conviction").

53.    To establish punishment, proof of intent or motive to punish is not necessary, and simply impossible. Rather, Lang, as a pre-trial detainee can prevail on a finding that his due process rights were violated since he has provided objective evidence that for the last 20 months, he has been substantially prejudiced and injured based on the violations of numerous jails – almost all of which remain ongoing and continuous to this day. The jails actions are not related to a legitimate governmental objective. *See Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466, 192 L.Ed,2d 416 (2015) (*citing Younberg v. Romero*, 457 U.S. 307, 322, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)).

54.    Here, Lang submits to this court for proper relief under these circumstances, in seeking either a finding that his Constitutional rights have been violated, or for release. Lang has demonstrated that while in jail, as a pretrial detainee, he has been substantially prejudiced and injured to the point that has caused psychological effects, which can remain permanent.

---

[3] U.S. CONST. AMEND. V.

55.    Because pretrial detainees are presumed innocent, they are entitled to more considerate treatment than criminals whose conditions of confinement are designed to punish after a conviction results.

56.    Again, the threshold question here has been met because Lang's injuries were caused by the jail, and done to a pre-trial detainee such as Lang in a way that "amounts to punishment". The treatment Lang has received, objectively, amounts to punishment that under these circumstances is "not reasonably related to a legitimate institutional goal". *See United States v. Riggins*, 456 F.Supp.3d 138 (2020) (*citing Hardy v. District of Columbia*, 601 F.Supp. 2d 182,188 (D.D.C. 2009)).

## POINT TWO

**II.    THE UNITED STATES GOVERNMENT DOES NOT HAVE EXCLUSIVE JURISDICTION OVER ALL OF THE 50 STATES, THUS THE ENTIRE PROCESS OF EXTRADITION WAS COMPLETELY SKIPPED WHEN LANG WAS ARRESTED IN NEW YORK, WITHOUT ANY NOTICE TO NEW YORK STATE AUTHORITIES, FROM THE NEW YORK GOVERNOR TO THE LOCAL SHERIFF'S OFFICE. (RESPONDING TO GOVERNMENT'S POINT TWO)**

"He was arrested by federal, not state authorities."

(*See* Government's Opposition at p. 18, ECF Doc. 71).

57.    The US Constitutions term "United States" has become so conflated with the power of the federal government, which should be interpreted as a separate federal Jurisdiction, not over individual states, that is also limited to exclusive and extraterritorial.  Common sense dictates the lengths our founding fathers went

through to enumerate individual state rights, the sovereignty of states, while at the same time highlighting that the federal government has limited jurisdictional power.

## A.   BACKGROUND REGARDING PERSONAL JURISDICTION OVER MR. LANG.

58.    In addressing the Government's first argument under Section II to its opposition, the Defendant must address the argument pertaining to the jurisdiction over the person of Mr. Lang.

59.    With that said jurisdiction is lacking. The central issue pertains to this jurisdictional question, where the merits of Mr. Lang's case are wholly irrelevant.

60.    Federal courts must examine their own jurisdiction, and standing "is perhaps the most important of [the jurisdictional] doctrines." *United States v. Hays*, 515 U.S. 737, 742 (1995). Accordingly, this Court must determine the merits of Mr. Lang's jurisdictional challenge so as to determine if the Government has *standing* to *sue* under criminal prosecution for the instant cause of action. "The Court must – at a minimum – satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over the defendants." *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014); *Salzman v. Islamic Republic of Iran*, Civil Action No. 17-2475 (RDM), at 3 (D.D.C. Sep. 25, 2019).

61.    The Government appears to regard valid challenges to the jurisdiction of the federal courts as "nonsensical." However the Supreme Court of the United States has long recognized challenges to the jurisdiction of federal courts as not only

proper but also a prerequisite to a party's standing for adjudication in both civil and criminal cases.

62.    In light of the language used in the Government's instant opposition, its necessary to explain in detail the nature of the *dual sovereign system of government which exists between the states of the Union and the Federal Government*.

63.    Mr. Lang was eventually indicted by a federal grand jury sitting in the District of Columbia. However, Mr. Lang was not arrested for the alleged offenses while he was personally within the District of Columbia. Mr. Lang, was apprehended by federal agents within the State of New York and more specifically at his apartment located at *428 Liberty Street*, Newburgh, New York.  It must also be noted that when arrested, it was based on a criminal complaint.

64.    In its Opposition the Government states and thereby concedes to these facts: "Here, a United States magistrate judge in this District issued a warrant for Lang's arrest for crimes he committed during the January 6, 2021, attack on the United States Capitol." (*See* Governments Opposition p. 14, ECF Doc. 71)(*citing* ECF No. 1, 27).

65.    Additionally, the Government states:

> Nothing about this process violated any law. Under Federal Rule of Criminal Procedure 4(c)(2), "[a] warrant may be executed, or a summons served, within the *jurisdiction of the United States* or anywhere else a federal

statute authorizes an arrest." Under Rule 5(a)(1)(A), "[a]
person making an arrest within the United States must take
the defendant without unnecessary delay before a
magistrate judge . . . unless a statute provides otherwise."
(*See* Governments Opposition p. 14, ECF Doc. 71).

66.    However, what is missing is that the federal States government does not

have Jurisdiction in each individual states, rather, its exclusive jurisdiction pertains

to only on its own land.   For example, Federal Rule of Criminal Procedure 4(c)(2),

highlights this point in stating "within the *jurisdiction of the United States*".

67.    The terms "United States" also represents the federal government as

having limited power over only limited federal land.  Let this Court not fall victim

with the government's attempt to conflate the "United States" as an all-power

autocratic entity that clearly goes against individual State rights as defined in the

United States Constitution, and each state's constitution.

68.    It must be noted that the magistrate who issued the arrest warrant for

Mr. Lang upon the Criminal Complaint failed to require that the Government apply

specificity to the Warrant Application, in that, the arrest warrant would have been

executed in accordance with both federal and state statutory laws. Rather, federal

agents with authorized state agents, would have both needed to be present. This,

federal statutory law prohibits agents and officers of the federal government from

executing federal arrest warrants ***beyond the territorial jurisdiction*** of the United

States. What is also missing here is the fact that dual sovereignties exist between the

states of the Union and the Federal Government. In fact, the Government argues that

the entire nation is somehow federalized, in stating:

> "personal jurisdiction in a federal criminal prosecution is supplied by the fact that the defendant is within the territory of the United States." (*See* Government Opposition at p.15)(*citing United States v. Burke*, 425 F.3d 400, 408 (7th Cir. 2005))
> . . . .
>
> Moreover, as noted above, Lang's U.S. presence was all that was needed for this Court's personal jurisdiction. (*Id.* at 18).

## B.    THE GOVERNMENT BELIEVES NOTHING ABOUT THIS PROCESS VIOLATED ANY LAW.

69.    The first step of this complicated process is to review the plain language

of Article 1, Section 8, clause 17:

> To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square)[4] as may, **by Cession**[5] of particular States, and the Acceptance of Congress, become the Seat of Government of the United States[6], and to exercise *like Authority* over all Places *purchased by the Consent of the Legislature of the State in which the Same shall be*, for the Erection of Forts,

---

[4] "[N]ot exceeding ten Miles square" is the entire area of the District of Columbia.

[5] "Cession" by its term refers to the United States government purchasing an entire piece of land, such as what was done in the states of Maryland and Virginia. *See Morris v. United States*, 174 U.S. 196, 240-41 (1899), *infra*.

[6] This part of clause 17 is where Exclusive Jurisdiction of the United States government ends.

Magazines, Arsenals, dock-Yards, and other needful Buildings. . . .[7]

*See* U.S.C.A. CONST. ART. I § 8, cl. 17.

70. Article 1, Section 8, clause 17's use of the term "by Cession" is explained more in *Morris*, where the United States Supreme Court explained the following:

> There is a still more important question, and that is whether the State of Maryland at that period could convey any interest, legal or equitable, in the property. In the act of 1791, ceding this property to the United States, there is this proviso: 'That the jurisdiction of the laws of this State over the persons and property of individuals residing within the limits of the cession aforesaid shall not cease or determine until Congress shall by law provide for the government thereof, under their jurisdiction in manner provided by the article of the Constitution before recited.' Now this continues in force the jurisdiction of the laws of the State of Maryland over the persons and property of individuals residing therein. To make that applicable to the present case it would be necessary to have extended it to the property held by the State; but it seems to me that that extended no further than to say that the laws which affected private rights should continue in force until proper provision was made by Congress. See what the consequences would be if another construction had been given to it. The State of Maryland extended to the Virginia shore, and suppose that after this cession and before 1801 the State of Maryland had undertaken to cede to the State of Virginia the whole bed or bottom of the Potomac River, from its source to its mouth, including that part in the District of Columbia, doubtless Congress could have had

---

[7] This part of clause 17 pertains to "Extraterritorial Jurisdiction", which common sense dictates is why federal agencies lease a certain piece of property, but that does not means that jurisdiction is vested to the United States government by virtue of them being "present" in a certain area.

something to say about it after the cession had been made. We are satisfied, therefore, that the proviso does not continue in operation the land laws of the State of Maryland, and consequently no title could be derived at the dates of this survey and patent or at the date when the warrant on which it was based was taken out. We are satisfied that the proviso does not continue in operation the land laws of the State of Maryland as to the public lands owned by the State within the said District, and that consequently no title to such lands could be obtained by patent from the State after the act of 1791.

*Morris v. United States*, 174 U.S. 196, 240-41 (1899).

71.    The *Morris* Court explained how the federal government, "by Cession" purchased parts of the State of Maryland and Virginia. *Id.* This means that the United States expanded its "[N]ot exceeding ten Miles square", which is the District of Columbia to two of its neighboring states. Such Cession goes to the United States "exclusive jurisdiction."

72.    Step two is to then draw a distinction between "exclusive" and "territorial" jurisdiction. Of the several categories listed in 18 U.S.C. § 7, Section 7(3) is the most significant, and provides:

The term "special maritime and territorial jurisdiction of the United States," as used in this title, includes: . . .
(3) Any *lands reserved*[8] *or acquired for the use of the* United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature

---

[8] "Any lands reserved" refers to areas such as federal parks.

of the State in which the same shall be, for the erection of
a fort, magazine, arsenal, dockyard, or other needful
building.[9]

73.     As is readily apparent, this subsection, and particularly its second

clause, bears a striking resemblance to the 17th Clause of Article I, Sec. 8 of the

Constitution. This clause provides:

> The Congress shall have power. . . *To exercise exclusive
> Legislation in all Cases whatsoever*, over such District
> (not exceeding ten Miles square) as may, be Cession of
> particular States, and the acceptance of Congress, become
> the Seat of the Government of the United States, and to
> exercise like Authority *over all Places purchased by the
> Consent of the Legislature of the State in which the Same
> shall be, for the Erection of Forts, Magazines, Arsenals,
> dock-Yards, and other needful Buildings.*

(Emphasis added.) For example, the constitutional phrase "exclusive legislation" is

the equivalent of the statutory expression "exclusive jurisdiction." *See James v.

Dravo Contracting Co*., 302 U.S. 134, 141 (1937)(*citing Surplus Trading Co. v.

Cook*, 281 U.S. 647, 652 (1930)).

74.     Until the decision in *Dravo*, it had been generally accepted that when

the United States acquired property with the consent of the state for any of the

enumerated purposes, it acquired exclusive jurisdiction by operation of law, and any

reservation of authority by the state, other than the right to serve civil and criminal

process. *See Surplus Trading Co. v. Cook*, 281 U.S. 647, 657 (1930).

---

[9] Respectfully, Edward Jacob Lang's apartment does not fall within this language.

75.     When *Dravo* held that a state might reserve legislative authority, such as the right to levy certain taxes, so long as that did not interfere with the United States' governmental functions, it became necessary for Congress to amend 18 U.S.C. § 7(3), by adding the words "so as," to restore criminal jurisdiction over those places previously believed to be under exclusive Federal legislative jurisdiction. *See* H.R. Rep. No. 1623, 76th Cong., 3d Sess. 1 (1940); S. Rep. No. 1788, 76th Cong., 3d Sess. 1 (1940).

76.     *Dravo* also settled that the phrase "other needful building" was not to be strictly construed to include only military and naval structures, but was to be construed as "embracing whatever structures are found to be necessary in the performance of the function of the Federal Government." *See Dravo,* 302 U.S. at 142-43. It therefore properly embraces courthouses, customs houses, post offices and locks and dams for navigation purposes.

77.     The "structures" limitation does not, however, prevent the United States from holding or acquiring and having jurisdiction over land acquired for other valid purposes, such as parks and irrigation projects since Clause 17 is not the exclusive method of obtaining jurisdiction. The United States may also obtain jurisdiction by reserving it when sovereign title is transferred to the state upon its entry into the Union or by cession of jurisdiction after the United States has otherwise acquired the property. *See Collins v. Yosemite Park Co.*, 304 U.S. 518, 529-30 (1938); *James*

*v. Dravo Contracting Co.*, 302 U.S. at 142; *Surplus Trading Co. v. Cook*, 281 U.S. at 650-52; *Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 526-27, 538, 539 (1885).

78.    The United States may hold or acquire property within the borders of a state without acquiring jurisdiction. It may acquire title to land necessary for the performance of its functions by purchase or eminent domain without the state's consent. *See Kohl v. United States*, 91 U.S. 367, 371, 372 (1976). But it does not thereby acquire legislative jurisdiction by virtue of its proprietorship. The acquisition of jurisdiction is dependent on the consent of or cession of jurisdiction by the state. *See Mason Co. v. Tax Commission*, 302 U.S. 97 (1937); *James v. Dravo Contracting Co.*, 302 U.S. at 141-42.

79.    State consent to the exercise of Federal jurisdiction may be evidenced by a specific enactment or by general constitutional or statutory provision. Cession of jurisdiction by the state also requires acceptance by the United States. *See Adams v. United States*, 319 U.S. 312 (1943); *Surplus Trading Co. v. Cook*, 281 U.S. at 651-52. Whether or not the United States has jurisdiction is a Federal question. *See Mason Co. v. Tax Commission*, 302 U.S. at 197.

80.    Simply stated, the "United States" may exercise plenary criminal jurisdiction over lands within state borders:

      A.    Where it reserved such jurisdiction upon entry of the state into the union;

B.    Where, prior to February 1, 1940, it acquired property for a purpose enumerated in the Constitution with the consent of the state;

C.    Where it acquired property whether by purchase, gift or eminent domain, and thereafter, but prior to February 1, 1940, received a cession of jurisdiction from the state; and

D.    Where it acquired the property, and/or received the state's consent or cession of jurisdiction after February 1, 1940, and has filed the requisite acceptance.

*See* The United States Department of Justice Archives, entitled "664. Territorial Jurisdiction, available at www.justice.gov/archives/jm/criminal-resource-manual-664-territorial-jurisdiction (last visited September 16, 2022).

81.    Furthermore, Title 18 U.S.C § 3046, gives directions only to, "See Rule 4" for arrest warrants issued upon a Criminal Complaint, and "Rule 9 for arrest warrants issued upon an Indictment. Rule 4(c)(2), prescribes in relevant part -

A warrant may be executed, or a summons served, within the ***jurisdiction of the United States*** or anywhere else a federal statute authorizes an arrest.

FED.CRIM.PROC.RULE 4(c)(2),

82.    The jurisdiction of the "United States", as used in Rule 4, by way of 18 U.S.C. § 3046, is controlled by the express terms of 18 U.S.C §§ 7, and 13 where "Exclusive" and "Extraterritorial" jurisdiction of the United States is Congressionally defined throughout all of Title 18.

83.    18 U.S.C. § 7 (3), prescribes in relevant parts -

The term "special maritime and ***territorial*** jurisdiction of the United States", as used in this title, includes:

Any lands reserved or ***acquired*** for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place or otherwise ***acquired by the United States by consent of the legislature of the state*** in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building. (Emp added)

84.    This phrase, *"within the exclusive jurisdiction of the United States,"* is well understood as applying to the crimes which are committed within the *premises, grounds, forts, arsenals, navy-yards, and other places within the boundaries of a State,* or even within a Territory, *over which the Federal Government has by cession,* by agreement, or by reservation exclusive jurisdiction. *Gon-Shay-Ee, Petitioner*, 130 U.S. 343, 352 (1889).

85.    Title 18 U.S.C. § 13 (a), prescribes that -

Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in Section 7 of this title, or on, above, or below any portion of the territorial sea of the United States ***not within the jurisdiction of any state***, commonwealth, territory, possession, or district is guilty of any act or omission which, although not made punishable if committed or omitted within the jurisdiction of the state, territory, possession, or district in which such place is situated, by the laws thereof enforced at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment. (Emp added)

86.    Chapter 13, it is said, relates to territorial jurisdiction and deals with certain offenses "`*when committed within any Territory or district, or within or upon any place within the exclusive jurisdiction of the United States.*'" *Johnson v. United States*, 225 U.S. 405, 413-15 (1912).

87.    In light of all this, the Government's argument is completely misplaced as to the statutory law, the principle of comity, and constitutional compliance. Further as an initial matter, "[u]nlike an objection to venue, lack of federal jurisdiction cannot be waived or be overcome by an actual or implied agreement of the parties." *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934).

88.    That means that just because *"Lang does not dispute his presence"* that jurisdiction over Lang's person is somehow waived. Courts have explained that federal and state Courts are independent, as is jurisdiction, and the sovereignty of an individual, or a state, in explaining:

> The Forbearance which courts of coordinate jurisdiction, administer under a single system, exercise towards each other, whereby conflicts are voided, by avoiding interference with the process of each other, in a principle of comity, with perhaps no higher sanction than the utility which comes from Concord; but between State courts and those of the United States it is something more. It is a principle of right and of law, and therefore, of necessity. It leaves nothing to discretion or mere convenience. ***These courts do not belong to the same system,*** as far as their jurisdiction is concerned; and although ***they coexist*** in the same space, ***they are independent, and have no common Superior***. They exercise jurisdiction, it is true, ***within the same territory, but not in the same plane***; and when one

> takes into its jurisdiction a specific thing, that res is as much withdrawn from the judicial power of the other, as if it had been carried physically into a different territorial sovereignty.

*Ponzi v. Fessenden,* 258 U.S. 254, 260-61 (1922).

89.    Specifically, here, Mr. Lang's apartment located at 428 Liberty Street, Newburgh, New York, is no[t] within the *territorial* jurisdiction of the Federal Government. The locus is firmly situated within the sovereignty of the state of New York. Defendant's argument is not to suggest that Mr. Lang could have escaped arrest and prosecution by the Federal Government. Rather, the sovereignty of the State of New York required established processes before the government could have lawfully and constitutionally acquired possession of Mr. Lang's body, to satisfy this Court's jurisdiction over Mr. Lang's person.

90.    The Federal Government ignored a crucial step in Mr. Lang's extraterritorial extradition due process rights, and in so doing, failed to acquire for this Court jurisdiction over Mr. Lang's person. Second, the Government fails to acknowledge Mr. Lang's inherent due process rights associated with extradition from one sovereignty to another as set out in 18 U.S.C § 3182. The crucial step missed here was to assure that a proper transfer of jurisdiction over Mr. Lang was to the District of Columbia, the requesting jurisdiction.

91.    Again, extradition is a distinct process and is not synonymous with a federal "Removal" proceeding. Lang is not arguing the validity of the federal

charges against him. Rather, we are presenting to the Court that pursuant to the due process clause of the United States Constitution, that the state courts of New York should have retained jurisdiction over Defendant Lang's person until such a time that the Governor of the state of New York signed a Governor's Fugitive Warrant, and a duly appointed judge of New York executes said Governor's Fugitive Warrant. Or, if Defendant Lang gave consent to voluntarily surrender his person over to agents of the federal government, in the presence of state court officials.

92.    In lieu of this Court's lack of jurisdiction over the person of the Defendant, the Court has no authority to adjudicate the validity of the Government's allegations, and has jurisdiction only to dismiss the case.

93.    All the statutes and cases cited above mandates that the Government must bring forth either: (1) evidence by way of cession or (2) New York State consent which establishes that the Defendant's address and place of arrest was ceded to the United States and was therefore "outside of the jurisdiction of the state" of New York.[10]

94.    Lastly, the Government argues that: "Lang was not charged or demanded by any State or Territory, but instead by the federal government. *He was*

---

[10] *Paul v. United States,* 371 U.S. 245, 267 (1963)(highlighting that "It must appear that the State, by consent or cession, has transferred to the United States that residium of jurisdiction which otherwise it would be free to exercise.").

***arrested by federal***, not state authorities. He had no right to extradition proceedings."
(*See* Governments Opposition p. 18, ECF Doc. 71).

95.    The Government's assertion however infringes upon the statutory laws of the state of New York, which further evidences a legally flawed argument. New York statutory law prohibits Special Agents of the federal government from arresting New York citizens for anything other than "state" offenses. Unless otherwise provided by statute, and while within the territorial jurisdiction of the "State of New York", Special Agents of the Federal Bureau of Investigation (FBI) have only limited statutory powers to arrest, seize, and search, relating to criminal offenses against the "State of New York", pursuant to the express terms of N.Y.C.P.L. § 140.25 which prescribes in relevant parts:

(1)    A peace officer, acting pursuant to his special duties, may arrest a person for:

(a)    Any offense when he has reasonable cause to believe that such person *has committed such offense in his presence*; and

(b)    A crime when he has reasonable cause to believe that such person has committed such crime, weather in his presence or otherwise.

. . .

(3)    A piece officer, whether or not he is acting pursuant to his special duties, may arrest a person for an offense committed or believed by him to have been

committed within the geographical area of such peace officers employment, as follows:

    (b)    he may arrest such person for a felony when he has reasonable cause to believe that such person has committed such felony, whether in his presence or otherwise.

96.    Additionally, the statutory terms of NY CPL 2.15 addresses the Federal Government's powers to arrest for any criminal offense under "federal" law, while such officer or agent is within the territorial jurisdiction of the state of "New York". The statute thereby prohibits the power of federal law enforcement agents to arrest for federal offences and limits the arrest authority to offenses against the laws of the "state" only.

97.    Under New York statutory law, the FBI had absolutely no authority to: (1) descend upon Lang's residence at 428 Liberty Street, Newburgh, New York, or (2) arrest Lang at gunpoint from his residence and then remove him by way of federal magistrate's Order to the District of Columbia, without the State of New York's authorized and known involvement.

98.    The reason for this is that the federal government lacked exclusive jurisdiction and territorial jurisdiction to do so in this part of the State of New York. Because the federal government lacked either means of jurisdiction, it also erred in not notifying the proper parties within the State of New York. Here, Lang was " arrested by federal, not state authorities." (*See* Government's Opposition at p. 18,

ECF Doc. 71). He then should have remained in the State of New York's custody, and been provided the opportunity to fight extradition before being transferred to the federal government's custody and control. Therefore, when such crucial step was surpassed the only appropriate remedy is dismissal.

## CONCLUSION AND PRAYER

WHEREFORE, and due to Mr. Lang's First, Fourth, Fifth, Sixth and Eight Amendment rights being violated, Mr. Lang prays for a finding of a due process violation; Additionally based on Lang's Fifth Amendment right to procedural due process initiating in the state courts being violated, Mr. Lang prays that the instant motion to dismiss his indictment for want of Jurisdiction over the person of Edward Jacob Lang is granted, and all other relief which this Honorable Court deems just and proper.

Dated: September 16, 2022

                            Respectfully Submitted,

                            */s/ Steven Alan Metcalf II*

                            _____

                             STEVEN A. METCALF II, ESQ.
                             Metcalf & Metcalf, P.C.
                             99 Park Avenue, 6ᵗʰFlr.
                             New York, NY 10016
                             (*Office*) 646.253.0514
                             (*Fax*) 646.219.2012

## **CERTIFICATE OF SERVICE**

I hereby certify that, on September 17, 2022, this motion was filed via the Court's electronic filing system, which constitutes service upon all counsel of record.

/s/ *Steven Alan Metcalf II*
_____
STEVEN A. METCALF II, ESQ.

*Counsel for Edward Jacob Lang*