# EXHIBIT H

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA

2

     * * * * * * * * * * * * * * *    )
3    UNITED STATES OF AMERICA,        )    Criminal Action
                                      )    No. 21-117
4              Plaintiff,             )
                                      )
5      vs.                            )
                                      )
6    ALEX KIRK HARKRIDER,             )    Washington, DC
                                      )    April 26, 2021
7              Defendant.             )    3:51 p.m.
                                      )
8    * * * * * * * * * * * * * * *    )

9

10          EXCERPTED TRANSCRIPT OF BENCH OPINION
        FROM THE BOND REVIEW HEARING HELD VIA ZOOM
11        BEFORE THE HONORABLE THOMAS F. HOGAN,
              UNITED STATES DISTRICT JUDGE
12

13

     APPEARANCES:
14

     FOR THE GOVERNMENT:      BRITTANY A. KEIL, ESQ.
15                            DANIELLE S. ROSBOROUGH, ESQ.
                              UNITED STATES ATTORNEY'S OFFICE
16                             FOR THE DISTRICT OF COLUMBIA
                              555 Fourth Street, Northwest
17                            Eleventh Floor
                              Washington, DC 20530
18

19   FOR THE DEFENDANT:       KIRA ANN WEST, ESQ.
                              LAW OFFICES OF KIRA WEST
20                            712 H Street, Northeast
                              Suite 509
21                            Washington, DC 20002

22

     FOR PRETRIAL SERVICES:   CHRISTINE SCHUCK
23

24

25

```
 1   REPORTED BY:            LISA EDWARDS, RDR, CRR
                             Official Court Reporter
 2                           United States District Court for the
                               District of Columbia
 3                           333 Constitution Avenue, NW
                             Room 6706
 4                           Washington, DC 20001
                             (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    (REPORTER'S NOTE:  THE FOLLOWING CONTAINS EXCERPTS REQUESTED

2    FROM THE BOND REVIEW HEARING AS FOLLOWS:)

3              THE COURT:  I'm going to issue a ruling.  It's

4    going to be a bench opinion.  I'll dictate it at this time,

5    rather than take the time to write something in detail.

6              As to the Co-Defendant Mr. Nichols, Mr. Files, if

7    you wish, you can stay on and listen to this.  And for

8    Mr. Nichols we can arrange another date for a status call.

9    This will take me about another 30 minutes or so at least.

10             MR. FILES:  No, your Honor.  We'll stay and

11   listen.

12             THE COURT:  That's fine.

13             All right.  I'm going to issue a ruling on this

14   request by the Defendant to reconsider the conditions of

15   bond and revoke the order of detention, originally called a

16   motion to modify the conditions of bond.

17             As we noted at the beginning of the case, I must

18   do a de novo review of the Magistrate Judge's findings in

19   our circuit and listen to the evidence and make findings

20   according to what I see and the evidence.

21             We start with the fact that Mr. Harkrider is not

22   contesting that he was seen on the videos entering the

23   Capitol with the crowd of individuals on January 6th in

24   possession of a tomahawk he kept with him at all times.

25   There's no evidence that he used it.
```

1    The charges against him -- the multiple charges

2    against him, many felonies and misdemeanors -- stem from his

3    participation in the riot and that he had -- prior to his

4    arriving, and I can find, and the evidence is clear, that he

5    and Mr. Nichols had exchanged text messages discussing their

6    plans about coming to the rally, which is fine, but they

7    also discussed bringing weapons, specifically freedom

8    blasters, which I assume is guns, picking up plate carriers

9    and maybe an actual battle, as is referenced back to his

10   statements, that he was looking forward to engaging in the

11   conflict, and he brought his .9-millimeter pistol and .30-30

12   rifle with him, which he left in his truck.

13          There's evidence the night before they went up to

14   the Black Lives Matter Plaza which has been put together on

15   16th Street near the White House and that they have said

16   that they were seen harassing individuals in the area,

17   including police officers.

18          I don't think that I can go with that, either.

19   They thought there was going to be a battle with antifa and

20   Black Lives Matter the next day or at the Capitol.  I don't

21   think it's clear that they had planned to attack the

22   Capitol.

23          But the videos show him in fairly -- in front of

24   the crowd trying to get into this one area of the Capitol

25   that was being blocked by the officers.  It does show him

1       motioning the crowd on.

2               By the way, I did want to ask the Government one

3       question before I finish:  What is the source of that video?

4       Who put that together?  Is that a witness to this or does

5       that come from various videos?

6               MS. KEIL:  That was a video, your Honor, that was

7       online that the agents found.  The Government did not

8       compile that.

9               THE COURT:  I understand it was a live video, but

10      I wanted to understand where it came from.  It was found

11      online?

12              MS. KEIL:  I believe that's correct, your Honor.

13              MS. WEST:  Your Honor, if I may interject, I want

14      to make sure that all these videos are, in fact, in

15      evidence.  I don't know what the Government gave the Court

16      exactly.  But my understanding --

17              THE COURT:  The Government gave me the exhibit

18      that was used, apparently, in the Magistrate Judge's

19      hearing.  I just have the record from the Magistrate Judge.

20      That's all I've looked at.

21              MS. WEST:  Okay.

22              THE COURT:  And that's a long video.  It's the

23      whole video.  The Government showed parts of it today.

24              MS. WEST:  My understanding from the Government

25      was they submitted several videos to the Court, and my

1    understanding was that those were in evidence.  So I want to

2    make sure --

3              THE COURT:  I have not seen other videos.  If they

4    have them, I haven't seen them.

5              MS. WEST:  May I inquire if I'm misunderstanding

6    that?

7              MS. KEIL:  So to be clear, the Government

8    submitted this video, which was about an hour and a half

9    long, I think, total, which is what the Government presented

10   today.

11             The Government did also submit on Friday the

12   phased excerpts, and there was an additional video that was

13   referenced in the preliminary hearing that was entered into

14   the preliminary hearing, which -- that was the video of them

15   down on Black Lives Matter Plaza, which we did not play

16   today.  By that was the other video I referenced.

17             THE COURT:  Right.  I haven't seen that.

18             MS. WEST:  I wanted to make sure that that was in

19   evidence, your Honor.  That's the one.

20             THE COURT:  That was before the Magistrate Judge,

21   you said?

22             MS. KEIL:  It was, your Honor.  Yes.

23             THE COURT:  That would have been -- it should have

24   been in the package that you presented here, then, for the

25   hearing.

1             MS. KEIL:  I did provide that on Friday, your

2  Honor, to your law clerk.

3             THE COURT:  Well, then, I'll make it part of the

4  record, because if the Government wants it to be considered,

5  it should be part of the record.  I did not review that

6  particular video.  I used the summary that I saw of the

7  materials.  It was in that video.

8             MS. WEST:  Thank you, your Honor.

9             THE COURT:  Now, Mr. Harkrider, then as I got to

10  the beginning of the video that we did watch shows him being

11  fairly towards the front of the crowd packed into this area.

12  And I guess it's a very dramatic scene as he progresses to

13  where people are attacking the police with spears or

14  whatever they're holding, et cetera; and he's in that crowd,

15  not doing any of that.  But it's clear he's there.

16             I think it's arguable whether he's being pushed by

17  other people or he's also pushing.  It seemed to me he is

18  doing some of the pushing himself.  But I can understand an

19  argument on that.

20             But the passing of the canister is very clear.

21  He's handed a canister somehow and he gets rid of it

22  somehow.  I don't clearly see how he got rid of it and what

23  was done with it, but there's a question that it seems it

24  went in front of him to end up directly in engaging with law

25  enforcement at some point.  We don't actually see that being

1    done.  That concerns me in weighing the evidence.

2           Then when you get to the ledge of the window, he

3    and Mr. Nichols are there.  And Mr. Nichols said very

4    violent things.  Mr. Harkrider did not say those, but he

5    stood next to him, gesturing.  And the tomahawk on his chest

6    is visible.

7           He went through the broken window and came back

8    afterwards and he had sent a message at that point that was

9    accurate, that they say it was accurate, that:  "We're in.

10   Two people killed already.  We need the patriots of this

11   country to rally the F up and fight for freedom.  Give us

12   liberty or give us death.  We won't stand for it."

13          Then you see him standing there waving his arms as

14   if he's encouraging people, but he was certainly waving his

15   arms and then finally making a very quick gesture across his

16   throat, which can be interpreted to be slashing throats.

17   I'm not sure what he was intending, but that's how it can be

18   interpreted, certainly.

19          Later, he made a Facebook post the next day that

20   "This is only the beginning.  After the Democrat and

21   Republican party, I stand with the constitutional party."

22          And after he was arrested, he made statements

23   about his involvement, which he said after given his Miranda

24   rights.

25          Now, looking at the legal standard of how we

1    handle this:  Obviously, under the Bail Reform Act, the

2    person awaiting trial, the Defendant, will be released or

3    detained depending on what the Court's reading of the

4    evidence is.  And the passage here -- the case involves a

5    felony; it involves possession or use of a dangerous weapon.

6    And three counts -- at least three counts of the indictment

7    fall under that category.

8            So I have to hold the Defendant pending trial if

9    the judicial officer determines that no condition or

10   combination of conditions can reasonably assure the

11   appearance of the person -- I'm not worried about that --

12   and the safety of any other person in the community.  That's

13   the real concern.  That's under *Sabol*, S-A-B-O-L, out of our

14   District Court here on April 14th.

15           So whether or not the Defendant is a danger to the

16   community:  I have to go through the four factors.  And I

17   think it's a difficult decision, because I have to

18   reasonably assure the public's safety.  I'm not worried

19   about his appearance.  I don't think that's a problem.

20           So I've got to look at the nature and

21   circumstances of the offense surrounding the charge.  And

22   it's inflammatory offenses here, including crimes of

23   violence, the weight of the evidence, the history and

24   characteristics of the person.

25           And under that category, I look at the character,

1    physical and mental condition, family ties, employment,

2    financial resources, residency in the community, community

3    ties, past conduct, history related to drug and alcohol

4    abuse, criminal history; and at the time of the current

5    offense, whether he was on any type of conditional control,

6    which he wasn't; and then the risk of any danger to any

7    person in the community.

8         If I find that no conditions of release will

9    reasonably assure the safety of the community, of other

10   persons, that has to be supported by clear and convincing

11   evidence.  There's a different burden about risk.

12        All right.  Obviously, *Munchel* said that the

13   violent breach of the Capitol on January 6th was a great

14   danger to democracy and that those participating could

15   rightly be subject to detention to safeguard the community.

16        Courts have looked at this very differently, and

17   some judges in this court look at it somewhat differently,

18   the type of burdens and the type of detention it ordered in

19   cases ordering the defendants detained without bond.

20        Chief Judge Howell has issued the *Chrestman* case,

21   where she appeared to put in categories or types of factors

22   that we should consider, which I think is very helpful.

23   Judge Bates in the *Klein* case released the Defendant.  He

24   was charged with three felonies, other similar charges, and

25   had hand-to-hand involvement with the police.  But there was

1    no evidence of preplanning or any evidence the Defendant

2    played a leadership or investigative role and no evidence he

3    overtly tried to endanger any officers.

4          Other judges have held defendants with similar

5    charges against them.

6          So looking at the circumstances here to be

7    assessed and in looking at the culpability, we use Chief

8    Judge Howell's guidelines and guidebook:  Compare

9    culpability of a given Defendant in relation to fellow

10   rioters.  That's *Chrestman*.  And other judges have used that

11   same analysis now.

12         So that includes whether the Defendant has been

13   charged with a felony or just misdemeanors.  Here, we have

14   felonies.

15         Whether he engaged in prior planning before

16   arriving at the Capitol:  It is disputed somewhat about this

17   prior planning.  I think it can be fairly read that the

18   prior planning seemed to be more about engaging with other

19   protesters of opposite views and by traveling that night

20   before to the Black Lives Matter Plaza and looking for

21   trouble, but not evidence that they had planned to go to the

22   Capitol and attack the Capitol.

23         Carry or use a dangerous weapon during the riot:

24   He did carry a dangerous weapon in the riot.

25         Coordinate with other participants before or

1   during or after the riot:  What prior planning or

2   coordination means.

3          Assumed a formal or de facto leadership role in

4   the assault by encouraging other rioters' misconduct:  He

5   stood by Mr. Nichols, who was obviously doing that, and was

6   very involved with that.  Whether that's encouraging others,

7   I'm not sure.  He did wave his hands and gesticulate and

8   then he came on the window scene later and waved his hands

9   and seemed to be encouraging people to come in and use this

10  slashing-the-throat sign.  And I'm not sure whether that is

11  an act of leadership or not.

12         Then the sixth is the nature of the Defendant's

13  words or movements during the riot and whether he threatened

14  or confronted federal officials and law enforcement while

15  being on federal property.  Well, he took, apparently, a

16  broken leg off a table.  I don't know if he's responsible

17  for that or what else he said he did there.

18         Whether the Defendant threatened or confronted

19  federal officials or law enforcement or promoted or

20  celebrated efforts to disrupt the certification of the

21  electoral vote count:  He certainly celebrated somewhat

22  afterwards.  And it was comment about:  Two people killed

23  and we're going forward here.

24         So the prior planning:  Let's talk about that

25  first factor.  They didn't coordinate plans to come to

1    Washington.  They did plan to bring weapons and secure vests

2    to wear to protect themselves.  Mr. Harkrider expressed

3    excitement at getting to an actual battle that could be a

4    war zone and bringing all the freedom blasters that he

5    owned.  And they stayed in Virginia.  They didn't bring the

6    guns to DC.

7            And the planning, it seems, were firearms and

8    vests, first aid equipment and goodies, which may be a

9    reference to the drugs that had been discussed prior.

10           And he was certainly dressed in tactical gear

11   earlier with some type of equipment he had on and armed

12   himself with a tomahawk, which someone at a peaceful protest

13   would not have done, is the Government's position.

14           And I think that that does show he wasn't caught

15   up in the frenzy of the crowd, but came to Washington with

16   intention.  I don't know whether it was disrupting the

17   democratic process and or whether he came to battle those

18   who had different views that he was concerned about.  And

19   there's some evidence that the defense provided that he was

20   worried about Black Lives Matter people and he had never

21   been up here before.

22           I think that that's not shown to me, that they

23   were planning to come here to attack the Capitol

24   definitively.

25           I think as far as his prior planning and

1    coordination, I don't see the evidence suggesting that he

2    talked to anyone about coming up to attack the Capitol.  He

3    talked to Mr. Nichols, who was obviously the leader.

4          But *Munchel* says very clearly -- I don't know how

5    to get around that -- that those who aided or conspired

6    with, planned or coordinated such actions are in a different

7    category of dangerousness.  But the opinion says that the

8    coordination involved more than two co-defendants.

9          Here, I can't find that they were definitively

10   coming to attack the Capitol.  I think, like in *Munchel*, the

11   Defendant traveled to the riot with tactical gear and

12   weapons and a lot of very strong statements, more than we

13   have here.  The Court found they were not involved in

14   planning or coordinating these activities.

15         And in fact, one of them actually had a Taser with

16   him that they didn't use but, like Mr. Harkrider, had a

17   weapon.

18         So I think the planning and preparation and

19   coordination factors at most are a wash.  In other words, I

20   don't think the Government carried the burden they have to

21   carry as to that factor.  And I don't think it puts him in a

22   higher category of dangerousness contemplated by *Munchel* at

23   this point, at least, under those factors.

24         Now the weapon concerns:  He carried a tomahawk

25   into the Capitol.  That's one thing.  He didn't use it.  And

1    I think under *Munchel* again -- that's M-U-N-C-H-E-L -- where

2    they said Munchel kept his Taser holstered on his hip, they

3    did not see a problem with that.

4        It's somewhat surprising, but that's the rule of

5    the circuit I have to follow. And the tomahawk was --

6    although you could see it, there is no evidence that it was

7    ever used. And it's certainly on an order of magnitude as

8    dangerous as any baton or a Taser or more dangerous.

9        But I think that the concern is the pepper spray

10   and what happened to that that was used against the

11   officers. And that is -- it has to be based upon what I

12   could spot from the video, the evidence on the video.

13       The video clearly shows at some point

14   Mr. Harkrider is handed a large container, a cylindrical

15   container that looks to be a foot long or more; and he takes

16   it, I believe, with his right hand and holds it up and that

17   he may -- it's not clear whether he's asking someone to take

18   it or whether he's saying to do something with it.

19       But then a second or two later, it is -- and this

20   bothers me -- it's not clear who he handed it to or how he

21   got rid of it. He did something with it, because he no

22   longer had it a few seconds later. But it concerns me that

23   the pepper spray, passing that on, has any meaningful

24   distinction from the conduct of the *Munchel* Defendants, who

25   carried a holstered Taser but didn't do anything with it,

1     but said some very strong things about what was involved in

2     their work in the attack on the Capitol.

3             And again, I think that I have to find by clear

4     and convincing evidence that he's a danger to the community.

5     And I can't find that by clear and convincing evidence, that

6     he did that, that that has shown that he did it knowing what

7     it was and passed it on.  I think that's close, but it's a

8     very slim case to me in the sense that it's a very close

9     case to me.  "Slim" is not the correct word.

10            Again, as to his leadership:  He's really not the

11    leader.  He's certainly following others.  He took a role

12    close to the beginning of the attack.  He was a few feet or

13    several feet back from going into where they were going in

14    the building; and you can see right in front of him they

15    were attacking the police, and he obviously could see that.

16    And then he had the episode at the window, pumping his visit

17    and he made that throat gesture.

18            It seems clear to me that Mr. Nichols played a

19    leadership role with the yelling and the bullhorn,

20    et cetera.  Mr. Harkrider, it seems to me, was playing

21    basically -- supporting Mr. Nichols.  And the evidence

22    shows, I think, as to the nature of his conduct that he knew

23    what he was doing.  He sent texts indicating what he was

24    doing.

25            There's been testimony by Mr. Anderson, his

1    friend, that he is a calm and peaceful man.  But it doesn't

2    show that he was deterred by any scenes of violence around

3    him at all.  There's no evidence that he did some serious

4    thing within the building once he got in.  It's really that

5    he was in the building and what steps he took to get in and

6    then he left, although he took a table leg, and that is

7    somewhat indicative of his position, that he kept the leg in

8    his home with him.

9         I think this is a close case.  I am going to find

10    that Mr. Harkrider was definitely an enthusiastic

11    participant, but there's no indication he committed a

12    destructive act inside the Capitol except for the canister

13    of pepper spray that I can't find definitively what

14    happened.

15         And on the balance, in light of the *Munchel* and

16    *Chrestman* factors, it seems to me to slightly indicate that

17    there's not a finding of dangerousness which I have to find

18    by clear and convincing evidence under the statute.

19         He possessed a dangerous weapon.  He committed

20    potentially a number of felonies.  But I don't think he

21    personally committed or actually committed violence or

22    engaged in far-reaching coordination with others and that

23    his subsequent statements, I think, were his bragging about

24    what he did.  When he said "This is the beginning," I can't

25    take that as meaning that he was ready to go back to the

1    next rally and commit crimes of violence against people.

2         I have to give some credence to the people -- to

3    Mr. Anderson's testimony.  His mother is a little less

4    credible because of her not recalling a lot of these text

5    messages with her son at this time and about what happened.

6         But the Government, it does have evidence against

7    the Defendant that seems very strong:  that he was there; he

8    went into the Capitol with a tomahawk, all of which is

9    illegal, with a dangerous weapon and that he took some steps

10    to encourage people, at least following Mr. Nichols, and

11    that they used social media to celebrate this entry into the

12    Capitol, is what they did.

13         The history and characteristics:  We've heard

14    about his combat, that he suffers from PTSD, that he says

15    he's doing better, that he has various family and friends

16    from the letters I've reviewed, all supporting him.

17         I am concerned.  Even some of these letters

18    indicate that there's a disbelief in the legitimacy of the

19    current government and the election.  They have to get some

20    way to make people understand.  The election is over.  And

21    Mr. Trump has been found after over 50 lawsuits that were

22    decided by judges, many appointed by Trump, that he did not

23    have a case.  And it concerns me that there's people still

24    out there that don't accept that.  And I don't know what's

25    going to happen eventually.  I asked questions about that

1    earlier.

2        I have to say that I can't find the Defendant will

3    not actually abide by conditions of release if we make

4    certain conditions that will assure me that, if released,

5    what he can do and not do will not cause harm to the public

6    or any individual.  I can't find it's not likely he will

7    comply with the conditions of release.

8        There were concerns about his mental health

9    status.  I'm also concerned about that.  His mother did not

10   indicate that was a problem at this time, that the suicide

11   was not an issue.  His counsel described what is a serious

12   discussion and that he was not going to do that.  I don't

13   see any other evidence in that respect.

14       I don't think that his release would justify him

15   or -- "justify" is not the word -- that his release would

16   expose people to danger at a possible future protest.

17   *Munchel* says there's no evidence that he would do that.  He

18   does have this mental health history and it does worry me,

19   and I take any conditions I set for him into account.  His

20   additional Facebook posts concern me.

21       So I'm going to find that he is not posing a

22   threat by clear and convincing evidence at this time or a

23   danger to the community should he be released based upon his

24   record and his history at this time.

25       I am going to order him to be released subject to

1    high-intensity supervision at his home.  His mother as a

2    third-party custodian has to be responsible for him and

3    report to the Court if there's any breach of any of his

4    requirements.

5         And I was concerned because there was some

6    indication I saw in the Pretrial Services report that in

7    Carthage, Texas, they may not have GPS.  I'll look into

8    that.  But that remains to be seen.  I would want a GPS or,

9    in any event, an electronic bracelet on Mr. Harkrider,

10   because I think it's the only way to assure where he is and

11   what he is doing.

12        He'll have to report originally daily to Pretrial

13   Services.  He can call in to make sure; and later, if he has

14   obeyed the conditions, we can lift that to weekly.  I want

15   to make sure that Pretrial Services stays in touch with him

16   on a regular basis and confirms what he is doing.  I want to

17   be sure that he does not come back to the Capitol or go to

18   any other political rally of any type during the term of his

19   bond.  And the only time he can come back to Washington, DC,

20   is for any court hearings or appearances.

21        I want to make sure you stay out of your social

22   Internet media on discussions of issues involving the riot

23   and the factors leading to the riot and your involvement.

24   You're not to contact anybody that's been in the -- that you

25   know was at the riot with you, which would include

1    Mr. Nichols, after your release, or others.  I want you to

2    get removed as far as possible from the influences and the

3    people that you dealt with that encouraged you to go into

4    Washington to engage in violence, because you came up here

5    not as a peaceful protester, which bothers me deeply.  You

6    came up here to have fights and hurt people.

7           I can't find the Government's shown that that was

8    to interrupt Congress's legitimate function of approving the

9    electors for the presidential election.

10          I think you came up here to hurt other people

11   if you could, whether you were attacked or whether you

12   wanted to attack other people.  And your actions the night

13   before the riot indicate that.  That troubles me.  But I

14   think you've seen what jail is like.

15          And the additional factor I'm considering in your

16   case is because of your mental health situation, without

17   your service dog, leaving you locked up 23 hours a day in a

18   cell, where I can't give you a trial date -- I think these

19   long delays are getting into trials in all of our cases, but

20   particularly now in the riot case, which concerns the Court.

21   There is no suggestion in any case I've had yet that there

22   can be any guarantee of getting something set in the Court's

23   schedule of having trial throughout the summer.  We still

24   can't even get the Government to agree to set trial dates

25   because they don't know what will develop.

1    So for those reasons, I am going to allow the

2    Defendant out on a highly supervised bond.  It's

3    high-intensity supervision.

4    It has a lot of requirements to it, Mr. Harkrider.

5    And if you fail to meet those requirements, you will be

6    rearrested and placed in detention awaiting trial, no matter

7    how long it takes to get to trial.

8    All right.  The Court is going to have his

9    counsel, along with the Government, talk to Mr. Smith and

10   get the order for his release together and submit it to me

11   and I'll sign it.  So it'll be a day or two before

12   Mr. Harkrider will be considered for his release until we

13   have that information.

14   But that'll be the bench opinion of the Court in

15   the matter.

16   (Conclusion of excerpt.)

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8                    Please note:  This hearing occurred

9    during the COVID-19 pandemic and is therefore subject to the

10   technological limitations of reporting remotely.

11

12                   Dated this 3rd day of May, 2021.

13

14                   /s/ Lisa Edwards, RDR, CRR
                     Official Court Reporter
15                   United States District Court for the
                       District of Columbia
16                   333 Constitution Avenue, NW, Room 6706
                     Washington, DC 20001
17                   (202) 354-3269

18

19

20

21

22

23

24

25