UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**EDWARD JACOB LANG,**<br><br>Defendant. | Case No. 1:21-cr-00053-CJN |

**FURTHER SUPPLEMENT TO THE UNITED STATES'
OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANT
LANG'S MOTION TO RENEW AND RECONSIDER HIS
REQUEST FOR IMMEDIATE TEMPORARY RELEASE
AND SUPPLEMENTAL BOND APPLICATION**

The United States of America, through undersigned counsel, respectfully further supplements its Omnibus Response, ECF 127, and its Supplement Response, ECF 129, all in Opposition to Defendant Lang's Motion to Renew and Reconsider His Request for Immediate Temporary Release, ECF 125, his Supplemental Bond Application, ECF 126, his Response to Government's Supplement in Opposition, ECF 130, and his Supplement to his Motion, ECF 132, as follows. In particular, this supplement (1) responds to the Court's question during the hearing held on May 23, 2024 concerning MDC-Brooklyn's capacity for allowing the defendant access to a laptop computer while detained, (2) provides additional information responsive to claims made by the defendant in his May 20 Supplement, ECF 132, that he was held in "solitary confinement" after he being charged "without proper cause" for an institutional infraction, and (3) and identifies additional social media posts published by the defendant since the hearing that further demonstrate his unsuitability for release. Respectfully, his pending motion is without merit and should be denied.

I. The Defendant's Failure to Utilize Available Means to Review Discovery at MDC-Brooklyn Undermines His Claimed Need for Special Accommodations.

At the hearing on May 23, 2024, this Court sought additional information about the defendant's ability to access a laptop computer with software for editing videos as part of his review of discovery while detained at MDC-Brooklyn. The United States can address the Court's specific question, but maintains that existing resources at MDC-Brooklyn are adequate for discovery review and that Lang has failed to provide sufficient reason for access to a laptop provided with special software.

Detainees at MDC-Brooklyn typically reside in general population housing units. Within such housing, inmates have access to desktop computers that are set aside specifically for reviewing discovery seven days a week, from approximately 8:00 a.m. through 7:00 p.m. Those computers do not have access to the internet. If necessary, inmates can also access their discovery at another housing unit at MDC-Brooklyn that contains an additional six computers designated for use by inmates to review discovery materials. While these computers do not have video editing software installed, they can be utilized with external hard drives containing case specific discovery to review video evidence particular to the defendant's case. Furthermore, within the housing unit, inmates have access to yet another computer from which they can send emails and conduct legal research.

In a limited number of cases, and pursuant to a court order, counsel for detainees at MDC-Brooklyn have procured air-gapped[1] laptop computers for defendants. MDC-Brooklyn requires

---

[1] One meaning for air-gapped is "An interface between two systems at which (a) they are not connected physically and (b) any logical connection is not automated (i.e., data is transferred through the interface only manually, under human control." *See* https://csrc.nist.gov/glossary/term/air_gap (last checked June 7, 2024). In practice, the laptop provided to MDC-Brooklyn would not be accepted unless it were unable to access the internet, Wi-Fi, Bluetooth, or other means of connecting with the outside world.

2

that defense counsel provide the laptop to the U.S. Attorney's Office for inspection. Any software installed on the laptop that utilizes network-related capabilities or requires access to the internet or other devices (potentially including video editing software) must be disabled in order to ensure that the laptop would not have access the internet. After examination, the U.S. Attorney's Office sends the laptop to MDC-Brooklyn. Once received, a detainee's record is updated to reflect that a laptop has been received for his use. Such laptops are stored in a filing cabinet in the Officer's station in the "Visiting Room" (that is, not in the detainee's housing unit or cell), and detainees can access the laptop there Monday through Friday from 8:00 a.m. to 3:00 p.m. If defendant's discovery does not fit on the laptop's hard drive, the inmate can use the laptop as a means to access discovery on an external hard drive (just as he would with the computers now available to the defendant within the housing unit).

It remains the government's position that the access to computers for both discovery review purposes and conducting legal research now generally available to Lang and all other detainees at MDC-Brooklyn are wholly sufficient to permit the defendant to prepare for trial in September. Despite this Court's specific inquiries, Lang has failed to articulate any rationale for why the computers available to him now at MDC-Brooklyn are insufficient and why he requires special accommodation in order to review his discovery. Lang's motion papers do not claim, let alone argue, that he has even tried to review his discovery or conduct legal research by means of the computers available to him now at MDC-Brooklyn; indeed, it appears Lang has not even directed his attorneys to retrieve the discovery that he gave to an inmate at the D.C. Jail more than three months ago. *See* ECF Dkt. 129 at 2-5 and Dkt. 129-1 (Declaration) ¶5. Furthermore, the housing unit computers are available seven days a week for most of the day, while access to any laptop would be limited to Monday through Friday, 8:00 a.m. to 3:00 p.m.; that is, Lang has greater access

3

to computers with which to review his discovery now than he would if a laptop were procured for him. And while Lang will no doubt argue that he should be entitled to keep any such laptop in his cell, his treatment and surreptitious disposal of the last laptop entrusted to his care fatally undermines any such claim.

Likewise, even if Lang were to claim that his time with the housing unit computers is insufficient for discovery purposes, any such claim would ring hollow in light of any failure to retrieve the discovery the D.C. jail recovered and has made available to defense counsel, and in light of the availability of a separate housing unit with additional computers. Such a claim would also contradict Lang's recent statements concerning his extensive use of computers for non-discovery purposes. *See* TGS/with George Interview with Jake Lang (April 9, 2024 at 08:03-08:26), *available at* https://rumble.com/v4ofuu6-january-6th-prisoner-jake-lang-comes-clean-tgs-w-jake-lang.html (last checked June 5, 2024) ("I've done probably 700 podcasts and interviews and what not, and so we just make it work, sometimes I don't have as great access, right now I have better access, there's pretty much, um, instantaneous ability to email back and forth here, where I'm at, so and I can answer all my messages, I'm on the computer most of the day."). Finally, while Lang claimed at the hearing to need access to video editing software in order to highlight parts of discovery videos, he has failed to offer any explanation for why he cannot email directions to his multiple retained attorneys to make the same edits. Indeed, since at least one of his attorneys has his primary office in New York City, such edited videos can then be shown to Lang during attorney visits. Lang's insistence on needing a laptop in order to prepare for trial is an entirely pretextual "problem" designed to support his preferred "solution" of release from detention, and is, in any event, without merit. Without such software, Lang has taken credit for production of two films about the January 6 attack on the Capitol, and his films include video clips from police body-

4

worn camera and other sources. He has failed to explain why, if he can edit or work with others to edit, video for a movie, a laptop and special software is needed for him to do the same in his own case while working with his defense team.

Lang has also not identified a specific software program that he wants to employ. Unless Lang can identify an editing program that will function in the way that he wishes without access to the internet, this Court should decline to order provision of a laptop for his use. The laptop will not be acceptable for security reasons if it has access to the internet. If Lang cannot specify software that will function without an internet connection, any laptop he might receive will not differ in any way that matters from computers already available for his use at MDC-Brooklyn, and he will have less access to the laptop than to the computers currently available in his housing unit.

II.     Lang's Claims Regarding His Institutional Infractions Are False.

Lang's supplemental motion insists that he was "charged, without proper cause, with an institutional infraction . . . [and t]he charge was later dismissed and he was returned to general population on April 22, 2024." ECF 132 at 1. This appears to refer to an incident in which the BOP determined that Lang was participating in a live interview[2] for more than an hour on April 9, 2024, and then conducted a search of Lang's cell and found a contraband cellular telephone. Lang admitted ownership of the cellular telephone. Although Lang did receive an incident report concerning the contraband phone, he is correct that the incident was eventually expunged due to an administrative technicality.

However, as the attached disciplinary reports document, *see* Exhibit 1, that was not Lang's only infraction at MDC-Brooklyn. Indeed, his records shows that Lang was sanctioned three

---

[2] Evidently the same interview described above, *available at* https://rumble.com/v4ofuu6-january-6th-prisoner-jake-lang-comes-clean-tgs-w-jake-lang.html.

additional times in April: twice for using a phone to circumvent the Trufone system, and once for destroying, altering, or damaging property over $100. *See* Exhibits 2 and 3. Specifically, on two separate occasions on April 10, 2024, Lang purportedly made a call to "Troy Smocks" but was in fact calling his girlfriend Rachel Myers.³ During the first call, Lang asked Myers to record the call, and proceeded to provide a voluminous stream of instructions related to his various businesses, "including social media postings, attempts to drive donations to his various GiveSendGo accounts, and employee pay." Exhibit 2 at 1. During the second call, Lang improperly directed Myers to place a third-party call to Hoang Quan,⁴ believed by BOP to be one of Lang's employees, and provided further instructions related to his businesses. *Id.* Lang's conduct was discovered on April 25, 2024. *Id.* As a result of that conduct, Lang was cited twice for committing prohibited acts, namely, the "use of the telephone for an illegal purpose or to commit or further a Greatest category prohibited act."⁵ At the DHO hearing on May 14, 2024, Lang acknowledged receiving a copy of the incident report. *Id.* at 6. The DHO determined that Lang was guilty of violating High Severity Level Prohibited Act 297 ("Use of the telephone for abuses other than illegal activity which circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called, or to commit or further a High category prohibited act.").⁶ Exhibit 2 at 6-7. The

---

³ Rachel Myers was also present at the siege of the U.S. Capitol on January 6, 2021, and pleaded guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) in November 2022. *United States v. Myers*, 22-cr-074 (JMC).

⁴ When Lang was detained at FCI Lewisburg, he abused his access to video-teleconferencing provided to confer with counsel by conferencing instead with an individual named Hoang Quan, who appears to be the same individual identified on the call described above. *See* ECF 92-1 (Declaration).

⁵ *See* Inmate Discipline Program, *available at* https://www.bop.gov/policy/progstat/5270_009_cn_1.pdf, p. 45-46 ("Greatest Severity Level Prohibited Act . . . 197 Use of the telephone for an illegal purpose or to commit or further a Greatest category prohibited act").

⁶ *See* Inmate Discipline Program, *available at* https://www.bop.gov/policy/progstat/5270_009_cn_1.pdf, Act 297 at p. 49.

DHO further observed that Lang was "unwilling to accept responsibility for the charge (297)," *id.* at 8, and explained that, "[b]y violating the rules and regulations of the institution the actions of an inmate, to circumvent the inmate telephone system seriously threatens the health, safety, and welfare of not only the inmate involved, but of all persons, whether that is another inmate or any other person involved in the act." *Id.* at 8-9. As a result of the infraction, Lang was sanctioned. *Id.* at 8; *see also* Ex. 1.

Then, on April 12, 2024, Lang was found to have destroyed property within his cell, including his mattress, a shower curtain, a towel, and a blanket. Exhibit 3 at 1-2. At the time, Lang and another detainee were housed together in the same cell in the West Special Housing Unit (namely, Range 4 cell 107). During a search of the cell, staff determined that Lang and his cellmate had destroyed their mattresses. *Id.* at 4. Lang was cited for destroying government property valued at over $100.[7] At the DHO hearing on April 16, 2024, Lang acknowledged receiving a copy of the incident report. *Id.* at 6. The DHO determined that Lang was guilty of violating the charged Act. *Id.* Again, Lang was sanctioned for his conduct. *Id.* at 8; *see also* Ex. 1.

In both instances, Lang was provided with copies of the relevant incident reports. In both instances, Lang was adjudicated guilty based on the weight of evidence at a DHO Hearing. And in both instances, the DHO issued sanctions against Lang designed to deter future misconduct. Nonetheless, in his supplemental motion filed on May 20, 2024, Lang omits any reference to disciplinary infractions, but misleadingly suggests that he was placed in the Special Housing Unit (SHU) without any legitimate basis. He also misleadingly argues, at considerable length, that being placed in the SHU constitutes "solitary confinement" and compares his experience to that of

---

[7] *Id.* at p. 48 ("218 Destroying, altering, or damaging government property, or the property of another person, having a value in excess of $100.00, or destroying, altering, damaging life-safety devices (e.g., fire alarm) regardless of financial value.").

Nelson Mandela. *See* ECF 132 at 1-3. Lang's supplemental motion likewise omits any reference to his cellmate while in SHU, a fact inconsistent with his claims of being held in solitary confinement. *See* Exhibit 3 at 1, 4, and 7. Lang's claims to have been unjustly placed in "solitary confinement" are false; rather, Lang was housed in SHU as a result of his repeated and documented disciplinary infractions. His placement in SHU was not "solitary" and it was legitimately based on his violations.

Once again, Lang appears to have provided materially false information to the Court. This Court should decline to credit such claims as a basis for release or any other relief; indeed, Lang's lack of candor generally and in particular to this Court undermines any argument that Lang is an appropriate candidate for release. *See* 18 U.S.C. 3142(g)(3)(A) (directing consideration of the person's character when assessing whether release conditions can assure the person's appearance or the safety of the community); *see* ECF 129 at 6-7 (collecting cases). Furthermore, Lang's unwillingness to abide by rules and regulations while detained offers still more reason to be skeptical of his claim that he will adhere to the orders of this Court if he were released from detention.

The United States respectfully submits that Lang's continuing lack of candor to the Court and inability to abide by rules and regulations provides reason enough to deny his motion for release.

III.  Lang's Social Media Postings Since the Hearing Further Demonstrate that He Remains a Danger to the Community and Merit His Continued Detention.

Finally, since the hearing on May 23 at which Lang sought to convince the Court that he would not pose a threat to the community if released, Lang has posted the following messages on social media:



Image 1: Screenshot of May 27 Tweet Stating: "Your Ancestors didn't die for your freedoms. They killed for them. Remember that."



Image 2: June 3 X/Twitter Post Advertisement for North Carolina State NAPALM Militia



Image 3: June 3 X/Twitter Post Announcing Formation of the North American Patriot and Liberty Militia (NAPALM)



Image 4: June 4 X/Twitter Advertisement for the NAPALMUSA.Com



Image 5: June 5 X/Twitter Post in which Lang Refers to Himself as the Chairman of the North American Patriot and Liberty Militia (NAPALM).

Since January 6, 2021, Lang has worked to form an armed militia, and has repeatedly used his social media posts to advocate for and justify future violence ("Your Ancestors didn't die for your freedoms. They killed for them. Remember that."). Indeed, the recruitment webpage for his armed militia specifically seeks to distinguish Lang's militia from other groups that are content to simply talk on social media: "Courage: In a generation of social media activists and online influencers, we are distinguished: We are prepared for any real time scenarios." *See* https://www.napalmusa.com (last checked June 7, 2024). Lang's latest attempt to create an armed militia (which he claims has thousands of members) and his numerous social media posts once again demonstrate that nothing short of detention will ensure the safety of the community. All 50 states prohibit private, unauthorized militias and military units from engaging in activities reserved for the state militia. *See, e.g.,* State Fact Sheets, available at

13

https://www.law.georgetown.edu/icap/our-work/addressing-political-violence-unlawful-paramilitaries-and-threats-to-democracy/state-fact-sheets/ (last checked June 6, 2024). Contrary to what Lang's social media implies, the Second Amendment does not "prevent the prohibition of private paramilitary organizations." *E.g., District of Columbia v. Heller*, 554 U.S. 570, 261 (2008) (citing *Presser v. Illinois*, 116 U.S. 252 (1886)). Lang's recruitment for unsanctioned, armed, private militias preparing for "any real time scenarios" coupled with his endorsements of violence provide reason enough to deny his motion for release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


/s/ *Karen Rochlin*
KAREN ROCHLIN
DC Bar No. 394447
Assistant United States Attorney Detailee
U.S. Attorney's Office
Southern District of Florida
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov

Craig Estes
Assistant U.S. Attorney Detailee
John Joseph Moakley Federal Courthouse
1 Courthouse Way
Boston, MA 02210
(617) 748-3100
Email: craig.estes@usdoj.gov